IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

*F I L E D*

*APR 16 2008*

*MICHAEL W. DOBBINS*
*CLERK, U.S. DISTRICT COURT*

| | |
|---|---|
| In re:<br><br>SENTINEL MANAGEMENT GROUP, INC.,<br><br>　　　　　　　　　Debtor. | CHAPTER 11<br><br>CASE NO. 07 B 14987<br><br>Hon. John H. Squires |

**08CV2205**
**JUDGE ZAGEL**
**MAG. JUDGE SCHENKIER**

| | |
|---|---|
| FREDERICK J. GREDE, as Chapter 11 Trustee for Sentinel Management Group, Inc.,<br><br>　　　　　　　　　Plaintiff,<br><br>　　　v.<br><br>MCGLADREY & PULLEN LLP and G. VICTOR JOHNSON,<br><br>　　　　　　　　　Defendants. | DIST. COURT NO. _____<br><br>ADV. NO. 08-00167<br><br>JURY TRIAL DEMANDED |

### DEFENDANTS MCGLADREY & PULLEN LLP AND G. VICTOR JOHNSON'S MOTION TO WITHDRAW THE REFERENCE

McGladrey & Pullen LLP and G. Victor Johnson, defendants in the above-captioned

adversary proceeding, hereby move the District Court, pursuant to 28 U.S.C. § 157(d) and Fed.

R. Bankr. P. 5011(a), for entry of an order withdrawing the reference to the Bankruptcy Court of

the adversary proceeding, and, in support thereof, respectfully state as follows:

　　　　1.　　　Withdrawal of the reference of this accounting malpractice and breach of

fiduciary duty action is warranted for several independent reasons. First, Defendants McGladrey

& Pullen LLP and G. Victor Johnson are exercising their Seventh Amendment right to a trial by

jury and do not consent to a jury trial in the Bankruptcy Court.

2.    Second, withdrawal of the reference is mandated because this action will require the Court to undertake "significant open and unresolved issues" regarding non-bankruptcy federal statutes.

3.    Even if withdrawal of the reference were not required, it still would be proper. The factors relied upon in assessing permissive withdrawal for cause, including the critical and undisputed fact that the claims lodged against Defendants are "non-core," direct withdrawal of the reference.

4.    In further support of this Motion, Defendants have filed a Memorandum in Support of Motion to Withdraw the Reference contemporaneously herewith.

WHEREFORE, Defendants McGladrey & Pullen LLP and G. Victor Johnson respectfully request that the Court enter an Order withdrawing the reference with respect to the above-captioned adversary proceeding and granting such other or further relief as the Court deems just or appropriate.

Dated: April 16, 2008                        Respectfully submitted,

                                            MCGUIREWOODS, LLP


                                    By:    /s/ Michael M. Schmahl
                                           Richard J. Mason (ARDC #1787659)
                                           Patricia K. Smoots (ARDC #6194076)
                                           Michael M. Schmahl (ARDC #06275860)
                                           McGuireWoods LLP
                                           77 W. Wacker Drive, Suite 4400
                                           Chicago, Illinois 60601
                                           Tel: 312.849-8100

                                           and

*Of Counsel*
Steven M. Farina
Thomas H. L. Selby
WILLIAMS & CONNOLLY LLP
725 12th Street, N.W.
Washington, D.C. 20005
Phone: (202) 434-5526
Facsimile: (202) 434-5029

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

*F I L E D*

*APR 1 6 2008*

*MICHAEL W. DOBBINS*
*CLERK, U.S. DISTRICT COURT*

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | |
| SENTINEL MANAGEMENT GROUP, INC. ) | Case No. 07 B 14987 |
| ) | |
| Debtor ) | Hon. John H. Squires |
| _____ ) | |
| FREDERICK J. GREDE, as Chapter 11 Trustee for ) | |
| Sentinel Management Group, Inc. ) | DIST COURT NO. _____ |
| ) | |
| Plaintiff, ) | Adv. No. 08 A 00167 |
| ) | |
| v. ) | **JURY TRIAL DEMANDED** |
| ) | |
| MCGLADREY & PULLEN LLP and ) | |
| G. VICTOR JOHNSON, ) | |
| ) | |
| Defendants. ) | |

## NOTICE OF FILING

**PLEASE TAKE NOTICE** that on **Wednesday, April 16, 2008,** the undersigned caused **Defendant's McGladrey & Pullen LLP and G. Victor Johnson's Motion to Withdraw the Reference** to be filed with the Clerk of the United States Bankruptcy Court for the Northern District of Illinois, a copy of which is attached hereto and herewith served upon you.

Dated:  April 16, 2008

McGladrey & Pullen, LLP and
G. Victor Johnson

By:/s/  Michael M. Schmahl_____
One of his Attorneys

Richard J. Mason, P.C. (ARDC #01787659)
John F. Pollick (ARDC # 03128122)
Michael M. Schmahl (ARDC #06275860)
McGuireWoods LLP
77 West Wacker Drive, Suite # 4100
Chicago, Illinois  60601-1815
(312) 849-8100
Attorneys for McGladrey & Pullen, LLP and
G. Victor Johnson

\5300069.1

The Undersigned, an attorney, hereby certifies that he caused a copy of this Notice of Filing and the **Defendant's McGladrey & Pullen LLP and G. Victor Johnson's Motion to Withdraw the Reference** to be served on the parties listed below by depositing the same in the U.S. mail, proper postage prepaid, on this 16th day of April, 2008.

/s/ Michael M. Schmahl

\5300069.1

## SERVICE LIST

Catherine L. Steege, Esq.
Jenner & Block LLP
330 N. Wabash Avenue
Chicago, IL 60611
FAX: 312/527-0484
E-Mail: csteege@jenner.com

Chris C. Gair
Jenner & Block LLP
330 N. Wabash Avenue
Chicago, IL 60611
FAX: 312/527-0484
E-Mail: cgair@jenner.com

J. Kevin McCall
Jenner & Block LLP
330 N. Wabash Avenue
Chicago, IL 60611
FAX: 312/527-0484
E-Mail: jmccall@jenner.com

Vincent E. Lazar
Jenner & Block LLP
330 N. Wabash Avenue
Chicago, IL 60611
FAX: 312/840-7389
E-Mail: vlazar@jenner.com

Office of the U.S. Trustee
219 South Dearborn Street
Suite 873
Chicago, IL 60604
FAX: 312/886-5794

U S Bankruptcy Court - Northern District of Illinois

KENNETH S. GARDNER, CLERK

# F I L E D

APR 1 6 2008  T C

Date _____April 17, 2008_____

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

United States District Court
Northern District of Illinois
Chicago, IL 60604

## 08CV2205
## JUDGE ZAGEL
## MAG. JUDGE SCHENKIER

Re:    Case Number _____08-00167_____

Case Name    **Frederick J Grede Trustee vs. McGladrey & Pullen LLP**

Bankruptcy Judge    **Squires**

To Whom It May Concern:

Pursuant to Rule 5011 of the Federal Rules of Bankruptcy Procedure, transmitted herewith is the Motion for Withdrawal of Reference.

Filed By:    **Michael M Schmahl**

Previous District Court Judge (when applicable): _____

Previous Civil Case Number (when applicable): _____

KENNETH S. GARDNER, CLERK

By: _____
    Deputy Clerk  -    **Claudia E Cabrales Team D** 4/17/08

cc:    Bankruptcy Judge & Party Who Filed Motion for Withdrawal of Reference

# U.S. Bankruptcy Court
## Northern District of Illinois (Chicago)
## Adversary Proceeding #: 08-00167
### Internal Use Only

*Assigned to:* Honorable Judge John H. Squires
*Related BK Case:* 07-14987
*Related BK Title:* Sentinel Management Group, Inc.
*Related BK Chapter:* 11
*Demand:*
*Nature[s] of Suit:*   14 Recovery of money/property other

*Date Filed:* 03/20/08

**08CV2205**
**JUDGE ZAGEL**
**MAG. JUDGE SCHENKIER**

## Plaintiff

**Frederick J Grede,** *as Chapter 11 Trustee for Sentinel Management Group Inc*

represented by **Catherine L Steege, ESQ**
Jenner & Block LLP
330 N. Wabash Avenue
Chicago, IL 60611
312 222-9350
Fax : 312 527-0484
Email: csteege@jenner.com
*LEAD ATTORNEY*

**Chris C. Gair**
Jenner & Block LLP
330 N. Wabash Avenue
Chicago, IL 60611
312-222-9350
Fax : 312-527-0484
Email: cgair@jenner.com
*LEAD ATTORNEY*

**J. Kevin McCall**
Jenner & Block
330 N. Wabash Avenue
Chicago, IL 60611
(312) 222-9350
Fax : (312) 547-0484
Email: jmccall@jenner.com
*LEAD ATTORNEY*

**Vincent E. Lazar**



This is to certify that the within and attached document is a full, true and correct copy of the original thereof as the same appears on file in the office of the Clerk of the United States Bankruptcy Court for the Northern District of Illinois.
KENNETH S. GARDNER
CLERK OF COURT
By _____
Deputy Clerk
Dated _____

Jenner & Block LLP
330 North Wabash Avenue
Chicago, IL 60611
312 923-2989
Fax : 312 840-7389
Email: vlazar@jenner.com

V.

**Defendant**
------------------------

**McGladrey & Pullen LLP**          represented by **Michael M Schmahl**
McGuireWoods LLP
77 West Wacker Drive
Suite 4100
Chicago, IL 60601
312 750-3881
Fax : 312 920-6598
Email:
mschmahl@mcguirewoods.com

**Patricia K. Smoots**
McGuireWoods LLP
77 West Wacker Drive
Suite 4100
Chicago, IL 60601
312 750-2759
Fax : 312 920-6169
Email:
psmoots@mcguirewoods.com

**Richard J Mason**
McGuire Woods, LLP
77 West Wacker Drive Suite 4100
Chicago, IL 60601
312 750-3527
Fax : 312 849-3690
Email:
rmason@mcguirewoods.com

**G. Victor Johnson**          represented by **Michael M Schmahl**
(See above for address)

**Patricia K. Smoots**
(See above for address)

**Richard J Mason**

(See above for address)

| Filing Date | # | Docket Text |
|---|---|---|
| 03/20/2008 | ●1 | Adversary case 08-00167. (14 (Recovery of money/property - other)): Complaint by Frederick J. Grede, as Chapter 11 Trustee for Sentinel Management Group, Inc. against McGladrey & Pullen LLP, G. Victor Johnson. Fee Amount $250. Status hearing to be held on 4/28/2008 at 10:00 AM at 219 South Dearborn, Courtroom 680, Chicago, Illinois 60604. (Lazar, Vincent) (Entered: 03/20/2008) |
| 03/20/2008 | ●2 | Summons Link Summons Issued on McGladrey & Pullen LLP Answer Due 04/21/2008; G. Victor Johnson Answer Due 04/21/2008 (Lazar, Vincent) (Entered: 03/20/2008) |
| 03/20/2008 | 3 | Receipt of Complaint(08-00167) [cmp,cmp] ( 250.00) Filing Fee. Receipt number 8510040. Fee Amount $ 250.00 (U.S. Treasury) (Entered: 03/20/2008) |
| 03/24/2008 | ●4 | Summons Service Executed on McGladrey & Pullen LLP 3/20/2008 (RE: [2] Summons Issued). (Childers, Christine) (Entered: 03/24/2008) |
| 03/24/2008 | ●5 | Summons Service Executed on G. Victor Johnson 3/20/2008 (RE: [2] Summons Issued). (Childers, Christine) (Entered: 03/24/2008) |
| 04/16/2008 | ●6 | Jury Demand Filed by Michael M Schmahl on behalf of G. Victor Johnson, McGladrey & Pullen LLP. (Schmahl, Michael) (Entered: 04/16/2008) |
| 04/16/2008 | ●7 | Notice of Filing Demand for Jury Trial Filed by Michael M Schmahl on behalf of G. Victor Johnson, McGladrey & Pullen LLP (RE: 6 Jury Demand). (Schmahl, Michael) (Entered: 04/16/2008) |
| 04/16/2008 | ●8 | Motion for Withdrawal of Reference. Fee Amount $150 Filed by Michael M Schmahl on behalf of G. Victor Johnson, McGladrey & Pullen LLP. (Attachments: # 1 Exhibit District Court Civil Cover Sheet) (Schmahl, |

| | | |
|---|---|---|
| | | Michael) (Entered: 04/16/2008) |
| 04/16/2008 | ●9 | Notice of Filing Notice of Filing Defendant's McGladrey & Pullen LLP and G. Victor Johnson's Motion to Withdraw the Reference Filed by Michael M Schmahl on behalf of G. Victor Johnson, McGladrey & Pullen LLP (RE: 8 Motion for Withdrawal of Reference). (Schmahl, Michael) (Entered: 04/16/2008) |
| 04/16/2008 | ●10 | Memorandum in Support In Support of Motion to Withdraw the Reference Filed by Michael M Schmahl on behalf of G. Victor Johnson, McGladrey & Pullen LLP (RE: 8 Motion for Withdrawal of Reference). (Attachments: # 1 Exhibit A# 2 Exhibit B) (Schmahl, Michael) (Entered: 04/16/2008) |
| 04/16/2008 | ●11 | Notice of Filing of Filing Defendant's McGladrey & Pullen LLP and G. Victor Johnson's Memorandum in Support of Motion to Withdraw the Reference Filed by Michael M Schmahl on behalf of G. Victor Johnson, McGladrey & Pullen LLP (RE: 10 Memorandum, ). (Schmahl, Michael) (Entered: 04/16/2008) |
| 04/16/2008 | 12 | Receipt of Motion for Withdrawal of Reference(08-00167) [motion,mwdref] ( 150.00) Filing Fee. Receipt number 8652880. Fee Amount $ 150.00 (U.S. Treasury) (Entered: 04/16/2008) |
| 04/16/2008 | ●13 | Appearance Filed by Michael M Schmahl on behalf of G. Victor Johnson, McGladrey & Pullen LLP. (Schmahl, Michael) (Entered: 04/16/2008) |
| 04/16/2008 | ●14 | Appearance Filed by Richard J Mason on behalf of G. Victor Johnson, McGladrey & Pullen LLP. (Mason, Richard) (Entered: 04/16/2008) |
| 04/16/2008 | ●15 | Appearance Filed by Patricia K. Smoots on behalf of G. Victor Johnson, McGladrey & Pullen LLP. (Smoots, Patricia) (Entered: 04/16/2008) |

Case 1:08-cv-02205    Document 1-2    Filed 04/16/2008    Page 6 of 12

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re: | CHAPTER 11 |
| SENTINEL MANAGEMENT GROUP, INC., | CASE NO. 07 B 14987 |
| Debtor. | Hon. John H. Squires |
| | **08CV2205** **JUDGE ZAGEL** **MAG. JUDGE SCHENKIER** |
| FREDERICK J. GREDE, as Chapter 11 Trustee for Sentinel Management Group, Inc., | DIST. COURT NO. _____ |
| Plaintiff, | ADV. NO. 08-00167 |
| v. | JURY TRIAL DEMANDED |
| MCGLADREY & PULLEN LLP and G. VICTOR JOHNSON, | |
| Defendants. | |

DEFENDANTS MCGLADREY & PULLEN LLP AND
G. VICTOR JOHNSON'S MEMORANDUM IN SUPPORT OF
MOTION TO WITHDRAW THE REFERENCE

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND............................................................................................... 1

ARGUMENT ...................................................................................................................... 3

I.      WITHDRAWAL OF THE REFERENCE IS MANDATORY. ......................................... 3

      A.     The Seventh Amendment Requires Withdrawal of the Reference. ........................ 3

      B.     Withdrawal of the Reference is also Required Under Section 157(d). ................... 6

II.     PERMISSIVE WITHDRAWAL OF THE REFERENCE IS ALSO
WARRANTED. .................................................................................................................. 7

CONCLUSION ................................................................................................................... 9

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Coe-Truman Techs., Inc. v. United States Gov't (In re Coe-Truman Techs., Inc.)*, 214 B.R. 183, 187 (N.D. Ill. 1997) ................................................................................................8

*Complete Mgmt., Inc. v. Arthur Anderson LLP (In re Complete Mgmt.)*, 02-CV-1736, 2002 WL 31163878, at *3 (S.D.N.Y. Sept. 27, 2002) .................................................8

*Consol. Indus. Corp. v. Welbilt Holding Co.*, 254 B.R. 237, 241 (N.D. Ind. 2000) ......................6

*Crowell v. Benson*, 285 U.S. 22, 51 (1932) ..................................................................................4

*Diamond Mortg. Corp. of Ill. v. Sugar*, 913 F.2d 1233, 1239 (7th Cir. 1990) .................................8

*Feltner v. Columbia Pictures TV, Inc.*, 523 U.S. 340, 352 (1998) ...................................................5

*FMG, Inc. v. Dev. Corp. (In re FMG, Inc.)*, No. 91 C 6018, 1991 WL 230390 (N.D. Ill. Oct. 28, 1991) ......................................................................................................................8

*Good v. Kvaerner U.S. Inc.*, No. 1:03-cv-0476, 2003 WL 21755782, at *3–4 (S.D. Ind. July 25, 2003)......................................................................................................................5

*Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 42 (1989) ........................................................4, 5

*In the Matter of Lissner Corp.*, 115 B.R. 604, 612 (N.D. Ill. 1990) ...................................................7

*In re Baker & Getty Fin. Servs., Inc.*, 954 F.2d 1169, 1173 (6th Cir. 1992) ....................................3

*In re Clay*, 35 F.3d 190, 197–98 (5th Cir. 1994) ...........................................................................3

*In re Grabill Corp.*, 967 F.2d 1152, 1158 (7th Cir. 1992)............................................................3, 5

*In re K&R Express Sys., Inc.*, 382 B.R. 443, 448 (N.D. Ill. 2007) ..........................................4, 7, 8

*In re Kaiser Steel Corp.*, 911 F.2d 380, 392 (10th Cir. 1990) .........................................................3

*In re Leedy Mortg. Co.*, 62 B.R. 303, 306 (E.D. Pa. 1986) .................................................................8

*In re N.Y. City Shoes, Inc.*, 122 B.R. 668, 673 (E.D. Pa. 1990) ...................................................4, 8

*In re Novak*, 116 B.R. 626, 627 (N.D. Ill. 1990) ........................................................................3, 9

*In re United Mo. Bank of Kan. City, N.A.*, 901 F.2d 1449, 1457 (8th Cir. 1990)............................3

*In re Vicars Ins. Agency, Inc.*, 96 F.3d 949, 952 (7th Cir. 1996).....................................................6

*In re White Motor Corp.*, 42 B.R. 693, 699–701 (N.D. Ohio 1984) ...............................................6

*Keck v. Bowytz (In re Keck)*, No. 00 C 1761, 2001 WL 292559, at *2 (N.D. Ill. Mar. 19, 2001) ........................................................................................................................................4, 5

*Maxwell v. Leavelaw.com, Inc. (In re Marchfirst, Inc.)* No. 03-cv-4043, 2003 WL 22244982, at *1 (N.D. Ill. Sept. 22, 2003)...................................................................................5

*N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 71–72 (1982) ...........................5

*Official Committee of Unsecured Creditors of VWE Group, Inc. v. Amlicke (In re VWE Group, Inc.)*, 359 B.R. 441, 451(S.D.N.Y. 2007) ...................................................................9

*Ross v. Bernard,* 396 U.S. 531, 533 (1970) ................................................................................4, 5

*Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 593-94 (1985) ....................5

*United States v. Balistrieri*, 981 F.2d 916, 928 (7th Cir. 1992).......................................................5

## OTHER AUTHORITIES

28 U.S.C. § 157(c) ...............................................................................................................................9

28 U.S.C. § 157(d) .......................................................................................................................3, 6, 7

28 U.S.C. § 157(e) ...............................................................................................................................4

28 U.S.C. § 1334(b) ............................................................................................................................3

Commodity Exchange Act, 7 U.S.C. §§ 1–25 ....................................................................................6

Fed. R. Bankr. P. 9033(d) ...................................................................................................................9

Investment Advisers Act of 1940, 15 U.S.C. §§ 80b-1–80b-21 .........................................................6

N.D. Ill. R. 40.3.1................................................................................................................................3

## INTRODUCTION

In this accounting malpractice and breach of fiduciary duty action, the reference to the Bankruptcy Court should be withdrawn so that the case may proceed in the District Court. Withdrawal of the reference is required for two independent reasons. First, defendants McGladrey & Pullen LLP ("McGladrey") and G. Victor Johnson (together, "Defendants") are exercising their Seventh Amendment right to a trial by jury, and do not consent to a jury trial in the Bankruptcy Court. Second, withdrawal of the reference is mandated because this action will require the Court to undertake "significant open and unresolved issues" regarding non-bankruptcy federal statutes. Moreover, even if withdrawal of the reference were not required, it still would be proper. The factors relied upon in assessing permissive withdrawal for cause, including the critical and undisputed fact that the claims lodged against Defendants are "non-core," direct withdrawal of the reference. For these reasons, Defendants respectfully submit that the District Court should, pursuant to 28 U.S.C. § 157(d) and Fed. R. Bankr. P. 5011(a), withdraw the reference of this matter to Bankruptcy Court.

## FACTUAL BACKGROUND

This action is brought by the Trustee in Bankruptcy of Sentinel Management Group, Inc. ("Sentinel"), a former McGladrey audit client.[1] *See* Ex. A, Compl. ¶ 1. According to the Complaint, Sentinel was a special purpose futures commission merchant established under the Commodity Exchange Act. *See id.* ¶¶ 14, 15. Sentinel's business was to manage cash for various sophisticated clients, including hedge funds, futures commission merchants, financial

---

[1]    The Complaint alleges that Mr. Johnson oversaw the 2006 audit conducted by McGladrey, which is the audit that is the purported basis for the Trustee's claims. *See* Compl. ¶ 12.

institutions, pension plans, and others. *See id.* ¶ 28. The Trustee alleges that Sentinel improperly used customer funds to guarantee its own loans, siphoned off interest from customer investments to pay down Sentinel debts, and failed to properly report to the Commodities Futures Trading Commission and the Securities and Exchange Commission the true financial condition of the company. *See* Compl. ¶¶ 2, 40, 103. According to the Complaint, Sentinel engaged in a risky leveraging scheme that unraveled months after McGladrey conducted its audit. *See id.* ¶¶ 168–72.

The Trustee alleges two common law counts against Defendants: "negligence/malpractice" and "aiding and abetting . . . breach of fiduciary duty." *Id.* ¶¶ 173–84. In particular, the Trustee alleges that McGladrey's audit of Sentinel's financial statements for the year ended December 31, 2006, failed to uncover various violations of federal law (specifically, the Investment Advisers Act and the Commodity Exchange Act). *See id* ¶¶ 2, 175(i). According to the Complaint, these non-bankruptcy statutes imposed unique auditing and reporting obligations on McGladrey. *See id.* ¶¶ 2, 14–27. The Trustee also alleges that Sentinel knowingly misstated its financial statements, and that McGladrey "certified" these false statements. *See id.* ¶ 3(a).

The Trustee seeks money damages in the amount of $550,000,000. *See id.* ¶ 5. The Trustee concedes that this action "is a non-core proceeding." *Id.* ¶ 8. Although the Trustee did not demand a jury, Defendants are submitting herewith a Jury Demand. *See* Ex. B. Defendants have not yet filed an answer or dispositive motion in this proceeding, and have not filed a proof of claim, or taken any other action to consent to the jurisdiction of the Bankruptcy Court, or compromised in any way their right to a jury trial.

## ARGUMENT

Under 28 U.S.C. § 1334(b), the District Court has original jurisdiction over all civil proceedings arising under or related to cases under Title 11. As a default, the Northern District of Illinois refers all cases arising under or related to Title 11 to the bankruptcy courts. *See* N.D. Ill. R. 40.3.1. The District Court, however, can withdraw the reference. Specifically, 28 U.S.C. § 157(d) provides, in relevant part, that the

> district court may withdraw . . . any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown. The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

28 U.S.C. § 157(d).

Under this provision, withdrawal may be mandatory or permissive. Here withdrawal is mandatory, and there is also "cause" for permissive withdrawal.

## I. WITHDRAWAL OF THE REFERENCE IS MANDATORY.

### A. The Seventh Amendment Requires Withdrawal of the Reference.

Only the District Court may adjudicate the claims against Defendants because Defendants demand a jury trial and do not consent to the Bankruptcy Court's jurisdiction. Courts have uniformly held that the Seventh Amendment does not permit a Bankruptcy Court to conduct a jury trial absent all parties' consent. *See In re Grabill Corp.*, 967 F.2d 1152, 1158 (7th Cir. 1992); *In re Novak*, 116 B.R. 626, 627 (N.D. Ill. 1990); *accord, In re Clay*, 35 F.3d 190, 197–98 (5th Cir. 1994); *In re Baker & Getty Fin. Servs., Inc.*, 954 F.2d 1169, 1173 (6th Cir. 1992); *In re United Mo. Bank of Kan. City, N.A.*, 901 F.2d 1449, 1457 (8th Cir. 1990); *In re Kaiser Steel Corp.*, 911 F.2d 380, 392 (10th Cir. 1990). These limitations on the Bankruptcy Court's jurisdiction are imposed not only by the Constitution, but also by the Bankruptcy Code.

*See* 28 U.S.C. § 157(e) (2000) ("If the right to a jury trial applies, . . . the bankruptcy judge may conduct the jury trial . . . with the express consent of all the parties.").

The Supreme Court has established a three-part test to determine whether a claim is one in which a jury trial is afforded. First, the court must determine whether the action would historically have been brought in a court of law or a court of equity. *See Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 42 (1989). Second, the court must examine the remedy sought and determine whether it is legal or equitable in nature. *See id.* Finally, the court must determine whether the right at issue is a private right, that is, it involves "'the liability of one individual to another under the law as defined.'" *Id.* at 51 n.8 (quoting *Crowell v. Benson*, 285 U.S. 22, 51 (1932)). If it is a public right, that is, it involves disputes "'between the government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments,'" then a jury trial right does not attach. *Id.* (quoting *Crowell*, 285 U.S. at 50).

Defendants have a right to a jury trial. First, the Trustee's causes of action existed at common law. *See, e.g., Ross v. Bernhard*, 396 U.S. 531, 533 (1970) (actions for damages are "unmistakably actions at law triable to a jury"); *Keck v. Bowytz (In re Keck)*, No. 00 C 1761, 2001 WL 292559, at *2 (N.D. Ill. Mar. 19, 2001) ("action[s] for breach of contract, attorney malpractice, and negligence all existed at common law" and thus defendant had right to jury trial in non-core action); *In re K&R Express Sys., Inc.*, 382 B.R. 443, 448 (N.D. Ill. 2007) (breach of fiduciary duty existed at common law in court of equity and a right to jury trial attached because plaintiff sought legal damages); *see also In re N.Y. City Shoes, Inc.*, 122 B.R. 668, 673 (E.D. Pa. 1990) (claims against defendant accounting firm existed at common law and right to jury trial attached justifying withdrawal of bankruptcy reference).

4

Second, the remedy the Trustee seeks is plainly legal, not equitable: damages in the amount of $550,000,000. *See Feltner v. Columbia Pictures TV, Inc.*, 523 U.S. 340, 352 (1998) (damages are a legal remedy); *United States v. Balistrieri*, 981 F.2d 916, 928 (7th Cir. 1992) ("[T]his case involved an action for compensatory damages, for which a jury trial is proper."). It is, moreover, irrelevant that the action may be related to the bankruptcy, because "[d]espite the fact that the cause of action is in some way tangentially connected to the bankruptcy, the important factor is the nature of the issue to be tried and not the character of the overall action." *Keck*, 2001 WL 292559, at *2 (citing *Ross v. Bernhard*, 396 U.S. at 538).

Finally, this is not a case where a public right is at issue—the government is not a party—the dispute is between and among private parties.[2] Therefore, a jury right attaches. *See Granfinanciera*, 492 U.S. at 55; *see also N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 71–72 (1982) (debtor's right to recover contract damages to augment the estate is a private right).

Because Defendants are exercising their right to a jury trial, and do not consent to trial before the Bankruptcy Court, the trial may only be conducted in the District Court. *See In re Grabill Corp.*, 967 F.2d at 1158, *Maxwell v. Leavelaw.com, Inc. (In re Marchfirst, Inc.)* No. 03-cv-4043, 2003 WL 22244982, at *1 (N.D. Ill. Sept. 22, 2003); *Good v. Kvaerner U.S. Inc.*, No. 1:03-cv-0476, 2003 WL 21755782, at *3–4 (S.D. Ind. July 25, 2003); *Keck,*, 2001 WL

---

[2]  Nor do other factors put a public right at issue. For example, this is not a matter that is more appropriate for agency resolution: "The crucial question [for purposes of determining a public versus a private right], in cases not involving the Federal Government, is whether 'Congress, acting for a valid legislative purpose pursuant to its constitutional powers under Article I, [has] create[d] a seemingly "private" right that is so closely integrated into a public regulatory scheme as to be a matter appropriate for agency resolution with limited involvement by the Article III judiciary.'" *Granfinanciera*, 492 U.S. at 54 (alterations in original) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 593–94 (1985) (Brennan, J., concurring in judgment)).

292559, at *3; *Consol. Indus. Corp. v. Welbilt Holding Co.*, 254 B.R. 237, 241 (N.D. Ind. 2000).

**B.    Withdrawal of the Reference is also Required Under Section 157(d).**

By statute, withdrawal of the reference to the Bankruptcy Court also is mandatory when "the court determines that resolution of the proceeding requires consideration of both Title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." 28 U.S.C. § 157(d). Withdrawal is mandatory where the proceedings require "substantial and material consideration" of non-Title 11 federal law. *See In re Vicars Ins. Agency, Inc.*, 96 F.3d 949, 952 (7th Cir. 1996) (quotation marks omitted) (citing *In re White Motor Corp.*, 42 B.R. 693, 699–701 (N.D. Ohio 1984)). The Seventh Circuit has interpreted this to mean that where the non-Title 11 issues require the interpretation of the non-Title 11 statute, or when the court must undertake analysis of significant open and unresolved issues regarding the non-Title 11 law, the Court must withdraw the reference.[3] *See id.* at 954. The legal questions involved need not be of "cosmic proportions." *Id.* (quotation marks omitted).

Mandatory withdrawal under this provision applies here. The Trustee's claims will require the Court to undertake analysis of "significant open and unresolved issues" regarding the Investment Advisers Act of 1940, 15 U.S.C. §§ 80b-1–80b-21 and the Commodity Exchange Act, 7 U.S.C. §§ 1–25 ("CEA"). *See Vicars,* 96 F.3d at 954. The Trustee's Complaint is premised on Defendants' alleged failure to properly report Sentinel's alleged violations of these federal statutes and their regulatory counterparts. *See, e.g.,* Compl. ¶ 2 ("M&P ignored blatant violations of federal law."); ¶ 83 ("M&P had unequivocal evidence of a violation of the

---

[3]    Although not required to trigger mandatory withdrawal in the 7th Circuit, *see Vicars*, 96 F.3d at 954, disposition of this case will also require consideration of Title 11 issues, including whether, under the circumstances alleged, the bankruptcy trustee has proper standing to bring these claims, and whether the doctrine of *in pari delicto* bars a bankruptcy trustee from bringing these claims.

segregation requirements under the CEA and the Investment Advisers Act."); ¶ 43 ("It was M&P's duty to see that . . . [Sentinel's] violations of critical CFTC and SEC regulations were duly reported."); ¶ 70 ("M&P's conscious disregard of facts demonstrating violations of CFTC and SEC segregation regulations"). Furthermore, there is virtually no case law regarding how these federal laws and regulations apply to a special purpose futures commission merchant, such as Sentinel. The Trustee alleges that Sentinel's business was to manage cash for various sophisticated clients, including hedge funds, futures commission merchants, financial institutions, pension plans, and others. *See* Compl. ¶ 28. Although it was registered as a futures commission merchant, Sentinel did not engage in commodities trading, but instead managed investments in securities for its clients, according to the Complaint. *See id.* ¶ 29. Consequently, how these statutes apply to a special purpose futures commission merchant such as Sentinel will be a matter of first impression for the court, requiring substantial interpretation of non-Title 11 federal law. This exercise must be left to the District Court.

Accordingly, because the resolution of the dispute over the Trustee's claims will "require more than rote application" of the provisions of non-Title 11 federal law (specifically, the CEA and the Investment Advisers Act), *see In the Matter of Lissner Corp.*, 115 B.R. 604, 612 (N.D. Ill. 1990), withdrawal of the reference is required pursuant to § 157(d).

## II.    PERMISSIVE WITHDRAWAL OF THE REFERENCE IS ALSO WARRANTED.

Even were withdrawal not mandatory, 28 U.S.C. § 157(d) authorizes discretionary, or permissive, withdrawal, upon a showing of "cause." Among the factors considered in this Circuit for determining whether to apply permissive withdrawal, the most important is "whether a proceeding is core or non-core, as efficiency, uniformity and judicial economy concerns are largely subsumed within it." *K&R*, 382 B.R. at 446. Courts will also consider "judicial economy, promotion of uniformity and efficiency in bankruptcy

administration, reduction of forum shopping, delay and costs to the parties, [and] the particular court's familiarity with the case." *Coe-Truman Techs., Inc. v. United States Gov't (In re Coe-Truman Techs., Inc.)*, 214 B.R. 183, 187 (N.D. Ill. 1997). Here, these factors warrant permissive withdrawal of the reference.

First, there is no doubt that all claims here are non-core, as the Trustee has already admitted. *See* Compl. ¶ 8. Core proceedings are those that invoke substantive rights provided by Title 11 or those proceedings that could only arise in the context of a bankruptcy case. *See Diamond Mortg. Corp. of Ill. v. Sugar*, 913 F.2d 1233, 1239 (7th Cir. 1990). The Trustee asserts two claims here: negligence and aiding and abetting breach of fiduciary duty. *See* Compl. ¶¶ 174–84. Other district courts have routinely found similar actions to recover against accountants and auditors for pre-petition conduct, which these claims are, to be non-core, resulting in withdrawal of the reference. *See, e.g., Complete Mgmt., Inc. v. Arthur Anderson LLP (In re Complete Mgmt.)*, 02-CV-1736, 2002 WL 31163878, at *3 (S.D.N.Y. Sept. 27, 2002) (granting motion to withdraw the reference of non-core claims in favor of defendant accounting firm); *In re N.Y. City Shoes, Inc.*, 122 B.R. at 673 (granting motion to withdraw reference where defendants, an accounting firm accused of breach of contract for the pre-petition audits, demanded a jury trial for the non-core claims); *In re Leedy Mortg. Co.*, 62 B.R. 303, 306 (E.D. Pa. 1986) (granting motion to withdraw to reference where plaintiff alleged negligence and breach of contract against accounting firm). This factor, alone, is sufficient to support withdrawal of the reference. *See K&R*, 382 B.R. at 447 (whether claim is non-core is most important factor); *Coe-Truman Techs.*, 214 B.R. at 187 (citing *FMG, Inc. v. Dev. Corp. (In re FMG, Inc.)*, No. 91 C 6018, 1991 WL 230390 (N.D. Ill. Oct. 28, 1991) (holding the non-core nature of proceeding to be sufficient to support discretionary withdrawal)).

8

Although questions of uniformity and forum shopping are not implicated here, judicial economy strongly favors withdrawing the reference. When a proceeding is non-core, the Bankruptcy Court lacks jurisdiction to enter final orders, and the Bankruptcy Court's decision will be subject to *de novo* review in the District Court. *See* 28 U.S.C. § 157(c); Fed. R. Bankr. P. 9033(d). Withdrawal of the reference thus would eliminate one level of review and thereby promote judicial efficiency, avoid duplication of effort and reduce the attendant fees and costs for both parties. *Cf. Official Committee of Unsecured Creditors of VWE Group, Inc. v. Amlicke (In re VWE Group, Inc.)*, 359 B.R. 441, 451(S.D.N.Y. 2007) (withdrawing the reference in an attorney malpractice case, finding that withdrawal will "avoid the duplication of effort" and that "[s]ince the Bankruptcy Court's determination of this non-core claim would be subject to *de novo* review in the district court, unnecessary costs can be avoided by a single proceeding in this court"); *and see, In re Novak*, 116 B.R. at 627 ("[W]hen a party to a non-core proceeding stands on its right to trial by jury, and the parties do not consent to adjudication by the bankruptcy court, it is better for the court to withdraw the reference") (citation omitted). Under the circumstances present here, the applicable factors strongly favor immediate withdrawal of the reference.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the District Court immediately withdraw for all purposes the reference of this adversary proceeding to the Bankruptcy Court.

Dated: April 16, 2008

Respectfully submitted,

MCGUIREWOODS, LLP

By:  /s/ Michael M. Schmahl _____
     Richard J. Mason (ARDC #1787659)
     Patricia K. Smoots (ARDC #6194076)
     Michael M. Schmahl (ARDC #06275860)
     McGuireWoods LLP
     77 W. Wacker Drive, Suite 4400
     Chicago, Illinois  60601
     Tel:  312.849-8100

     and

     *Of Counsel*
     Steven M. Farina
     Thomas H. L. Selby
     WILLIAMS & CONNOLLY LLP
     725 12th Street, N.W.
     Washington, D.C.  20005
     Phone:  (202) 434-5526
     Facsimile: (202) 434-5029


     *Counsel to the Defendants*

EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | CHAPTER 11 |
| | ) | |
| SENTINEL MANAGEMENT GROUP, INC., | ) | CASE NO. 07 B 14987 |
| | ) | |
| Debtor. | ) | Hon. John H. Squires |
| | ) | |
| FREDERICK J. GREDE, as Chapter 11 | ) | |
| Trustee for Sentinel Management Group, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | ADV. NO. _____ |
| MCGLADREY & PULLEN LLP and G. | ) | |
| VICTOR JOHNSON, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Frederick J. Grede, not individually but as Chapter 11 Trustee for Sentinel Management Group, Inc. ("the Trustee"), hereby states for his Complaint as follows:

## NATURE OF THE ACTION

1.      This is an adversary proceeding by the Trustee against McGladrey & Pullen LLP ("M&P") and G. Victor Johnson, one of M&P's partners. M&P served as the auditor of Sentinel Management Group, Inc. ("Sentinel" or the "Company") for the year ended December 31, 2006. Mr. Johnson was the engagement partner for that audit.

2.      M&P's audit of Sentinel's financial statements for the year ended December 31, 2006 (the "2006 audit") failed to satisfy the most basic standards of the accounting and auditing profession as well as the contractual promises in its engagement letter. M&P ignored blatant violations of federal law being committed by certain Sentinel insiders and failed to fulfill its legal duty to report those violations to Sentinel's regulators. M&P expressed an unqualified opinion that Sentinel's financial statements stated fairly in all material respects the financial

position of Sentinel (hereinafter, referred to as "certified"), when it knew that those statements materially misstated the facts and obfuscated violations of federal regulations critical to the protection of Sentinel's investors.    M&P ignored its duties to approach the audit with professional care and skepticism, and in some instances, M&P itself participated in the wrongdoing committed by a Sentinel insider.

3.      M&P's misfeasance and malfeasance includes:

a.      M&P certified financial statements that materially misstated Sentinel's assets and falsely classified as company assets hundreds of millions of dollars worth of securities that M&P knew should have been segregated for customers.

b.      M&P itself created certain of the accounting entries that led to Sentinel's financial misstatements.  In particular, M&P knew that Sentinel's books and records did not properly reflect a $230 million bank loan.  In response, M&P made adjusting journal entries to Sentinel's Trial Balance purporting to reflect both Sentinel's liability for the bank loan and the value of securities pledged as collateral for that loan.  But those adjusting journal entries were themselves materially misstated, and the financial statements that M&P certified incorporated the materially misstated figures from M&P's adjusting journal entries.  In addition, M&P prepared footnotes to the financial statements that falsely stated that the securities pledged for that loan were held in segregated customer accounts.

c.      M&P also improperly certified materially false Sentinel financial statements submitted to regulators on Commodity Futures Trading Commission ("CFTC") Form 1-FR.  Form 1-FR is the document that the CFTC uses to assess whether futures commission merchants ("FCMs") like Sentinel are segregating customer assets as required by law and whether they have the required net capital to protect their investors.  M&P knew or should have known that Sentinel had engaged in systematic violations of the CFTC and Securities and

2

Exchange Commission ("SEC") segregation requirements.  In addition, M&P knew or should have known that Sentinel had a massive net capital deficiency.  Both of those facts were apparent from the documents M&P reviewed during its audit.

        d.     Compounding the segregation and net capital related deficiencies, the financial statements M&P certified falsely represented that Sentinel's bank loan was used for short-term liquidity.  In reality, M&P knew or consciously disregarded that the primary purpose of the bank loan was to finance a leveraging scheme in which over $2 billion in securities were purchased and financed using a combination of Sentinel's bank loan and repurchase agreements ("repos").

        e.     Although M&P reviewed Sentinel records that reflected its repo leveraging, there was no disclosure in the financial statements of the huge risks associated with those repo positions or that all of Sentinel's leveraging activity depended on the pledging of customer securities for its bank loan.  This leveraging activity was a substantial factor in Sentinel's demise. The financial statements and M&P's report on its audit also did not disclose that many of the repo positions had been internally allocated to Sentinel's house account or that Sentinel internal records allocated billions of dollars in repo positions to customers, but that the statements Sentinel provided to customers did not reflect any repo activity.

        f.     Ultimately, M&P's malfeasance extended to assisting in the creation of a fictitious management agreement to justify the payment of approximately one million dollars to Sentinel Investment Group ("SIG"), a company controlled by Sentinel's CEO.  M&P knew that SIG did not provide any management services to Sentinel, and that the payments were merely a mechanism for Sentinel's CEO to siphon money from Sentinel.  Nonetheless, M&P certified Sentinel's financial statements that misrepresented the true purpose of that agreement.

3

4.      As a result of M&P's failure to properly fulfill its responsibilities, Sentinel insiders were allowed to continue the operation of the Company for their own benefit, in violation of CFTC and SEC segregation regulations, and without the required regulatory capital. If M&P had adequately performed its duties, it would not have certified Sentinel's 2006 financial statements, and it would have reported Sentinel's regulatory violations and control weaknesses to management and to the applicable regulatory agencies. This would have resulted in either the regulators shutting down Sentinel, the withdrawal of money by Sentinel's customers, or Sentinel otherwise adjusting its business practices and rectifying its deficiencies, thus avoiding all of the losses and increased net liabilities in 2007. Instead, by failing to properly perform its audit duties and by failing to report Sentinel's violations, M&P substantially contributed to and caused hundreds of millions of dollars of losses and related damages during 2007 – thereby undermining Sentinel's ability to satisfy its obligations and pushing Sentinel into an insolvency from which it could not recover.

5.      As a result of M&P's gross dereliction of its duties, this Complaint seeks actual and consequential damages exceeding Five Hundred And Fifty Million Dollars ($550,000,000.00).

## JURISDICTION AND VENUE

6.      This Court has jurisdiction pursuant to 28 U.S.C. § 1334(b). This adversary proceeding is related to and arises under the chapter 11 case, *In Re Sentinel Management Group, Inc.*, pending in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, as Case No. 07 B 14987.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1409(a).

8.      This proceeding is a non-core proceeding. The Trustee consents to entry of final orders or judgment by the bankruptcy judge.

4

## THE PARTIES AND RELATED ENTITIES

9.     Plaintiff Frederick J. Grede is the chapter 11 trustee for Sentinel, duly appointed under Section 1104 of the Bankruptcy Code by Orders of this Court dated August 23 and 29, 2007.

10.    Sentinel is an Illinois corporation, headquartered in Northbrook, Illinois. Sentinel is registered with the SEC as an investment adviser and with the CFTC as an FCM. It is also a member of the National Futures Association ("NFA"), which is Sentinel's designated self-regulatory organization ("DSRO").

11.    Defendant McGladrey & Pullen LLP is a national accounting and auditing firm. At all times relevant to this complaint, McGladrey & Pullen LLP served as the independent auditor of Sentinel.

12.    Defendant G. Victor Johnson is a certified public accountant licensed in Illinois and a partner at McGladrey & Pullen LLP. Mr. Johnson served as the engagement partner for the 2006 audit of Sentinel.

13.    Philip Bloom, Eric Bloom, and Charles Mosley ("the Sentinel Insiders") were officers and directors of Sentinel who breached their fiduciary duties to Sentinel. There were at all relevant times one or more officers and employees of Sentinel who were not part of the Sentinel Insiders' scheme. As discussed below, M&P was required to disclose certain regulatory violations and material inadequacies in Sentinel's internal controls to certain regulators if Sentinel itself failed to do so.

5

## BACKGROUND

A.    **Regulatory Requirements**

### *The Commodity Exchange Act and CFTC Rules*

14.    Sentinel was registered as an FCM because many of its customers were FCMs who were investing their own clients' cash. CFTC regulations limited the options for investing such funds and one of the permitted options was to invest with another FCM.

15.    As an FCM, Sentinel and any bank acting as custodian for customer funds were subject to the provisions of the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.* ("the CEA"), and the rules and regulations of the CFTC, 17 C.F.R. §§ 1.1-190.10.

16.    Section 4d(a)(2) of the CEA requires that money, securities, and property deposited by customers be segregated from the funds of the FCM.

17.    CFTC Rule 1.20(a) provides that all customer funds shall be segregated on behalf of customers and shall be deposited under an account name that clearly identifies them as customer property. CFTC Rule 1.20(a) also prohibits the pledging of customer funds to secure a bank loan for any purpose other than for commodity transactions for that customer. Moreover, CFTC Rule 1.26 requires a written acknowledgement from the depository bank that the securities are customer securities and are being held in compliance with the CEA.

18.    Under CFTC Rule 1.25, FCMs' customers' funds can be invested only in high grade corporate and government securities and similar highly liquid investments. CFTC Rule 1.25 permits FCMs to use repurchase agreements in connection with the investment of customer funds, but only if the securities involved in the repurchase transactions are the types permitted under Rule 1.25. Moreover, the CEA and CFTC regulations require that all repurchase transactions for customers settle solely in the customer segregated accounts.

6

19.     Funds of FCM customers engaged in trading at foreign exchanges are subject to CFTC Rule 30.7, which imposes certain segregation requirements and investment restrictions.

20.     As of December 31, 1980, CFTC Rule 1.17 would have required Sentinel to maintain adjusted net capital (essentially liquid assets in excess of liabilities) equal to or in excess of 4% of all funds required to be segregated for its customers. On May 7, 1981, Sentinel obtained from the CFTC a letter recommending no-action against Sentinel for maintaining net capital less than 4% of all funds required to be segregated. The 1981 letter was conditioned on Sentinel's representations concerning its arrangements for maintaining the custody of customer funds. Those arrangements were no longer present since at least 2003.

21.     CFTC Rule 1.17 was amended in 2004, and pursuant to CFTC and NFA rules, effective July 2006, Sentinel's minimum net capital requirement was $500,000.

### The Investment Advisers Act and SEC Rules

22.     Sentinel was also registered as an investment adviser and subject to the provisions of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 *et seq.* (the "Investment Advisers Act"), and the rules and regulations of the SEC, 17 C.F.R. §§ 275.0-2 – 275.222-2.

23.     Section 206 of the Investment Advisers Act makes it illegal to "employ any device, scheme, or artifice to defraud any client or prospective client" and to "engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client."

24.     SEC Rule 206(4)-2 provides that it is a "fraudulent, deceptive, or manipulative" act or practice to have custody of client funds except as provided in SEC Rule 206(4)-2. Rule 206(4)-2 requires that client funds and securities be maintained by a "qualified custodian . . . [i]n a separate account for each client under that client's name" or "[i]n accounts that contain only

7

[the investment adviser's] clients' funds and securities, under [the investment adviser's] name as agent or trustee for the clients."

25.    SEC Rule 206(4)-2 further provides that an investment adviser must "notify the client in writing of the qualified custodian's name, address, and the manner in which the funds or securities are maintained, promptly when the account is opened and following any changes to this information."

26.    SEC Rule 206(4)-4 provides that an investment adviser must disclose to its clients all material facts with respect to a "financial condition of the adviser that is reasonably likely to impair the ability of the adviser to meet contractual commitments to clients . . . ."

27.    As Sentinel's auditor, M&P was responsible for reporting known violations of these statutes and regulations and, in particular, for reporting violations of the segregation and net capital rules that were designed to protect Sentinel's customers.

## B.    Sentinel's Three Customer Groups

28.    Sentinel's business was to manage cash for clients including FCMs, hedge funds, financial institutions, pension funds, and individuals.  In 2006, Sentinel managed approximately $1.4 billion in funds deposited by its customers.  These funds were invested in a variety of securities including government and corporate debt as well as collateralized debt obligations.  In addition to investing its clients' funds, as of December 31, 2006, Sentinel had purchased over $2 billion worth of securities pursuant to a leveraging scheme that involved the use of a bank loan and repo agreements to finance those purchases.

29.    Unlike traditional FCMs, Sentinel did not engage in commodities trading for its customers, but instead managed investments only in securities.

8

30.     Sentinel divided its customers into three groups and was required to strictly segregate the investments of these three customer groups from each other, and from Sentinel's proprietary funds. Sentinel also had subgroups within two of its three main customer groups.

31.     The first customer group, known within Sentinel as SEG 1, was supposed to include only customers of other FCMs. The investment of the funds of SEG 1 customers was subject to the strict investment standards embodied in CFTC Rule 1.25.

32.     The second customer group, known within Sentinel as SEG 2, was supposed to consist solely of FCM customers who were engaged in trading at foreign exchanges. The funds of SEG 2 customers were supposed to be invested in accordance with CFTC Rule 30.7.

33.     The third customer group, known within Sentinel as SEG 3, was supposed to consist of all other types of clients, including other FCMs who were investing their proprietary (*i.e.*, non-customer) funds.

34.     In addition to managing investments for the SEG 1, SEG 2, and SEG 3 customer portfolios, Sentinel owned a "House" or "Street" portfolio of securities traded by Sentinel for the ultimate benefit of the Sentinel Insiders. Sentinel customer agreements, as well as CFTC and SEC regulations, required that the funds and securities in all of these accounts remain segregated.

35.     The custodial accounts for the three SEG groups and the Sentinel "House" account were maintained by the Bank of New York ("BONY").

## C.     Changes In Sentinel's Operations

36.     Prior to late 2002, Sentinel operated as a cash manager, managing investments of client funds in high-quality, low-risk securities. From time to time, BONY made short-term loans to Sentinel to facilitate customer requests for redemption. After redeeming customer investments with the loan proceeds, Sentinel would sell securities that had been allocated to the redeeming customer group and then repay the loan with the sales proceeds. The short-term loans

9

were made in the form of daytime "overdrafts" which from time to time would be converted to short-term overnight loans until the securities needed to cover the redemptions were sold. Prior to 2003, Sentinel's loan balances were modest compared to the loan balances in later years. For example, as of late 2002, Sentinel's loan balance was approximately \$23 million, as compared to the December 31, 2006 loan balance of over \$230 million.

37.     Beginning in 2003, Sentinel began purchasing a large volume of securities that were not segregated for its customers and that did not appear on its customers' statements. Typically, these transactions involved the purchase of the security either with funds from the BONY loan or with funds received from a repurchase counterparty. In its repurchase transactions, Sentinel would deliver the security to its counterparty, who would in turn deliver a percentage of the value of the security to Sentinel. As part of the agreement, Sentinel was obligated to repurchase the security for the amount it received plus interest.

38.     Even in those circumstances when Sentinel could pay for the securities with proceeds from a repurchase agreement, Sentinel was still required to finance a portion of the purchase with the BONY loan. This was because repurchase counterparties would only loan a percentage (often 90%) of the value of the security Sentinel delivered to the counterparty in the repurchase transaction. The percentage of the security's value that the counterparty would not finance is referred to as the repo haircut. Sentinel used the BONY loan to cover the amount of the repo haircut. Through these arrangements, Sentinel obtained control over \$2 billion of securities with none of its own equity.

39.     While BONY ultimately lent Sentinel hundreds of millions of dollars, which Sentinel used in this leveraging scheme, BONY always required that Sentinel post collateral to secure the balance of its loan. BONY maintained a non-segregated collateral account for that purpose entitled "SEN Clearance Coll A/C FBO BNY" (the "BONY collateral account"). As the

10

BONY loan grew, the House securities, other House funds on deposit with Sentinel, and the Sentinel Insiders' equity in Sentinel were insufficient to secure the BONY loan. As a result, the Sentinel Insiders began collateralizing the BONY loan with securities that were supposed to be segregated for Sentinel's SEG customers.

40.     Sentinel purchases of securities that did not appear on customer statements increased dramatically from 2003 to 2006. The BONY loan grew proportionately. At year-end 2003, the BONY loan was $53,050,000. As of December 31, 2006, Sentinel's loan balance at BONY grew to $230,628,000, and approximately $255 million in securities that were supposed to be segregated for customers were posted as collateral for the BONY loan.[1]

41.     The net result of Sentinel's financing structure was that as of December 31, 2006, Sentinel controlled over $2 billion in securities that had been financed by repo agreements and the BONY loan. In these repo transactions, Sentinel had taken over $200 million in haircuts, virtually all of which were financed with the BONY loan. None of Sentinel's repo positions were reflected on statements provided to Sentinel's customers, and none of Sentinel's customer statements reflected the fact that customer securities were being used to finance repo haircuts or to collateralize the BONY loan.

42.     Sentinel's bank loan and its repo positions grew in lockstep. This combined growth gave Sentinel a highly leveraged financial structure, which in conjunction with Sentinel's segregation and net capital deficiencies, created a material risk of huge losses if the market moved unfavorably to Sentinel's repo positions – risks that ultimately came to fruition and led to Sentinel's demise.

---

[1] Unless otherwise noted herein the value of all securities maintained in various BONY accounts is denominated in par value.

43.     As Sentinel's auditor, M&P was fully aware of Sentinel's highly leveraged structure and that customer securities were being unlawfully pledged for the BONY loan. As an expert in the financial services industry, M&P fully appreciated the extreme risks associated with Sentinel's financial structure. It was M&P's duty as Sentinel's independent auditor to see that these facts were accurately reflected in Sentinel's financial statements and that its violations of critical CFTC and SEC regulations were duly reported. As detailed below, M&P failed miserably in fulfilling its duties.

## M&P'S AUDITORS

44.     M&P's audit team for the 2006 audit was comprised primarily of Defendant G. Victor Johnson (engagement partner), Susan Menelaides (concurring partner), Ann Bernard Tushaus (auditor in-charge), and Megan Hannigan (manager/director). As engagement partner, it was Defendant Johnson's duty to supervise the audit team and ensure that it was fulfilling M&P's audit responsibilities.

45.     For several years prior to 2006, many members of the M&P audit team also had been involved in auditing Sentinel's financial statements as employees of Altschuler, Melvoin & Glasser ("AM&G"). Upon information and belief, McGladrey & Pullen LLP acquired AM&G in or around November 2006.

46.     In addition to conducting year-end audits of Sentinel, the M&P auditors had also conducted several segregation audits of Sentinel under SEC Rule 206(4)-2 and audits of Sentinel's anti-money laundering programs under the PATRIOT Act. Thus, the M&P audit team was knowledgeable about Sentinel's business and its regulatory requirements.

47.     As head of the audit team, Defendant Johnson was responsible for assuring that M&P adhered to CFTC audit requirements, and Defendant Johnson was acutely aware of the consequences of failing to fulfill those obligations. Indeed, in September 2004, Mr. Johnson and

12

AM&G entered into a consent order with the CFTC regarding their audit of another CFTC registrant. Pursuant to that consent order, Mr. Johnson and AM&G stipulated that in performing their audit they had departed from Generally Accepted Auditing Standards, violated CFTC Rule 1.16, and certified materially misstated financial statements.

48.     Among other things, Mr. Johnson was ordered not to participate in any audit of any CFTC registrant as engagement partner, reviewing partner, or audit team member until after December 31, 2005. All accounting professionals at AM&G participating in audits of CFTC registrants on or before September 30, 2006 were ordered to undergo training in Statement on Auditing Standards 99 relating to fraud risks. Thus, the M&P audit team should have been especially vigilant in assuring that they and Sentinel complied with applicable CFTC and SEC regulations.

## THE ENGAGEMENT LETTER BETWEEN M&P AND SENTINEL

49.     M&P was engaged by Sentinel to audit Sentinel's 2006 financial statements pursuant to an engagement letter dated December 11, 2006.

50.     The 2006 audit engagement letter states, in part: "We will perform an audit of the Company's statement of financial condition as of December 31, 2006 and related statements of income, changes in stockholder's equity, and cash flows for the year then ending, and the schedules supporting such financial statements required under Regulation 1.10 of the [CEA]. Also, as required by Regulation 1.16(d) under the [CEA], we will make a study of the practices and procedures, including tests of compliance with such practices and procedures, followed by the Company that we consider relevant to the objectives stated in Regulation 1.16(d)."

51.     Paragraph 6 of the letter states: ". . . we will report whether we believe your procedures are adequate for the [CFTC's] purposes. In addition, our report will set forth those conditions, if any, which we believe are material weaknesses in relation to Regulation 1.16(d)."

13

52.     The engagement letter further states:  "We will communicate fraud involving senior management and other fraud that causes a material misstatement of the financial statements [and] illegal acts that come to our attention (unless clearly inconsequential)."

53.     Thus, pursuant to its engagement letter, M&P was obligated to study whether Sentinel's procedures for segregating customer assets were adequate and to report material inadequacies in relation to CFTC segregation requirements and other violations of law of which it became aware.

### STANDARDS GOVERNING M&P'S AUDIT OF SENTINEL

**A.     M&P's Audit Duties Under CFTC Regulations**

54.     Because Sentinel was a registered FCM, M&P, as Sentinel's auditor, had certain obligations under CFTC regulations.

55.     Specifically, CFTC Rule 1.16 expressly required M&P to:

a.     Review and appropriately test Sentinel's accounting system, internal controls, and procedures for safeguarding customer and firm assets in accordance with the CEA and CFTC regulations;

b.     Implement all procedures necessary to express an opinion on the financial statements and schedules to be filed with the CFTC;

c.     Implement sufficient procedures to provide reasonable assurance that M&P would discover any "material inadequacies" in the internal controls or procedures applicable to the segregation of customer securities;

d.     Review Sentinel's practices and procedures for making the CFTC-mandated daily segregation computations and Sentinel's periodic net capital calculations;

14

e.    File a report with the CFTC stating that the audit was conducted according to Generally Accepted Auditing Standards ("GAAS") or explaining whether and why any auditing procedures were omitted; and

f.    Report any material inadequacies to Sentinel and issue a supplemental report discussing those material inadequacies.

56.    For purposes of the above requirements, a "material inadequacy" includes any condition relating to the daily segregation of customer assets or periodic net capital computations that could reasonably be expected to: (1) inhibit Sentinel from discharging its responsibilities to customers; (2) result in a material financial loss; (3) result in material misstatements in the financial statements; or (4) result in violations of the CFTC's segregation requirements.

57.    Pursuant to CFTC Rules 1.10 and 1.16, M&P was required to audit and certify Sentinel's year-end Form 1-FR, which contained both a Statement of Segregation and Statement of Computation of Minimum Capital Requirements.

58.    M&P failed to comply with the auditing standards set forth in CFTC Rules 1.10 and 1.16 in conducting and reporting the results of its audit of Sentinel's 2006 financial statements and year-end Form 1-FR.

**B.    M&P's Audit Duties Under Generally Accepted Auditing Standards**

59.    M&P was also required to comply with GAAS, as approved and adopted by the American Institute of Certified Public Accountants ("AICPA"). The Statements on Auditing Standards ("SAS") are recognized by the AICPA as the authoritative interpretation of GAAS.

60.    In accordance with GAAS, M&P was obligated to conduct its audit in compliance with the following:

15

a.      Under SAS 105,[2] M&P was required to have adequate technical training and proficiency, to maintain independence in mental attitude, and to exercise due professional care and approach each task with "professional skepticism."

b.      Under SAS 105, M&P was required to (1) adequately plan the work and properly supervise any assistants; (2) obtain a sufficient understanding of Sentinel and its environment, including its internal controls, to assess the risk of material misstatement whether due to error or fraud, and to accordingly design the nature, timing, and extent of its audit procedures; and (3) obtain sufficient appropriate audit evidence to afford a reasonable basis for opining on the financial statements.

c.      Also under SAS 105, M&P was required to state whether the financial statements were presented in accordance with Generally Accepted Accounting Principles ("GAAP"); identify those circumstances in which GAAP had not been consistently observed; state instances where the informative disclosures were not reasonably adequate; and express an opinion regarding the financial statements or state that an opinion cannot be expressed and the reasons therefore.

d.      In accordance with SAS 99, M&P was required to assess the risk of fraud, including motivation, opportunity, and attitude of management; analyze the business basis for unusual transactions or transactions that create a risk of fraud; and communicate possible fraud to Sentinel's management and board.

---

[2] SAS 105 superseded SAS 95 and became effective for audits of financial statements for periods beginning on or after December 15, 2006 unless adopted earlier. If M&P was not an early adopter, then SAS 95, which is substantially the same as SAS 105 in all material respects, would apply to audit periods before December 15, 2006. For ease of reference, the Complaint uses "SAS 105" to refer to the standards set forth in SAS 95 and SAS 105 that are applicable to the 2006 audit.

e.     In accordance with SAS 107,[3] M&P was required to plan and perform its audits to obtain reasonable assurance that material misstatements in Sentinel's financial statements, whether caused by errors or fraud, were detected and evaluate whether the financial statements taken as a whole were presented fairly in all material respects.

61.     Additionally, the AICPA issues an audit guide, which provides authoritative assistance to auditors for both GAAP and reporting on financial statements of FCMs in accordance with GAAS ("AICPA Guide"). M&P's work papers reflect that M&P relied on the AICPA Guide in performing its audit of Sentinel's 2006 financial statements and Form 1-FR.

62.     Among other things, the AICPA Guide required M&P to:

a.     Read the applicable CFTC and SEC rules governing Sentinel's business, including the segregation and net capital regulations, and have an understanding of how those rules affected the scope of the audit and its reporting requirements;

b.     Evaluate whether customer securities were used to secure bank loans to Sentinel;

c.     Determine the amount of Sentinel's statutory net capital requirement and audit Sentinel's year-end net capital computations; and

d.     Consider applicable risk factors, including deficient internal controls and commingling of customer funds and securities with Sentinel's funds and securities.

63.     M&P failed to comply with each of the above auditing standards in conducting and reporting the results of its audit of Sentinel's 2006 financial statements.

---

[3] SAS 107 superseded SAS 47 and became effective for audits of financial statements for periods beginning on or after December 15, 2006 unless adopted earlier. If M&P was not an early adopter, then SAS 47, which is substantially the same as SAS 107 in all material respects, would apply to audit periods before December 15, 2006. For ease of reference, the Complaint uses "SAS 107" to refer to the standards set forth in SAS 47 and SAS 107 that are applicable to the 2006 audit.

**C.     Reporting Standards Under Generally Accepted Accounting Principles**

64.     As noted above, M&P was required to state an opinion either that all of Sentinel's financial statements were prepared in accordance with GAAP or identify the reasons that they did not comply with GAAP.  The AICPA and Financial Accounting Standards Board ("FASB") have published the authoritative pronouncements of GAAP, including Statements of Financial Accounting Standards ("FAS"), which set forth and explain various GAAP principles, and Statements of Financial Concepts ("CON"), which provide a conceptual framework for financial statement reporting.  The AICPA also publishes Statements of Positions ("SOP"), which set forth its position with respect to how to apply GAAP, and the AICPA Guide.

65.     GAAP applicable to Sentinel's financial statements include, among other things, the following requirements:

a.     Under FAS 5, the financial statements should properly disclose uncertainties regarding assets and liabilities, and should properly disclose "assets pledged as collateral for loans."

b.     Under FAS 140, Sentinel's financial statements must include all assets and corresponding liabilities from its repo transactions and disclose and fairly describe all assets pledged as collateral for loans.

c.     Under CON 6, assets are defined as "probable future economic benefits obtained or controlled by a particular entity as a result of past transactions or events."  In particular, assets only include economic benefits the company itself will realize.

d.     Under CON 6, notes to financial statements should amplify and clarify items listed on the balance sheet.

18

66.     The AICPA Guide provides that the financial statements should fairly describe all assets pledged as collateral for firm loans and that customer securities cannot be pledged as collateral for firm loans.

## M&P'S DUTIES TO REPORT SENTINEL'S REGULATORY VIOLATIONS

67.     CFTC Rule 1.16(e)(2) required M&P to report to Sentinel any material inadequacies (i) relating to Sentinel's inability to promptly discharge its responsibilities to customers, (ii) which would result in material financial loss, (iii) which would result in material misstatement of Sentinel's financial statements; or (iv) with respect to violations of the CFTC's segregation requirements to the extent they could reasonably be expected to result in the conditions identified in (i)-(iii) above.  If such notice was provided to Sentinel, CFTC Rules 1.12(d) and 1.16(e)(2) required Sentinel to report the inadequacies to the CFTC and NFA.  If Sentinel failed to notify the CFTC and NFA of those material inadequacies within three business days or if M&P disagreed with the substance of Sentinel's notification, M&P was required to notify the CFTC and NFA directly of the material inadequacies it discovered.

## M&P'S INDEPENDENT AUDITORS' REPORT

68.     On March 30, 2007, M&P provided its Independent Auditors' Report on Sentinel's Financial Statements for the Year Ended December 31, 2006 to Sentinel.  M&P knew its report and Sentinel's financial statements and year-end Form 1-FR would be provided to the CFTC and NFA.

69.     In its audit report, M&P represented that (i) it had conducted its audit in accordance with GAAS; (ii) in its opinion, Sentinel's financial statements presented fairly, in all material respects, the financial position of Sentinel in conformity with GAAP; (iii) its audit provided a reasonable basis for its opinion; and (iv) Sentinel's year-end Form 1-FR had been subjected to the auditing procedures applied to the statement of financial condition and that, in

19

M&P's opinion, the Form 1-FR was fairly stated in all material respects when considered together with the other financial statements.

## M&P'S AUDIT DEFICIENCIES AND
## THE FINANCIAL STATEMENTS' MATERIAL MISSTATEMENTS

70.    Notwithstanding the above-described duties and M&P's audit representations, Sentinel's financial statements contained numerous material misstatements regarding the segregation of securities, the pledging of securities for the BONY loan, Sentinel's compliance with its net capital requirements, Sentinel's repo positions and the associated market risks, and Sentinel's agreement with SIG.    M&P's certification of Sentinel's financial statements containing these misstatements reflected M&P's conscious disregard of facts demonstrating violations of CFTC and SEC segregation regulations and other material inadequacies, and, at best, its reckless disregard of Sentinel's net capital deficiencies.    In addition, M&P failed to report those violations or any other material inadequacies to either Sentinel, the CFTC, or the NFA.

## I.    M&P'S DEFICIENCIES REGARDING VIOLATIONS OF
## SEGREGATION REQUIREMENTS AND THE PLEDGING
## OF SECURITIES FOR THE BONY LOAN

### A.    M&P's Inadequate Planning

71.    M&P's audit deficiencies with respect to the segregation of securities and the pledging of securities for the BONY loan began in the planning stage of the audit and permeated every aspect of the audit thereafter.

72.    M&P only had a short hour-long planning meeting with Sentinel personnel prior to conducting its audit.  The agenda for that planning meeting does not reflect any discussion of the segregation and custody requirements governing Sentinel or of the BONY loan.

20

73.    Junior personnel from M&P were on site for approximately one week to conduct the audit fieldwork, with little supervision from M&P partners. This fieldwork occurred just two weeks before the issuance of M&P's audit report.

74.    Based on a review of M&P's work papers, M&P apparently did not meet with the individuals directly involved either in the activities related to the segregation of securities or the pledging of securities for the BONY loan.

**B.    M&P's Failure To Appropriately Account for Risk Factors**

75.    Because of the nature of Sentinel's business, M&P deemed the Sentinel engagement to be "high risk due to fraud risk considerations." However, there is no indication that this high-risk designation affected the audit procedures M&P actually employed.

76.    For example, M&P's audit programs required its auditors to assess whether the following risk factors applied to Sentinel: (1) "whether the company is highly leveraged"; (2) "whether there have been significant changes to the client's operation"; (3) "company is unusually dependent on debt financing or has a marginal ability to meet debt repayments items"; (4) "significant assets [are] likely to be impaired"; and (5) "whether available financing is adequate to meet cash needs and/or regulatory requirements." The AICPA Guide similarly identified risk factors relating to commingling and use of customer assets.

77.    As a result of the use of and growth in Sentinel's bank loan and repo positions, those risk factors clearly applied to Sentinel. For example, with the rapidly-increasing balance in the BONY loan and its use in connection with Sentinel's repo activity, Sentinel had become highly leveraged and totally dependent on debt financing. In addition, Sentinel's switch in 2003 from using the BONY loan principally for providing liquidity for customer redemptions to using the loan to finance repo haircuts constituted a significant change in Sentinel's operations. The increasing bank loan also raised inherent risks with respect to Sentinel's compliance with CFTC

21

Rule 1.20's prohibition against pledging securities allocated to customers to collateralize loans, the CFTC and SEC segregation requirements, and Sentinel's ability to fulfill customer redemptions -- not to mention the financial viability of Sentinel itself.

78.    Given the numerous deficiencies in Sentinel's financial statements relating to these very risks and M&P's failure to report any material inadequacies or regulatory violations concerning these issues, M&P's audit failures were the result of either a deliberate or reckless disregard of its audit responsibilities.

### C.    M&P's Deficient Audit

79.    Not surprisingly, M&P's failure to adequately plan for the audit and its conscious or reckless disregard of audit risk factors resulted in a grossly deficient audit, materially misstated financial statements, and a failure to report violations of applicable regulations and law.

*M&P Reviewed Sentinel and Bank Records*
*That Demonstrated Violations of the Segregation Regulations*

80.    Based on its audit plan, M&P knew it should test the BONY loan and the securities pledged for that loan and be sure that material facts concerning those matters were properly disclosed.

81.    Indeed, as part of its audit, M&P was provided and reviewed Sentinel's "Active & Matured Securities reports," which were the reports used by Sentinel to generate the account statements it provided to customers. The Active & Matured reports listed all firm securities and securities allocated to customers by CUSIP number and identified the SEG account in which it was represented to Sentinel's customers that the securities were being held.

82.    M&P's audit work papers also contained a position report from BONY for each Sentinel account -- SEG 1, SEG 2, SEG 3, collateral account -- which listed the CUSIP number of

22

each security maintained in the respective account. In other words, M&P had actual bank records showing the BONY account in which each and every security was being held.

83.    Together, the Active & Matured and BONY position reports demonstrated that approximately $257 million of securities identified on the Active & Matured report as being allocated to segregated customer accounts were actually being held in the non-segregated BONY collateral account. Thus, M&P had unequivocal evidence of a violation of the segregation requirements under the CEA and the Investment Advisers Act.

84.    Moreover, as part of its audit procedures, M&P itself created a document that conclusively demonstrated violations of the CFTC and SEC segregation requirements. Specifically, M&P annotated Sentinel's Active & Matured report to compare the account in which securities were located according to that report with the BONY records showing where the securities were actually being held by BONY.

85.    As one example, the December 31, 2006 annotated Active & Matured report lists CUSIP 3133XBMH5, with a par value of $19,775,000. The annotated report reflects that while it was represented to Sentinel's customers that the security was being held in SEG 3, according to BONY's records, that security was maintained in the non-segregated collateral account.

86.    This annotated Active & Matured report prepared by M&P shows that according to BONY records, approximately $257 million of securities were held in the non-segregated collateral account, while Sentinel's records reflected that those securities were held in segregated accounts for customers.

### M&P Itself Made Incorrect Journal Entries that Formed the Basis of Material Misstatements on Sentinel's Financial Statements

87.    In addition to reconciling the Active & Matured reports to the BONY position reports, M&P also examined the accounts listed on Sentinel's Trial Balance. M&P saw that

there was no entry on Sentinel's Trial Balance for either the BONY loan or the securities pledged as collateral for the loan.

88.      Instead of appropriately responding to the fact that together these records demonstrated massive segregation violations, M&P simply proposed adjusting journal entries to Sentinel's Trial Balance that purported to allocate the BONY loan to customer segregated accounts and firm accounts, and also to reflect the purported value of securities pledged from those accounts to collateralize the loan.

89.      Moreover, in making these adjusting journal entries, rather than using the values reflected on the Active & Matured reports or the BONY collateral account report, M&P used values for which there was no audit evidence and which did not reflect the true value of the securities pledged as collateral for the loan.

90.      Specifically, M&P's adjusting journal entries reflected that $5.6 million from SEG 1, $278,000 from SEG 2, $201.7 million from SEG 3, and $23 million from the House account were pledged as collateral for the BONY loan. Those amounts were incorrect, as M&P knew or should have known. According to the year-end Active & Matured and BONY position reports, the value of the securities collateralizing the loan was actually $257 million (approximately $71 million from SEG 1, $500,000 from SEG 2, and $186 million from SEG 3).

91.      The values M&P used in its adjusting journal entries were taken from an internal Sentinel record that purportedly reflected an allocation of the BONY loan. That internal allocation was done arbitrarily and did not even purport to reflect the value of the securities pledged. M&P had no audit evidence to support the values it used in its adjusting journal entries and it did nothing to verify the basis for the allocation of loan amounts to segregated accounts or to reconcile the inconsistency between those allocation values and the values of the securities reflected on the Active & Matured and BONY position reports.

24

92.     As a result, M&P's proposed adjusting journal entries reflect two glaring deficiencies in M&P's audit. First, they reflect M&P's knowledge of the segregation violations resulting from the pledging of customer securities – a flagrant violation that was never reflected on the financial statements, referenced in M&P's independent auditors' report, or reported to authorities. Second, in addressing the pledging of these securities, M&P used values for the pledged securities that were simply wrong and for which they had no factual basis. The materially misstated figures that M&P used in its proposed adjusting journal entries were ultimately reflected on Sentinel's 2006 financial statements.

***M&P Had Access to Customer Statements that Proved***
***Segregation Violations and Misrepresentations to Customers***

93.     M&P also consciously disregarded or failed to properly consider discrepancies between Sentinel customer statements, BONY records, and Sentinel internal records.

94.     Based on its audit plan, M&P was supposed to review bank confirmations and confirm customer securities. M&P did send confirmation letters and customer statements to customers asking the customers to verify their respective account balances. M&P sent similar letters to BONY asking it to confirm various account balances.

95.     If M&P had compared the customer statements it reviewed as part of that confirmation process with the bank records received from BONY and Sentinel's Active & Matured report, M&P would have known that the customer statements did not reflect either the fact that the securities listed on the statements had been pledged as collateral for the BONY loan, or that Sentinel had internally allocated the BONY loan to various customer groups. In addition, the Active & Matured report reflected that Sentinel had internally allocated billions of dollars in securities held by repo counterparties to Sentinel customer groups, but the customer statements did not reflect that customers had any repo positions.

25

96. The inconsistencies between BONY bank records, Sentinel internal records, and customer statements were stark evidence of segregation violations, the misuse of securities that should have been segregated, and that Sentinel customers had no knowledge of these violations or of the repo positions that materially altered the risk of their investments with Sentinel.

97. M&P's failure to either ensure that Sentinel's financial statements accurately reflected the facts or refuse to certify materially misstated financial statements, as well as its failure to report these violations in its audit report and to authorities, reflects a deliberate disregard of M&P's obligations as an auditor.

### M&P Failed to Implement Any Audit Procedures with Respect to Sentinel's Daily Segregation Computations, which it Knew Could Not Have Been Correct

98. Under CFTC Rule 1.16, M&P was supposed to review "the practices and procedures followed by [Sentinel] in making . . . daily computations of the segregation requirements of section 4d(a)(2) of the [CEA and CFTC regulations]." 17 C.F.R. § 1.16(d) (emphasis added).

99. However, M&P had no audit evidence to support Sentinel's daily segregation computations. Indeed, M&P consciously disregarded evidence that showed that those computations could not have been correct.

100. The audit work papers do not reveal that M&P employed any audit procedures or gathered any audit evidence pertaining to Sentinel's daily segregation computations, other than noting the name of the Sentinel employee who made the computations.

101. Given the information it had, M&P knew or should have known that Sentinel's daily segregation computations included the securities that were pledged as collateral for the BONY loan, in violation of the CEA and CFTC regulations.

26

*M&P Failed to Implement Any Audit Procedures with Respect to
Sentinel's Allocation of Interest Income*

102.    M&P knew that Sentinel was a cash management firm and that its investment objective was to deliver interest income to customers. Sentinel represented to customers that interest earned in each segregated customer account was allocated on a pro rata basis among all customers with an interest in that segregated account. However, the audit work papers do not reflect that M&P undertook any audit procedures to test whether Sentinel properly allocated interest among its customer and House accounts.

103.    If M&P had performed even minimal testing, it would have learned that the Sentinel Insiders pooled all interest from all securities (segregated or not, repo'd or owned), then applied that interest first to pay the BONY loan interest, then to pay for certain fees, and then to meet arbitrarily determined "return" targets for each customer group. Thus, each and every day, Sentinel Insiders commingled returns among the different segregated accounts and among customer and House accounts. Often, the return on securities in one SEG group was used to subsidize income allocations made to other SEG groups. Interest earned on securities in each segregated account should have been attributed only to customers with funds in each segregated account – assuming of course that securities were in fact in the proper account.

104.    As a result of this commingling and misallocation of interest income, the interest reported on customer statements and the House interest reflected on the 2006 financial statements did not reflect the actual interest earned on securities in the respective accounts. Sentinel's financial statements therefore were materially misstated because the income statement reported arbitrarily-determined interest revenue. This misallocation of income was an additional segregation violation that went unreported on Sentinel's financial statements or to the regulatory authorities.

27

*M&P's Audit Deficiencies Violated GAAS and CFTC Rule 1.16*

105.    M&P's deficient audit procedures relating to the above-described violations of segregation regulations violated, at a minimum, SAS 105, SAS 99, CFTC Rule 1.16, and the audit standards set forth in the AICPA Guide.

**D.    Resulting Material Misstatements In The Financial Statements**

106.    As a result of M&P's deliberate or, at best, reckless disregard of its audit duties, M&P certified Sentinel financial statements for the year ended December 31, 2006 that contained numerous material misstatements, including (1) listing securities which should have been segregated for customers as Sentinel assets; (2) stating that over $207 million in securities pledged for the BONY loan were being held in segregation when they were not; (3) misstating the value of securities pledged to collateralize the BONY loan; (4) misstating the true purpose of the BONY loan; and (5) falsely reporting the amount of Sentinel's interest revenue.

*Material Misstatements Regarding the Listing of Securities Allocated to Customers as Assets*

107.    The 2006 financial statements represented that Sentinel had $233,268,260 in "securities pledged" as assets.  In other words, the financial statements purported to list the amount of securities collateralizing Sentinel's loan from BONY as Sentinel assets.  This statement was misleading and not in conformance with GAAP.

108.    The $233,268,260 in securities pledged consisted of securities allocated to customers – securities that were included on customer statements and should have been segregated for customers.  Those securities should not have been included as assets *of Sentinel* in the financial statements.

109.    For the reasons stated above, there also was no adequate audit evidence supporting the $233,268,260 value assigned to those securities.  Clearly, there was no basis for including as a Sentinel asset any of the securities allocated to customers, much less only a

28

portion of those securities. In reality, the amount of securities listed as assets of Sentinel was arbitrarily chosen simply to offset the amount of the BONY loan and cause the financial statements to balance.

110.    M&P's certification of Sentinel's financial statements therefore violated SAS 105, SAS 99, SAS 107, and the audit standards set forth in the AICPA Guide, and the financial statements themselves failed to conform with GAAP, including but not limited to FAS 5, FAS 140, and CON 6.

### *M&P Knew or Should Have Known that the Financial Statements Materially Misstated the Amount of Securities Held in Segregation*

111.    Note 2 to the 2006 financial statements, entitled "Customers' Cash and Securities Segregated and Held in Trust," stated that total assets segregated for customers included $207 million in securities "pledged" for the BONY loan. However, those securities were not "segregated" or "held in trust." Rather, there were approximately $257 million (par value) or $245 million cost plus accrued interest – not $207 million – in securities that should have been segregated but were actually pledged as collateral. As described above, based on the information M&P reviewed during its audit, M&P consciously disregarded those material misstatements in certifying Sentinel's financial statements.

112.    M&P's certification of financial statements that included the inaccurate statements in Note 2 violated SAS 105, SAS 99, SAS 107, and the audit standards set forth in the AICPA Guide, and the financial statements themselves were not in conformance with GAAP, including without limitation, FAS 5, FAS 140, and CON 6.

### M&P Knew or Should Have Known that Note 3
### to the Financial Statements Was Materially Misleading

113.   Note 3 to the financial statements contained a description of the securities collateralizing the BONY loan that obfuscated the fact that securities that were supposed to be segregated for customers were actually collateralizing the loan.

114.   Notes to financial statements are supposed to amplify and clarify the information on the balance sheet. However, describing the securities as "securities pledged" in Note 3 was materially misleading because instead of clarifying whose securities these were or disclosing that it was securities that should have been segregated for customers that were pledged as collateral for the loan, the description instead obscured the segregation violations.

115.   In addition, Note 3 to the 2006 financial statements incorrectly stated that the purpose of the BONY loan was "to meet short-term liquidity needs."

116.   M&P either knew or should have known that the BONY loan was actually being used to finance repo haircuts and purchase additional securities. The failure to accurately describe the use of the BONY loan was a critical deficiency given that the Sentinel Insiders' actual use of the BONY loan was a key component of the leveraging scheme that ultimately led to Sentinel's demise.

117.   M&P's certification of financial statements that materially misstated the purpose of the bank loan violated SAS 105, SAS 99, SAS 107, and the audit standards set forth in the AICPA Guide, and the financial statements themselves failed to comply with GAAP, including but not limited to FAS 5, FAS 140, and CON 6.

30

II.    **M&P CERTIFIED MATERIALLY MISSTATED
STATEMENTS OF SEGREGATION AND MINIMUM NET CAPITAL**

A.    **M&P Certified a Materially Misstated
Statement of Segregation on Form 1-FR**

118.    As described above, M&P certified the 2006 year-end Form 1-FR that was filed
with the CFTC. The 2006 Form 1-FR stated that Sentinel had approximately $1.4 billion in
customer liabilities and a corresponding amount of securities in segregation. In other words, the
Form 1-FR submitted to the CFTC represented that Sentinel had enough securities in segregation
to meet all of its customer liabilities.

119.    As alleged above, the Active & Matured and BONY position reports that M&P
reviewed during its audit demonstrated that this statement was false. Those reports show that as
of December 31, 2006, only approximately $1.17 billion worth of securities (cost basis plus
accrued interest) were being maintained in segregated accounts at BONY. The failure to keep
adequate securities in segregation to offset customer liabilities violated CFTC Rule 1.20.

120.    M&P knew, or should have known, that Sentinel's statement of segregation was
false. As discussed below, this error carried over to the Statement of Computation of Minimum
Capital Requirements included in the year-end Form 1-FR. Had the year-end Form 1-FR
submitted to the CFTC contained a correct statement of segregation, the CFTC would have seen
that Sentinel had in excess of $200 million more in customer liabilities than securities that were
being maintained in segregated accounts to satisfy those liabilities. As a result, either Sentinel
would have corrected its segregation deficiency or the CFTC would have shut down Sentinel,
and the losses and related damages that followed would have been avoided.

121.    M&P's certification of the false statement of segregation in the 2006 Form 1-FR
violated SAS 105, SAS 99, SAS 107, CFTC Rule 1.16, and the audit standards set forth in the
AICPA Guide.

31

**B.**    **M&P Improperly Certified Materially Misstated**
         **Net Capital Calculations on Sentinel's Year-End Form 1-FR**

122.    As part of its audit, M&P was supposed to review Sentinel's compliance with the CFTC's net capital requirements.    As described below, M&P failed to fulfill those audit responsibilities and instead certified Sentinel's materially misstated computations of net capital. Those net capital computations were materially misstated because the calculations of net capital included assets that should not have been included and excluded liabilities that should have been included and failed to take applicable haircuts.

123.    Had proper calculations of net capital been submitted to the CFTC, Sentinel either would have corrected its net capital deficiency or would have been shut down immediately given its substantial net capital deficiency.

124.    M&P's certification of grossly misstated net capital calculations violated, at a minimum, SAS 105, SAS 107, CFTC Rules 1.10 and 1.16, and the audit standards set forth in the AICPA Guide.

*M&P Certified Net Capital Computations That Were Materially Misstated Because They*
*Improperly Omitted the BONY Loan and Included Customer Securities Pledged For the Loan*

125.    In computing net capital, FCMs like Sentinel are required to subtract from assets certain liabilities, including bank loans.    However, Sentinel's net capital computations did not subtract the $230 million BONY loan from net assets, even though there is a specific line-item on Form 1-FR for secured loans from banks.

126.    A related material misstatement in Sentinel's net capital calculations is that they listed approximately $1.4 billion of securities as assets segregated or in separate accounts pursuant to the CEA and CFTC regulations.

127.    However, by virtue of the pledging of customer securities as collateral for the bank loan, the amount of securities actually in segregation was approximately $1.17 billion, not

the $1.4 billion included in Sentinel's net capital computations. Thus, in excess of $200 million in non-segregated securities should not have been included as assets in Sentinel's net capital calculations.

128.    As described above, M&P clearly knew about the BONY loan and the fact that customer securities were pledged for the loan, but consciously disregarded those facts – and the resulting massive net capital deficiency – in certifying Sentinel's materially misstated net capital computations.

### M&P Failed to Adequately Test Current v. Non-Current Assets

129.    CFTC regulations require that securities included as assets in the net capital calculations be marked-to-market and that, in many instances, securities with no readily-available market price be excluded as non-current assets. Under CFTC and SEC regulations, a security does not have a readily-available market price unless it can be nearly-instantaneously priced.

130.    M&P was undoubtedly aware of the net capital rules and the possible effects that non-current assets would have on Sentinel's net capital calculations. Classifying assets as "non-current" will in most instances result in a dollar-for-dollar reduction in an FCM's net capital. For a thinly-capitalized FCM like Sentinel, this could easily lead to a net capital deficiency – a risk that M&P plainly should have recognized.

131.    A review of M&P's work papers demonstrates that M&P conducted only minimal testing of the value of the securities that were, and that should have been, included as current assets in Sentinel's net capital computations. In addition, the audit work papers do not reflect that M&P performed any testing on the procedures Sentinel itself used to determine whether securities could be included as current assets on its Form 1-FR.

132.　Sentinel had approximately $1.4 billion in securities held in BONY accounts valued on a cost plus accrued interest basis, which were included as assets in its net capital computations.　Sentinel's net capital computations improperly failed to include any of the securities it had on repo that had a face value of approximately $2.4 billion, even though Form 1-FR has a specific line-item for securities sold under agreements to repurchase.　In addition, Sentinel had $12.5 million in noncustomer-owned securities (*i.e.*, securities allocated to Sentinel Insiders and entities they controlled), and over $16 million in unallocated securities and reconciling items.

133.　Of those $3.83 billion in securities that should have been tested and potentially marked-to-market, M&P only tested the purchase price of 15 securities totaling $56 million. The audit work papers do not reflect that M&P did anything to test the market value of the billions of dollars of additional securities on repo or held by Sentinel.　Remarkably, M&P completely passed on testing any of the over $2 billion of securities sold subject to repo agreements.

134.　Had M&P conducted even minimal testing, it would have learned that many of the securities held by Sentinel could not be nearly instantaneously priced, did not have a readily-available market price, were highly illiquid, and were unrated.　For example, as of December 31, 2006, there were hundreds of millions of dollars in illiquid collateralized debt obligations that Sentinel was obligated to repurchase from repo counterparties.　Classifying even a small portion of those assets – or a small portion of the $28 million in noncustomer-owned and unallocated securities – as non-current would have meant that Sentinel had insufficient adjusted net capital and would either have corrected its net capital deficiency or have been shut down by regulators.

### M&P Failed to Determine That Applicable Haircuts Should be Taken

135.　Similarly, M&P failed to address whether Sentinel's net capital computations took the "haircuts" required under CFTC and SEC regulations.　A "haircut" is a percentage

34

deduction in value that is intended to account for the possibility that the FCM may not be able to realize the stated value of the security.

136.    Sentinel's Form 1-FR only included one $232,682.73 haircut on a single security valued at $2,585,363.   M&P reviewed the mathematical calculation of that haircut and determined that it "appear[ed] to be materially correct."

137.    M&P's audit work papers do not reflect any analysis of whether Sentinel's net capital computations should have taken other haircuts under applicable CFTC and SEC regulations. In fact, Sentinel's net capital computations should have taken numerous haircuts, which would have resulted in a substantial net capital deficiency.

138.    Under CFTC and SEC regulations, a haircut must be taken on certain securities that are neither segregated for customers nor used to collateralize loans. As discussed above, Sentinel had over $12 million in noncustomer-owned securities that needed to be analyzed for potential haircuts. Based on the audit work papers, M&P did nothing to analyze those securities for applicable haircuts. In fact, based on the type and maturity of those securities, a haircut of nearly one million dollars should have been taken on the noncustomer-owned securities.

139.    In addition, under CFTC and SEC regulations, market-value and risk-based haircuts must be taken on repo obligations. Again, Sentinel had approximately $2.4 billion in repo'd securities that should have been analyzed for potential haircuts. And, again, M&P's audit work papers do not reveal any analysis as to whether those repo positions were subject to haircuts.

140.    In fact, Sentinel's net capital calculations should have included additional haircuts of as much as tens of millions of dollars due to the fact that numerous securities held by repo counterparties were not "readily marketable" under CFTC and SEC regulations and because, according to Sentinel's records, the value of the securities held by its repo counterparties

35

substantially exceeded Sentinel's repayment obligations to those counterparties. The amount by which the value of repo'd securities exceeds the repayment obligations is often referred to as the repo equity. Haircuts are applied to repo equity to reflect the fact that the full value of the "equity" may not be realized.

141.    If the net capital computations had been audited properly, M&P would have determined that Sentinel's year-end net capital calculations were materially misstated because they did not take applicable haircuts on noncustomer-owned and repo'd securities, and therefore that Sentinel had a massive net capital deficiency.

## III.    M&P'S AUDIT DEFICIENCIES REGARDING SENTINEL'S REPO ACTIVITY

142.    In addition to failing to analyze the effects of Sentinel's repo positions on its net capital computations, M&P also failed to assure that Sentinel's financial statements fairly presented both Sentinel's "House" repo positions and the financial risks associated with its full repo positions.

143.    At year-end 2006, Sentinel had approximately $2.4 billion in repo positions. According to Sentinel's Active & Matured report, approximately $2.3 billion of those repo positions were for the SEG accounts and $155 million of those repo positions were House positions.

144.    Sentinel's financial statements did not fairly reflect those repo positions in two respects. First, the financial statements did not reflect that the "House" had any repo positions at all. Thus, the $155 million in House repo positions was not reflected anywhere on the financial statements. In addition, M&P should have known that the only manner in which Sentinel could have financed the $155 million in House repo positions was through the use as collateral of securities that should have been segregated for customers.

36

145.  Second, Note 2 to the financial statements generally referenced Sentinel's repo positions, but it obfuscated the fact that the Company's internal records reflected these repos as customer positions. Nor did it note that customer statements did not reflect any repo positions for any customers.

146.  This inconsistency in Sentinel's internal records and customer statements was a red flag if not a smoking gun. At a bare minimum, this inconsistency reflected a material weakness in Sentinel's internal controls that should have been reported to Sentinel and to its regulators.

147.  Had M&P treated this "inconsistency" with an appropriate level of importance, it should have refused to certify Sentinel's financial statements absent acceptable audit evidence that the $2.3 billion in supposedly "customer" repo positions were not in reality Company positions.

148.  Nonetheless, M&P certified Sentinel's financial statements without seeking confirmation from a single customer that it was aware that its SEG account was allocated certain repo positions.

149.  In addition to the above-described material misstatements, the financial statements made no disclosure of any of the market risk associated with Sentinel's $2.4 billion in repo positions.

150.  Sentinel's repo positions entailed precisely the type of market risk that M&P knew it was supposed to assess as part of its audit. The leverage associated with Sentinel's repo positions had the potential of magnifying Sentinel and/or customer losses if the market moved unfavorably. These risks were magnified even further because the repo haircuts were financed with the BONY loan and not with Sentinel's own equity. Given Sentinel's thin capital, even the slightest market fluctuations would mean that Sentinel had no means of meeting the liabilities it

37

incurred. This very substantial and undisclosed risk was further magnified because hundreds of millions of dollars worth of the securities on repo were highly illiquid.

151.    M&P certified financial statements that failed to disclose the very market risks associated with the repo positions that ultimately led to the Company's demise. Note 2 of Sentinel's financial statements stated, "At December 31, 2006, the aggregate fair value of collateral pledged under repurchase agreements is substantially equal to the aggregate carrying value." However, as described above, M&P performed no market testing of any securities purchased under repo agreements, and therefore had no basis for accepting this statement.

152.    Ultimately, the illiquidity of the repo'd securities coupled with the extensive leverage reflected in the $2.4 billion in repos and the $230 million BONY loan were the driving forces behind Sentinel's collapse. As repo counterparties demanded repayment of their loans or new security as collateral, Sentinel was unable to simultaneously meet its repo obligations, pay back its bank loan, and redeem customer requests. Sentinel's thin capital gave it no ability to handle even a slight market downturn or liquidity crunch.

153.    In the face of the compelling inconsistencies in Sentinel's financial records and Sentinel's "three wheels over the cliff" leverage posture, M&P did nothing. And, in so doing, it was grossly derelict in fulfilling its obligations as an auditor.

154.    M&P's deficient audit conduct relating to Sentinel's repo activity violated SAS 105, SAS 99, SAS 107, and the audit standards set forth in the AICPA Guide, and M&P certified financial statements that violated GAAP, including, without limitation, FAS 5, FAS 140, and CON 6.

155.    Had M&P properly performed its audit obligations and either refused to certify the materially misstated financial statements or even required footnote disclosure of all of the

38

risks associated with Sentinel's repo obligations, Sentinel's subsequent losses and related damages would have been avoided.

## M&P'S FAILURE TO REPORT
## VIOLATIONS OF CFTC AND SEC REGULATIONS AND THE
## MATERIAL INADEQUACIES IN SENTINEL'S INTERNAL CONTROLS

156. Under CFTC regulations, applicable auditing standards, and the terms of M&P's engagement letter, M&P was required to report known violations of law, including violations of CFTC and SEC regulations, and material inadequacies in Sentinel's internal controls and procedures.

157. M&P failed to fulfill that obligation. M&P knew or should have known, at a minimum, of Sentinel's violation of (a) CFTC Rule 1.20's segregation requirements; (b) CFTC Rule 1.20's prohibition against the pledging of securities that should have been segregated for customers to collateralize a bank loan; (c) CFTC Rule 1.17's net capital requirements; (d) SEC Rule 206(4)-2's custody requirements; and (e) SEC Rule 206(4)-4's requirement to provide customers with information regarding financial conditions reasonably likely to impair Sentinel's ability to meet commitments to customers.

158. Similarly, M&P failed to report the material inadequacies that caused or permitted the above violations and other activity that inhibited Sentinel's ability to satisfy its obligations to customers and had the potential to lead to material financial losses.

159. Numerous documents M&P reviewed as part of its audit demonstrated violations of the above regulations and other material inadequacies, which Sentinel's financial statements and year-end Form 1-FR obfuscated and which M&P failed to report. In addition to the clear evidence of the violations and material inadequacies described above, M&P also reviewed as part of its audit each of the Form 1-FRs that Sentinel submitted to regulators on a monthly basis. For the same reasons discussed above, each and every one of the financial statements, statements

39

of segregation, and net capital computations on those monthly Forms 1-FR was false, thus providing M&P with yet additional evidence of regulatory violations.

160.    M&P not only failed to report the above-described violations and material inadequacies in its audit report, but it also failed to ensure that these violations and material inadequacies were reported to the CFTC and NFA. Had M&P fulfilled its responsibilities, Sentinel would not have been permitted to continue its operations and its subsequent losses and related damages would have been avoided.

## M&P'S PARTICIPATION IN THE CREATION OF A
## FICTITIOUS AGREEMENT TO SIPHON MONEY TO SENTINEL'S CEO

161.    In late 2006, Eric Bloom, Sentinel's CEO, decided to take money out of Sentinel in such a way as to hide those payments from his ex-wife. Rather than pay himself this money directly, Eric Bloom decided that he would cause Sentinel to pay an "administrative" or "management" fee to its parent company, Sentinel Investment Group ("SIG"), which Eric Bloom controlled.

162.    M&P knew that SIG performed no services, administrative or otherwise, for Sentinel and that the administrative fee was merely a bonus for Eric Bloom. In fact, in its own work papers, M&P refers to the administrative fee as a bonus that Eric Bloom took for personal reasons.

163.    Nevertheless, M&P participated in creating a fictitious, back-dated agreement between Sentinel and SIG to justify nearly $1 million paid to SIG. Even though M&P knew that SIG performed no services for Sentinel, M&P advised Sentinel that in order to justify the payments, an agreement would have to be drafted that included a substantive description of the services SIG provided for Sentinel and how the fee was determined.

40

164.    In March 2007, Eric Bloom caused outside counsel for Sentinel to draft a management services agreement. After receiving the initial draft, M&P informed Sentinel that it was not satisfied with the description of how the fee was determined and suggested that Sentinel request that its lawyers put in more "meat."

165.    Sentinel subsequently sent M&P a final, signed agreement, which M&P accepted even though it did not contain any additional detail regarding how the fee was determined. The agreement was nothing more than a pretext for the payments to SIG.

166.    M&P nevertheless certified financial statements that stated in Note 7 that "The Company has a management fee agreement with the Parent [SIG] to provide economic research, forecasting, and analysis in support of the Company's operations." But M&P knew that the payments were not a "management fee" and that SIG did not actually provide services to Sentinel, and therefore knew that Note 7 was false and that the payments to SIG were fraudulent transfers.

167.    M&P's participation in the creation of a fictitious agreement between SIG and Sentinel violated GAAS, including but not limited to SAS 105, SAS 99, and SAS 107, and the financial statements themselves failed to comport with, at a minimum, FAS 57's pronouncements regarding the fair presentation of related-party transactions and CON 6.

## THE COLLAPSE OF SENTINEL

168.    By turning a blind eye to the Sentinel Insiders' misconduct and regulatory violations, failing to properly assess the risks associated with Sentinel's operations, and certifying financial statements that concealed the misconduct and falsely portrayed Sentinel's financial condition, M&P substantially contributed to and caused hundreds of millions of dollars in losses and related damages in 2007. The material misstatements and omissions in Sentinel's

41

financial statements and deficiencies in M&P's audit procedures directly related to the financial circumstances and activity that led to Sentinel's demise.

169. In late June and early July 2007, Sentinel's two primary repo counterparties decided to stop rolling forward higher-risk repo transactions with Sentinel and insisted on repayment of the repo loans. Because Sentinel could not finance those payments in any other way, on June 1, 2007, it borrowed an additional $94 million from BONY, increasing its total loan balance to more than $353 million.

170. Shortly thereafter, Sentinel's repo counterparties refused to roll forward many more repo transactions. As a result, Sentinel continued borrowing money from BONY, and throughout June and July 2007, the outstanding loan balance ballooned. To collateralize the additional loan amounts, the Sentinel Insiders and BONY continued to transfer securities between the various SEG accounts and the BONY collateral account in an attempt to fill various shortfalls.

171. Sentinel's severe financial stress continued through the end of July and into August as it was unable to simultaneously reduce its loan balance with BONY, sell the higher-risk securities it had received back from repo counterparties that had stopped financing such securities, and meet its redemption obligations to customers who wanted to withdraw funds. The financial risks coupled with its undercapitalization, neither of which was identified in Sentinel's financial statements or in M&P's audit report, crushed Sentinel, and the undisclosed segregation violations left Sentinel unable to fulfill its obligations to its customers.

172. This final carnage could have and would have been avoided if M&P had done its job.

## COUNT ONE
### (Negligence/Malpractice against M&P and Johnson)

173.   Plaintiff restates and realleges paragraphs 1 through 172 of this Complaint as though fully set forth herein.

174.   At all relevant times, M&P acted as Sentinel's independent auditor and owed Sentinel a duty to, among other things, perform an independent, objective, and thorough audit of Sentinel's financial statements in accordance with GAAS, take appropriate action to satisfy itself that Sentinel's financial statements were prepared in accordance with GAAP, and report violations of, at a minimum, the segregation and minimum net capital requirements of the CFTC and SEC. Defendant Johnson was responsible for ensuring that the M&P audit team fulfilled those duties.

175.   With respect to the audit of Sentinel for December 31, 2006, M&P breached its duties to Sentinel by:

  a.     failing to adequately plan for the audit;

  b.     failing to properly understand and report on Sentinel's internal controls;

  c.     failing to conduct its audit in accordance with GAAS and the relevant CFTC regulations;

  d.     consciously disregarding evidence of commingling and other misuse of customer funds that were evident in the information and materials provided to or made available to M&P;

  e.     consciously disregarding Sentinel's net capital deficiency;

  f.     consciously disregarding the risks associated with Sentinel's repo activity;

  g.     certifying Sentinel's financial statements despite the numerous misstatements and departures from GAAP contained therein;

43

h.      participating in the creation of a fictitious agreement between Sentinel and SIG to justify a bonus to Sentinel's CEO; and

i.      failing to report Sentinel's violations of CFTC and SEC regulations regarding segregation and minimum net capital and other material inadequacies and weaknesses to Sentinel and the appropriate regulatory authorities.

176.   Sentinel was damaged as a direct and proximate consequence of M&P's and Johnson's negligent breaches of its duties. Absent M&P's various acts of misfeasance and malfeasance, Sentinel would not have suffered hundreds of millions of dollars in losses and related damages in 2007.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and against each of the defendants for actual and consequential damages, plus interest, costs and attorneys' fees, and grant such other equitable relief as may be just and appropriate.

## COUNT TWO
### (Aiding and Abetting/Knowing Participation in Breach of
### Fiduciary Duty against M&P and Johnson)

177.   Plaintiff restates and realleges paragraphs 1 through 176 of this Complaint as though fully set forth herein.

178.   At all times relevant to this Complaint, the Sentinel Insiders were officers and directors of Sentinel.

179.   As officers and directors of Sentinel, the Sentinel Insiders owed fiduciary duties to Sentinel, including a duty of loyalty, and a duty to act with due care and to deal honestly and fairly with Sentinel.

180.   The Sentinel Insiders caused Sentinel to engage in a risky leveraged trading strategy and commingled and misused client funds for their own financial gain, causing Sentinel

44

to violate the CEA and CFTC regulations, and Investment Advisers Act and SEC regulations, and to incur hundreds of millions of dollars in losses and related damages.

181.    Specifically, the Sentinel Insiders breached their fiduciary duties to Sentinel by, among other things:  commingling customer securities and money with securities and money belonging to the House, commingling customer securities and money from one segregated account with those from another segregated account, pledging customer funds to secure the BONY loan, clearing and maintaining customer funds and securities in accounts that were not registered in Sentinel's name as agent or trustee of its clients, transferring securities out of segregation to collateralize the BONY loan, pledging customer securities to collateralize a loan for the benefit of the Sentinel Insiders themselves, borrowing funds from BONY far in excess of Sentinel's ability to repay, concealing from customers the use of leveraging through bank loans and repurchase agreements, providing false reports to federal regulators, and creating a fictitious agreement to justify bonus payments made to Eric Bloom.

182.    M&P and Johnson knowingly participated in, aided, assisted and benefited from Philip Bloom's, Eric Bloom's and Charles Mosley's breaches of their fiduciary duties to Sentinel by, among other things:

    a.    consciously disregarding Sentinel's violations of CFTC and SEC segregation requirements and failing to report those violations to Sentinel and the appropriate regulators;

    b.    consciously disregarding Sentinel's providing the CFTC with materially misstated minimum net capital computations, certifying those incorrect computations, and failing to report those material inadequacies to Sentinel and the appropriate regulators;

    c.    consciously disregarding the risks associated with Sentinel's repo activity and certifying financial statements that did not disclose those risks and that were materially

45

misstated, and failing to report those material inadequacies to Sentinel and the appropriate regulators; and

        d.     participating in the creation of a bogus agreement in order to provide a pretext for Sentinel's CEO to siphon money from the Company, and certifying financial statements that falsely described the nature of those payments.

     183.    The same auditors involved in the 2006 audit had been involved in prior Sentinel audits. M&P profited from the continued business relationship with Sentinel and certified Sentinel's 2006 financial statements despite its knowledge of numerous material misstatements for the purpose of continuing the relationship with Sentinel. M&P used its audit relationship with Sentinel to secure additional business and market itself as having particular expertise in auditing companies subject to SEC and CFTC regulations.

     184.    Sentinel has been damaged as a result of M&P's and Johnson's knowing participation in and aiding and abetting of the Sentinel Insiders' breaches of their fiduciary duties. Absent M&P's and Johnson's various acts of misfeasance and malfeasance, Sentinel would not have suffered hundreds of millions of dollars in losses and related damages in 2007.

46

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of

Plaintiff and against each of the defendants for actual and consequential damages, plus interest,

costs and attorneys' fees, and grant such other equitable relief as may be just and appropriate.

Dated: March 20, 2008                      Respectfully submitted,

                                           FREDERICK J. GREDE, not individually
                                           but as Chapter 11 Trustee of Sentinel
                                           Management Group, Inc.


                                           By: _____
                                                One of his attorneys


J. Kevin McCall (ARDC # 3125685)
Catherine L. Steege (ARDC # 6183529)
Chris C. Gair (ARDC # 6190781)
Vincent E. Lazar (ARDC # 6204916)
JENNER & BLOCK LLP
330 N. Wabash Ave.
Chicago, IL 60611
Phone: (312) 222-9350
Facsimile: (312) 527-0484

EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | CHAPTER 11 |
| | ) | |
| **SENTINEL MANAGEMENT GROUP, INC.,** | ) | **CASE NO. 07 B 14987** |
| | ) | |
| Debtor. | ) | Hon. John H. Squires |
| —————————————————————— | ) | |
| **FREDERICK J. GREDE**, as Chapter 11 | ) | |
| Trustee for Sentinel Management Group, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **ADV. NO. _____** |
| **MCGLADREY & PULLEN LLP** and **G.** | ) | |
| **VICTOR JOHNSON,** | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Frederick J. Grede, not individually but as Chapter 11 Trustee for Sentinel Management Group, Inc. ("the Trustee"), hereby states for his Complaint as follows:

### NATURE OF THE ACTION

1.    This is an adversary proceeding by the Trustee against McGladrey & Pullen LLP ("M&P") and G. Victor Johnson, one of M&P's partners. M&P served as the auditor of Sentinel Management Group, Inc. ("Sentinel" or the "Company") for the year ended December 31, 2006. Mr. Johnson was the engagement partner for that audit.

2.    M&P's audit of Sentinel's financial statements for the year ended December 31, 2006 (the "2006 audit") failed to satisfy the most basic standards of the accounting and auditing profession as well as the contractual promises in its engagement letter. M&P ignored blatant violations of federal law being committed by certain Sentinel insiders and failed to fulfill its legal duty to report those violations to Sentinel's regulators. M&P expressed an unqualified opinion that Sentinel's financial statements stated fairly in all material respects the financial

position of Sentinel (hereinafter, referred to as "certified"), when it knew that those statements materially misstated the facts and obfuscated violations of federal regulations critical to the protection of Sentinel's investors. M&P ignored its duties to approach the audit with professional care and skepticism, and in some instances, M&P itself participated in the wrongdoing committed by a Sentinel insider.

      3.    M&P's misfeasance and malfeasance includes:

      a.    M&P certified financial statements that materially misstated Sentinel's assets and falsely classified as company assets hundreds of millions of dollars worth of securities that M&P knew should have been segregated for customers.

      b.    M&P itself created certain of the accounting entries that led to Sentinel's financial misstatements. In particular, M&P knew that Sentinel's books and records did not properly reflect a $230 million bank loan. In response, M&P made adjusting journal entries to Sentinel's Trial Balance purporting to reflect both Sentinel's liability for the bank loan and the value of securities pledged as collateral for that loan. But those adjusting journal entries were themselves materially misstated, and the financial statements that M&P certified incorporated the materially misstated figures from M&P's adjusting journal entries. In addition, M&P prepared footnotes to the financial statements that falsely stated that the securities pledged for that loan were held in segregated customer accounts.

      c.    M&P also improperly certified materially false Sentinel financial statements submitted to regulators on Commodity Futures Trading Commission ("CFTC") Form 1-FR. Form 1-FR is the document that the CFTC uses to assess whether futures commission merchants ("FCMs") like Sentinel are segregating customer assets as required by law and whether they have the required net capital to protect their investors. M&P knew or should have known that Sentinel had engaged in systematic violations of the CFTC and Securities and

Exchange Commission ("SEC") segregation requirements. In addition, M&P knew or should have known that Sentinel had a massive net capital deficiency. Both of those facts were apparent from the documents M&P reviewed during its audit.

d.      Compounding the segregation and net capital related deficiencies, the financial statements M&P certified falsely represented that Sentinel's bank loan was used for short-term liquidity. In reality, M&P knew or consciously disregarded that the primary purpose of the bank loan was to finance a leveraging scheme in which over $2 billion in securities were purchased and financed using a combination of Sentinel's bank loan and repurchase agreements ("repos").

e.      Although M&P reviewed Sentinel records that reflected its repo leveraging, there was no disclosure in the financial statements of the huge risks associated with those repo positions or that all of Sentinel's leveraging activity depended on the pledging of customer securities for its bank loan. This leveraging activity was a substantial factor in Sentinel's demise. The financial statements and M&P's report on its audit also did not disclose that many of the repo positions had been internally allocated to Sentinel's house account or that Sentinel internal records allocated billions of dollars in repo positions to customers, but that the statements Sentinel provided to customers did not reflect any repo activity.

f.      Ultimately, M&P's malfeasance extended to assisting in the creation of a fictitious management agreement to justify the payment of approximately one million dollars to Sentinel Investment Group ("SIG"), a company controlled by Sentinel's CEO. M&P knew that SIG did not provide any management services to Sentinel, and that the payments were merely a mechanism for Sentinel's CEO to siphon money from Sentinel. Nonetheless, M&P certified Sentinel's financial statements that misrepresented the true purpose of that agreement.

3

4.    As a result of M&P's failure to properly fulfill its responsibilities, Sentinel insiders were allowed to continue the operation of the Company for their own benefit, in violation of CFTC and SEC segregation regulations, and without the required regulatory capital. If M&P had adequately performed its duties, it would not have certified Sentinel's 2006 financial statements, and it would have reported Sentinel's regulatory violations and control weaknesses to management and to the applicable regulatory agencies. This would have resulted in either the regulators shutting down Sentinel, the withdrawal of money by Sentinel's customers, or Sentinel otherwise adjusting its business practices and rectifying its deficiencies, thus avoiding all of the losses and increased net liabilities in 2007. Instead, by failing to properly perform its audit duties and by failing to report Sentinel's violations, M&P substantially contributed to and caused hundreds of millions of dollars of losses and related damages during 2007 -- thereby undermining Sentinel's ability to satisfy its obligations and pushing Sentinel into an insolvency from which it could not recover.

5.    As a result of M&P's gross dereliction of its duties, this Complaint seeks actual and consequential damages exceeding Five Hundred And Fifty Million Dollars ($550,000,000.00).

## JURISDICTION AND VENUE

6.    This Court has jurisdiction pursuant to 28 U.S.C. § 1334(b). This adversary proceeding is related to and arises under the chapter 11 case, *In Re Sentinel Management Group, Inc.*, pending in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, as Case No. 07 B 14987.

7.    Venue is proper in this District pursuant to 28 U.S.C. § 1409(a).

8.    This proceeding is a non-core proceeding. The Trustee consents to entry of final orders or judgment by the bankruptcy judge.

4

## THE PARTIES AND RELATED ENTITIES

9.    Plaintiff Frederick J. Grede is the chapter 11 trustee for Sentinel, duly appointed under Section 1104 of the Bankruptcy Code by Orders of this Court dated August 23 and 29, 2007.

10.    Sentinel is an Illinois corporation, headquartered in Northbrook, Illinois. Sentinel is registered with the SEC as an investment adviser and with the CFTC as an FCM. It is also a member of the National Futures Association ("NFA"), which is Sentinel's designated self-regulatory organization ("DSRO").

11.    Defendant McGladrey & Pullen LLP is a national accounting and auditing firm. At all times relevant to this complaint, McGladrey & Pullen LLP served as the independent auditor of Sentinel.

12.    Defendant G. Victor Johnson is a certified public accountant licensed in Illinois and a partner at McGladrey & Pullen LLP. Mr. Johnson served as the engagement partner for the 2006 audit of Sentinel.

13.    Philip Bloom, Eric Bloom, and Charles Mosley ("the Sentinel Insiders") were officers and directors of Sentinel who breached their fiduciary duties to Sentinel. There were at all relevant times one or more officers and employees of Sentinel who were not part of the Sentinel Insiders' scheme. As discussed below, M&P was required to disclose certain regulatory violations and material inadequacies in Sentinel's internal controls to certain regulators if Sentinel itself failed to do so.

5

## BACKGROUND

A.    **Regulatory Requirements**

### The Commodity Exchange Act and CFTC Rules

14.    Sentinel was registered as an FCM because many of its customers were FCMs who were investing their own clients' cash. CFTC regulations limited the options for investing such funds and one of the permitted options was to invest with another FCM.

15.    As an FCM, Sentinel and any bank acting as custodian for customer funds were subject to the provisions of the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.* ("the CEA"), and the rules and regulations of the CFTC, 17 C.F.R. §§ 1.1-190.10.

16.    Section 4d(a)(2) of the CEA requires that money, securities, and property deposited by customers be segregated from the funds of the FCM.

17.    CFTC Rule 1.20(a) provides that all customer funds shall be segregated on behalf of customers and shall be deposited under an account name that clearly identifies them as customer property. CFTC Rule 1.20(a) also prohibits the pledging of customer funds to secure a bank loan for any purpose other than for commodity transactions for that customer. Moreover, CFTC Rule 1.26 requires a written acknowledgement from the depository bank that the securities are customer securities and are being held in compliance with the CEA.

18.    Under CFTC Rule 1.25, FCMs' customers' funds can be invested only in high grade corporate and government securities and similar highly liquid investments. CFTC Rule 1.25 permits FCMs to use repurchase agreements in connection with the investment of customer funds, but only if the securities involved in the repurchase transactions are the types permitted under Rule 1.25. Moreover, the CEA and CFTC regulations require that all repurchase transactions for customers settle solely in the customer segregated accounts.

6

19.    Funds of FCM customers engaged in trading at foreign exchanges are subject to CFTC Rule 30.7, which imposes certain segregation requirements and investment restrictions.

20.    As of December 31, 1980, CFTC Rule 1.17 would have required Sentinel to maintain adjusted net capital (essentially liquid assets in excess of liabilities) equal to or in excess of 4% of all funds required to be segregated for its customers. On May 7, 1981, Sentinel obtained from the CFTC a letter recommending no-action against Sentinel for maintaining net capital less than 4% of all funds required to be segregated. The 1981 letter was conditioned on Sentinel's representations concerning its arrangements for maintaining the custody of customer funds. Those arrangements were no longer present since at least 2003.

21.    CFTC Rule 1.17 was amended in 2004, and pursuant to CFTC and NFA rules, effective July 2006, Sentinel's minimum net capital requirement was $500,000.

### The Investment Advisers Act and SEC Rules

22.    Sentinel was also registered as an investment adviser and subject to the provisions of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 *et seq.* (the "Investment Advisers Act"), and the rules and regulations of the SEC, 17 C.F.R. §§ 275.0-2 – 275.222-2.

23.    Section 206 of the Investment Advisers Act makes it illegal to "employ any device, scheme, or artifice to defraud any client or prospective client" and to "engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client."

24.    SEC Rule 206(4)-2 provides that it is a "fraudulent, deceptive, or manipulative" act or practice to have custody of client funds except as provided in SEC Rule 206(4)-2. Rule 206(4)-2 requires that client funds and securities be maintained by a "qualified custodian . . . [i]n a separate account for each client under that client's name" or "[i]n accounts that contain only

7

[the investment adviser's] clients' funds and securities, under [the investment adviser's] name as agent or trustee for the clients."

25.     SEC Rule 206(4)-2 further provides that an investment adviser must "notify the client in writing of the qualified custodian's name, address, and the manner in which the funds or securities are maintained, promptly when the account is opened and following any changes to this information."

26.     SEC Rule 206(4)-4 provides that an investment adviser must disclose to its clients all material facts with respect to a "financial condition of the adviser that is reasonably likely to impair the ability of the adviser to meet contractual commitments to clients . . . ."

27.     As Sentinel's auditor, M&P was responsible for reporting known violations of these statutes and regulations and, in particular, for reporting violations of the segregation and net capital rules that were designed to protect Sentinel's customers.

**B.     Sentinel's Three Customer Groups**

28.     Sentinel's business was to manage cash for clients including FCMs, hedge funds, financial institutions, pension funds, and individuals.  In 2006, Sentinel managed approximately $1.4 billion in funds deposited by its customers.  These funds were invested in a variety of securities including government and corporate debt as well as collateralized debt obligations.  In addition to investing its clients' funds, as of December 31, 2006, Sentinel had purchased over $2 billion worth of securities pursuant to a leveraging scheme that involved the use of a bank loan and repo agreements to finance those purchases.

29.     Unlike traditional FCMs, Sentinel did not engage in commodities trading for its customers, but instead managed investments only in securities.

8

30.     Sentinel divided its customers into three groups and was required to strictly segregate the investments of these three customer groups from each other, and from Sentinel's proprietary funds. Sentinel also had subgroups within two of its three main customer groups.

31.     The first customer group, known within Sentinel as SEG 1, was supposed to include only customers of other FCMs. The investment of the funds of SEG 1 customers was subject to the strict investment standards embodied in CFTC Rule 1.25.

32.     The second customer group, known within Sentinel as SEG 2, was supposed to consist solely of FCM customers who were engaged in trading at foreign exchanges. The funds of SEG 2 customers were supposed to be invested in accordance with CFTC Rule 30.7.

33.     The third customer group, known within Sentinel as SEG 3, was supposed to consist of all other types of clients, including other FCMs who were investing their proprietary (*i.e.*, non-customer) funds.

34.     In addition to managing investments for the SEG 1, SEG 2, and SEG 3 customer portfolios, Sentinel owned a "House" or "Street" portfolio of securities traded by Sentinel for the ultimate benefit of the Sentinel Insiders. Sentinel customer agreements, as well as CFTC and SEC regulations, required that the funds and securities in all of these accounts remain segregated.

35.     The custodial accounts for the three SEG groups and the Sentinel "House" account were maintained by the Bank of New York ("BONY").

## C.     Changes In Sentinel's Operations

36.     Prior to late 2002, Sentinel operated as a cash manager, managing investments of client funds in high-quality, low-risk securities. From time to time, BONY made short-term loans to Sentinel to facilitate customer requests for redemption. After redeeming customer investments with the loan proceeds, Sentinel would sell securities that had been allocated to the redeeming customer group and then repay the loan with the sales proceeds. The short-term loans

9

were made in the form of daytime "overdrafts" which from time to time would be converted to short-term overnight loans until the securities needed to cover the redemptions were sold. Prior to 2003, Sentinel's loan balances were modest compared to the loan balances in later years. For example, as of late 2002, Sentinel's loan balance was approximately $23 million, as compared to the December 31, 2006 loan balance of over $230 million.

37.     Beginning in 2003, Sentinel began purchasing a large volume of securities that were not segregated for its customers and that did not appear on its customers' statements. Typically, these transactions involved the purchase of the security either with funds from the BONY loan or with funds received from a repurchase counterparty.   In its repurchase transactions, Sentinel would deliver the security to its counterparty, who would in turn deliver a percentage of the value of the security to Sentinel.   As part of the agreement, Sentinel was obligated to repurchase the security for the amount it received plus interest.

38.     Even in those circumstances when Sentinel could pay for the securities with proceeds from a repurchase agreement, Sentinel was still required to finance a portion of the purchase with the BONY loan.   This was because repurchase counterparties would only loan a percentage (often 90%) of the value of the security Sentinel delivered to the counterparty in the repurchase transaction.   The percentage of the security's value that the counterparty would not finance is referred to as the repo haircut.   Sentinel used the BONY loan to cover the amount of the repo haircut.   Through these arrangements, Sentinel obtained control over $2 billion of securities with none of its own equity.

39.     While BONY ultimately lent Sentinel hundreds of millions of dollars, which Sentinel used in this leveraging scheme, BONY always required that Sentinel post collateral to secure the balance of its loan.   BONY maintained a non-segregated collateral account for that purpose entitled "SEN Clearance Coll A/C FBO BNY" (the "BONY collateral account").   As the

10

BONY loan grew, the House securities, other House funds on deposit with Sentinel, and the Sentinel Insiders' equity in Sentinel were insufficient to secure the BONY loan. As a result, the Sentinel Insiders began collateralizing the BONY loan with securities that were supposed to be segregated for Sentinel's SEG customers.

40.    Sentinel purchases of securities that did not appear on customer statements increased dramatically from 2003 to 2006. The BONY loan grew proportionately. At year-end 2003, the BONY loan was $53,050,000. As of December 31, 2006, Sentinel's loan balance at BONY grew to $230,628,000, and approximately $255 million in securities that were supposed to be segregated for customers were posted as collateral for the BONY loan.[1]

41.    The net result of Sentinel's financing structure was that as of December 31, 2006, Sentinel controlled over $2 billion in securities that had been financed by repo agreements and the BONY loan. In these repo transactions, Sentinel had taken over $200 million in haircuts, virtually all of which were financed with the BONY loan. None of Sentinel's repo positions were reflected on statements provided to Sentinel's customers, and none of Sentinel's customer statements reflected the fact that customer securities were being used to finance repo haircuts or to collateralize the BONY loan.

42.    Sentinel's bank loan and its repo positions grew in lockstep. This combined growth gave Sentinel a highly leveraged financial structure, which in conjunction with Sentinel's segregation and net capital deficiencies, created a material risk of huge losses if the market moved unfavorably to Sentinel's repo positions – risks that ultimately came to fruition and led to Sentinel's demise.

---

[1] Unless otherwise noted herein the value of all securities maintained in various BONY accounts is denominated in par value.

43.    As Sentinel's auditor, M&P was fully aware of Sentinel's highly leveraged structure and that customer securities were being unlawfully pledged for the BONY loan. As an expert in the financial services industry, M&P fully appreciated the extreme risks associated with Sentinel's financial structure. It was M&P's duty as Sentinel's independent auditor to see that these facts were accurately reflected in Sentinel's financial statements and that its violations of critical CFTC and SEC regulations were duly reported. As detailed below, M&P failed miserably in fulfilling its duties.

## M&P'S AUDITORS

44.    M&P's audit team for the 2006 audit was comprised primarily of Defendant G. Victor Johnson (engagement partner), Susan Menelaides (concurring partner), Ann Bernard Tushaus (auditor in-charge), and Megan Hannigan (manager/director). As engagement partner, it was Defendant Johnson's duty to supervise the audit team and ensure that it was fulfilling M&P's audit responsibilities.

45.    For several years prior to 2006, many members of the M&P audit team also had been involved in auditing Sentinel's financial statements as employees of Altschuler, Melvoin & Glasser ("AM&G"). Upon information and belief, McGladrey & Pullen LLP acquired AM&G in or around November 2006.

46.    In addition to conducting year-end audits of Sentinel, the M&P auditors had also conducted several segregation audits of Sentinel under SEC Rule 206(4)-2 and audits of Sentinel's anti-money laundering programs under the PATRIOT Act. Thus, the M&P audit team was knowledgeable about Sentinel's business and its regulatory requirements.

47.    As head of the audit team, Defendant Johnson was responsible for assuring that M&P adhered to CFTC audit requirements, and Defendant Johnson was acutely aware of the consequences of failing to fulfill those obligations. Indeed, in September 2004, Mr. Johnson and

12

AM&G entered into a consent order with the CFTC regarding their audit of another CFTC registrant. Pursuant to that consent order, Mr. Johnson and AM&G stipulated that in performing their audit they had departed from Generally Accepted Auditing Standards, violated CFTC Rule 1.16, and certified materially misstated financial statements.

48.     Among other things, Mr. Johnson was ordered not to participate in any audit of any CFTC registrant as engagement partner, reviewing partner, or audit team member until after December 31, 2005. All accounting professionals at AM&G participating in audits of CFTC registrants on or before September 30, 2006 were ordered to undergo training in Statement on Auditing Standards 99 relating to fraud risks. Thus, the M&P audit team should have been especially vigilant in assuring that they and Sentinel complied with applicable CFTC and SEC regulations.

**THE ENGAGEMENT LETTER BETWEEN M&P AND SENTINEL**

49.     M&P was engaged by Sentinel to audit Sentinel's 2006 financial statements pursuant to an engagement letter dated December 11, 2006.

50.     The 2006 audit engagement letter states, in part: "We will perform an audit of the Company's statement of financial condition as of December 31, 2006 and related statements of income, changes in stockholder's equity, and cash flows for the year then ending, and the schedules supporting such financial statements required under Regulation 1.10 of the [CEA]. Also, as required by Regulation 1.16(d) under the [CEA], we will make a study of the practices and procedures, including tests of compliance with such practices and procedures, followed by the Company that we consider relevant to the objectives stated in Regulation 1.16(d)."

51.     Paragraph 6 of the letter states: ". . . we will report whether we believe your procedures are adequate for the [CFTC's] purposes. In addition, our report will set forth those conditions, if any, which we believe are material weaknesses in relation to Regulation 1.16(d)."

13

52.    The engagement letter further states:  "We will communicate fraud involving senior management and other fraud that causes a material misstatement of the financial statements [and] illegal acts that come to our attention (unless clearly inconsequential)."

53.    Thus, pursuant to its engagement letter, M&P was obligated to study whether Sentinel's procedures for segregating customer assets were adequate and to report material inadequacies in relation to CFTC segregation requirements and other violations of law of which it became aware.

**STANDARDS GOVERNING M&P'S AUDIT OF SENTINEL**

**A.    M&P's Audit Duties Under CFTC Regulations**

54.    Because Sentinel was a registered FCM, M&P, as Sentinel's auditor, had certain obligations under CFTC regulations.

55.    Specifically, CFTC Rule 1.16 expressly required M&P to:

a.    Review and appropriately test Sentinel's accounting system, internal controls, and procedures for safeguarding customer and firm assets in accordance with the CEA and CFTC regulations;

b.    Implement all procedures necessary to express an opinion on the financial statements and schedules to be filed with the CFTC;

c.    Implement sufficient procedures to provide reasonable assurance that M&P would discover any "material inadequacies" in the internal controls or procedures applicable to the segregation of customer securities;

d.    Review Sentinel's practices and procedures for making the CFTC-mandated daily segregation computations and Sentinel's periodic net capital calculations;

14

      e.      File a report with the CFTC stating that the audit was conducted according to Generally Accepted Auditing Standards ("GAAS") or explaining whether and why any auditing procedures were omitted; and

      f.      Report any material inadequacies to Sentinel and issue a supplemental report discussing those material inadequacies.

56.      For purposes of the above requirements, a "material inadequacy" includes any condition relating to the daily segregation of customer assets or periodic net capital computations that could reasonably be expected to: (1) inhibit Sentinel from discharging its responsibilities to customers; (2) result in a material financial loss; (3) result in material misstatements in the financial statements; or (4) result in violations of the CFTC's segregation requirements.

57.      Pursuant to CFTC Rules 1.10 and 1.16, M&P was required to audit and certify Sentinel's year-end Form 1-FR, which contained both a Statement of Segregation and Statement of Computation of Minimum Capital Requirements.

58.      M&P failed to comply with the auditing standards set forth in CFTC Rules 1.10 and 1.16 in conducting and reporting the results of its audit of Sentinel's 2006 financial statements and year-end Form 1-FR.

**B.**      **M&P's Audit Duties Under Generally Accepted Auditing Standards**

59.      M&P was also required to comply with GAAS, as approved and adopted by the American Institute of Certified Public Accountants ("AICPA"). The Statements on Auditing Standards ("SAS") are recognized by the AICPA as the authoritative interpretation of GAAS.

60.      In accordance with GAAS, M&P was obligated to conduct its audit in compliance with the following:

a.      Under SAS 105,[2] M&P was required to have adequate technical training and proficiency, to maintain independence in mental attitude, and to exercise due professional care and approach each task with "professional skepticism."

b.      Under SAS 105, M&P was required to (1) adequately plan the work and properly supervise any assistants; (2) obtain a sufficient understanding of Sentinel and its environment, including its internal controls, to assess the risk of material misstatement whether due to error or fraud, and to accordingly design the nature, timing, and extent of its audit procedures; and (3) obtain sufficient appropriate audit evidence to afford a reasonable basis for opining on the financial statements.

c.      Also under SAS 105, M&P was required to state whether the financial statements were presented in accordance with Generally Accepted Accounting Principles ("GAAP"); identify those circumstances in which GAAP had not been consistently observed; state instances where the informative disclosures were not reasonably adequate; and express an opinion regarding the financial statements or state that an opinion cannot be expressed and the reasons therefore.

d.      In accordance with SAS 99, M&P was required to assess the risk of fraud, including motivation, opportunity, and attitude of management; analyze the business basis for unusual transactions or transactions that create a risk of fraud; and communicate possible fraud to Sentinel's management and board.

_____

[2] SAS 105 superseded SAS 95 and became effective for audits of financial statements for periods beginning on or after December 15, 2006 unless adopted earlier. If M&P was not an early adopter, then SAS 95, which is substantially the same as SAS 105 in all material respects, would apply to audit periods before December 15, 2006. For ease of reference, the Complaint uses "SAS 105" to refer to the standards set forth in SAS 95 and SAS 105 that are applicable to the 2006 audit.

e.	In accordance with SAS 107,[3] M&P was required to plan and perform its audits to obtain reasonable assurance that material misstatements in Sentinel's financial statements, whether caused by errors or fraud, were detected and evaluate whether the financial statements taken as a whole were presented fairly in all material respects.

61.	Additionally, the AICPA issues an audit guide, which provides authoritative assistance to auditors for both GAAP and reporting on financial statements of FCMs in accordance with GAAS ("AICPA Guide"). M&P's work papers reflect that M&P relied on the AICPA Guide in performing its audit of Sentinel's 2006 financial statements and Form 1-FR.

62.	Among other things, the AICPA Guide required M&P to:

a.	Read the applicable CFTC and SEC rules governing Sentinel's business, including the segregation and net capital regulations, and have an understanding of how those rules affected the scope of the audit and its reporting requirements;

b.	Evaluate whether customer securities were used to secure bank loans to Sentinel;

c.	Determine the amount of Sentinel's statutory net capital requirement and audit Sentinel's year-end net capital computations; and

d.	Consider applicable risk factors, including deficient internal controls and commingling of customer funds and securities with Sentinel's funds and securities.

63.	M&P failed to comply with each of the above auditing standards in conducting and reporting the results of its audit of Sentinel's 2006 financial statements.

---

[3] SAS 107 superseded SAS 47 and became effective for audits of financial statements for periods beginning on or after December 15, 2006 unless adopted earlier. If M&P was not an early adopter, then SAS 47, which is substantially the same as SAS 107 in all material respects, would apply to audit periods before December 15, 2006. For ease of reference, the Complaint uses "SAS 107" to refer to the standards set forth in SAS 47 and SAS 107 that are applicable to the 2006 audit.

17

C.    **Reporting Standards Under Generally Accepted Accounting Principles**

64.    As noted above, M&P was required to state an opinion either that all of Sentinel's financial statements were prepared in accordance with GAAP or identify the reasons that they did not comply with GAAP. The AICPA and Financial Accounting Standards Board ("FASB") have published the authoritative pronouncements of GAAP, including Statements of Financial Accounting Standards ("FAS"), which set forth and explain various GAAP principles, and Statements of Financial Concepts ("CON"), which provide a conceptual framework for financial statement reporting. The AICPA also publishes Statements of Positions ("SOP"), which set forth its position with respect to how to apply GAAP, and the AICPA Guide.

65.    GAAP applicable to Sentinel's financial statements include, among other things, the following requirements:

a.    Under FAS 5, the financial statements should properly disclose uncertainties regarding assets and liabilities, and should properly disclose "assets pledged as collateral for loans."

b.    Under FAS 140, Sentinel's financial statements must include all assets and corresponding liabilities from its repo transactions and disclose and fairly describe all assets pledged as collateral for loans.

c.    Under CON 6, assets are defined as "probable future economic benefits obtained or controlled by a particular entity as a result of past transactions or events." In particular, assets only include economic benefits the company itself will realize.

d.    Under CON 6, notes to financial statements should amplify and clarify items listed on the balance sheet.

18

66.    The AICPA Guide provides that the financial statements should fairly describe all assets pledged as collateral for firm loans and that customer securities cannot be pledged as collateral for firm loans.

## M&P'S DUTIES TO REPORT SENTINEL'S REGULATORY VIOLATIONS

67.    CFTC Rule 1.16(e)(2) required M&P to report to Sentinel any material inadequacies (i) relating to Sentinel's inability to promptly discharge its responsibilities to customers, (ii) which would result in material financial loss, (iii) which would result in material misstatement of Sentinel's financial statements; or (iv) with respect to violations of the CFTC's segregation requirements to the extent they could reasonably be expected to result in the conditions identified in (i)-(iii) above.  If such notice was provided to Sentinel, CFTC Rules 1.12(d) and 1.16(e)(2) required Sentinel to report the inadequacies to the CFTC and NFA.  If Sentinel failed to notify the CFTC and NFA of those material inadequacies within three business days or if M&P disagreed with the substance of Sentinel's notification, M&P was required to notify the CFTC and NFA directly of the material inadequacies it discovered.

## M&P'S INDEPENDENT AUDITORS' REPORT

68.    On March 30, 2007, M&P provided its Independent Auditors' Report on Sentinel's Financial Statements for the Year Ended December 31, 2006 to Sentinel.  M&P knew its report and Sentinel's financial statements and year-end Form 1-FR would be provided to the CFTC and NFA.

69.    In its audit report, M&P represented that (i) it had conducted its audit in accordance with GAAS; (ii) in its opinion, Sentinel's financial statements presented fairly, in all material respects, the financial position of Sentinel in conformity with GAAP; (iii) its audit provided a reasonable basis for its opinion; and (iv) Sentinel's year-end Form 1-FR had been subjected to the auditing procedures applied to the statement of financial condition and that, in

19

M&P's opinion, the Form 1-FR was fairly stated in all material respects when considered together with the other financial statements.

## M&P'S AUDIT DEFICIENCIES AND
## THE FINANCIAL STATEMENTS' MATERIAL MISSTATEMENTS

70.     Notwithstanding the above-described duties and M&P's audit representations, Sentinel's financial statements contained numerous material misstatements regarding the segregation of securities, the pledging of securities for the BONY loan, Sentinel's compliance with its net capital requirements, Sentinel's repo positions and the associated market risks, and Sentinel's agreement with SIG.   M&P's certification of Sentinel's financial statements containing these misstatements reflected M&P's conscious disregard of facts demonstrating violations of CFTC and SEC segregation regulations and other material inadequacies, and, at best, its reckless disregard of Sentinel's net capital deficiencies.   In addition, M&P failed to report those violations or any other material inadequacies to either Sentinel, the CFTC, or the NFA.

I.     **M&P'S DEFICIENCIES REGARDING VIOLATIONS OF SEGREGATION REQUIREMENTS AND THE PLEDGING OF SECURITIES FOR THE BONY LOAN**

   A.     **M&P's Inadequate Planning**

71.     M&P's audit deficiencies with respect to the segregation of securities and the pledging of securities for the BONY loan began in the planning stage of the audit and permeated every aspect of the audit thereafter.

72.     M&P only had a short hour-long planning meeting with Sentinel personnel prior to conducting its audit.   The agenda for that planning meeting does not reflect any discussion of the segregation and custody requirements governing Sentinel or of the BONY loan.

73.     Junior personnel from M&P were on site for approximately one week to conduct the audit fieldwork, with little supervision from M&P partners. This fieldwork occurred just two weeks before the issuance of M&P's audit report.

74.     Based on a review of M&P's work papers, M&P apparently did not meet with the individuals directly involved either in the activities related to the segregation of securities or the pledging of securities for the BONY loan.

**B.     M&P's Failure To Appropriately Account for Risk Factors**

75.     Because of the nature of Sentinel's business, M&P deemed the Sentinel engagement to be "high risk due to fraud risk considerations." However, there is no indication that this high-risk designation affected the audit procedures M&P actually employed.

76.     For example, M&P's audit programs required its auditors to assess whether the following risk factors applied to Sentinel: (1) "whether the company is highly leveraged"; (2) "whether there have been significant changes to the client's operation"; (3) "company is unusually dependent on debt financing or has a marginal ability to meet debt repayments items"; (4) "significant assets [are] likely to be impaired"; and (5) "whether available financing is adequate to meet cash needs and/or regulatory requirements." The AICPA Guide similarly identified risk factors relating to commingling and use of customer assets.

77.     As a result of the use of and growth in Sentinel's bank loan and repo positions, those risk factors clearly applied to Sentinel. For example, with the rapidly-increasing balance in the BONY loan and its use in connection with Sentinel's repo activity, Sentinel had become highly leveraged and totally dependent on debt financing. In addition, Sentinel's switch in 2003 from using the BONY loan principally for providing liquidity for customer redemptions to using the loan to finance repo haircuts constituted a significant change in Sentinel's operations. The increasing bank loan also raised inherent risks with respect to Sentinel's compliance with CFTC

21

Rule 1.20's prohibition against pledging securities allocated to customers to collateralize loans, the CFTC and SEC segregation requirements, and Sentinel's ability to fulfill customer redemptions – not to mention the financial viability of Sentinel itself.

78.     Given the numerous deficiencies in Sentinel's financial statements relating to these very risks and M&P's failure to report any material inadequacies or regulatory violations concerning these issues, M&P's audit failures were the result of either a deliberate or reckless disregard of its audit responsibilities.

      C.    **M&P's Deficient Audit**

79.     Not surprisingly, M&P's failure to adequately plan for the audit and its conscious or reckless disregard of audit risk factors resulted in a grossly deficient audit, materially misstated financial statements, and a failure to report violations of applicable regulations and law.

### *M&P Reviewed Sentinel and Bank Records That Demonstrated Violations of the Segregation Regulations*

80.     Based on its audit plan, M&P knew it should test the BONY loan and the securities pledged for that loan and be sure that material facts concerning those matters were properly disclosed.

81.     Indeed, as part of its audit, M&P was provided and reviewed Sentinel's "Active & Matured Securities reports," which were the reports used by Sentinel to generate the account statements it provided to customers. The Active & Matured reports listed all firm securities and securities allocated to customers by CUSIP number and identified the SEG account in which it was represented to Sentinel's customers that the securities were being held.

82.     M&P's audit work papers also contained a position report from BONY for each Sentinel account – SEG 1, SEG 2, SEG 3, collateral account – which listed the CUSIP number of

each security maintained in the respective account. In other words, M&P had actual bank records showing the BONY account in which each and every security was being held.

83.    Together, the Active & Matured and BONY position reports demonstrated that approximately $257 million of securities identified on the Active & Matured report as being allocated to segregated customer accounts were actually being held in the non-segregated BONY collateral account. Thus, M&P had unequivocal evidence of a violation of the segregation requirements under the CEA and the Investment Advisers Act.

84.    Moreover, as part of its audit procedures, M&P itself created a document that conclusively demonstrated violations of the CFTC and SEC segregation requirements. Specifically, M&P annotated Sentinel's Active & Matured report to compare the account in which securities were located according to that report with the BONY records showing where the securities were actually being held by BONY.

85.    As one example, the December 31, 2006 annotated Active & Matured report lists CUSIP 3133XBMH5, with a par value of $19,775,000. The annotated report reflects that while it was represented to Sentinel's customers that the security was being held in SEG 3, according to BONY's records, that security was maintained in the non-segregated collateral account.

86.    This annotated Active & Matured report prepared by M&P shows that according to BONY records, approximately $257 million of securities were held in the non-segregated collateral account, while Sentinel's records reflected that those securities were held in segregated accounts for customers.

### M&P Itself Made Incorrect Journal Entries that Formed the Basis of Material Misstatements on Sentinel's Financial Statements

87.    In addition to reconciling the Active & Matured reports to the BONY position reports, M&P also examined the accounts listed on Sentinel's Trial Balance. M&P saw that

there was no entry on Sentinel's Trial Balance for either the BONY loan or the securities pledged as collateral for the loan.

88.     Instead of appropriately responding to the fact that together these records demonstrated massive segregation violations, M&P simply proposed adjusting journal entries to Sentinel's Trial Balance that purported to allocate the BONY loan to customer segregated accounts and firm accounts, and also to reflect the purported value of securities pledged from those accounts to collateralize the loan.

89.     Moreover, in making these adjusting journal entries, rather than using the values reflected on the Active & Matured reports or the BONY collateral account report, M&P used values for which there was no audit evidence and which did not reflect the true value of the securities pledged as collateral for the loan.

90.     Specifically, M&P's adjusting journal entries reflected that $5.6 million from SEG 1, $278,000 from SEG 2, $201.7 million from SEG 3, and $23 million from the House account were pledged as collateral for the BONY loan. Those amounts were incorrect, as M&P knew or should have known. According to the year-end Active & Matured and BONY position reports, the value of the securities collateralizing the loan was actually $257 million (approximately $71 million from SEG 1, $500,000 from SEG 2, and $186 million from SEG 3).

91.     The values M&P used in its adjusting journal entries were taken from an internal Sentinel record that purportedly reflected an allocation of the BONY loan. That internal allocation was done arbitrarily and did not even purport to reflect the value of the securities pledged. M&P had no audit evidence to support the values it used in its adjusting journal entries and it did nothing to verify the basis for the allocation of loan amounts to segregated accounts or to reconcile the inconsistency between those allocation values and the values of the securities reflected on the Active & Matured and BONY position reports.

24

92.     As a result, M&P's proposed adjusting journal entries reflect two glaring deficiencies in M&P's audit. First, they reflect M&P's knowledge of the segregation violations resulting from the pledging of customer securities – a flagrant violation that was never reflected on the financial statements, referenced in M&P's independent auditors' report, or reported to authorities. Second, in addressing the pledging of these securities, M&P used values for the pledged securities that were simply wrong and for which they had no factual basis. The materially misstated figures that M&P used in its proposed adjusting journal entries were ultimately reflected on Sentinel's 2006 financial statements.

### M&P Had Access to Customer Statements that Proved
### Segregation Violations and Misrepresentations to Customers

93.     M&P also consciously disregarded or failed to properly consider discrepancies between Sentinel customer statements, BONY records, and Sentinel internal records.

94.     Based on its audit plan, M&P was supposed to review bank confirmations and confirm customer securities.  M&P did send confirmation letters and customer statements to customers asking the customers to verify their respective account balances.  M&P sent similar letters to BONY asking it to confirm various account balances.

95.     If M&P had compared the customer statements it reviewed as part of that confirmation process with the bank records received from BONY and Sentinel's Active & Matured report, M&P would have known that the customer statements did not reflect either the fact that the securities listed on the statements had been pledged as collateral for the BONY loan, or that Sentinel had internally allocated the BONY loan to various customer groups.  In addition, the Active & Matured report reflected that Sentinel had internally allocated billions of dollars in securities held by repo counterparties to Sentinel customer groups, but the customer statements did not reflect that customers had any repo positions.

25

96.    The inconsistencies between BONY bank records, Sentinel internal records, and customer statements were stark evidence of segregation violations, the misuse of securities that should have been segregated, and that Sentinel customers had no knowledge of these violations or of the repo positions that materially altered the risk of their investments with Sentinel.

97.    M&P's failure to either ensure that Sentinel's financial statements accurately reflected the facts or refuse to certify materially misstated financial statements, as well as its failure to report these violations in its audit report and to authorities, reflects a deliberate disregard of M&P's obligations as an auditor.

### M&P Failed to Implement Any Audit Procedures with Respect to Sentinel's Daily Segregation Computations, which it Knew Could Not Have Been Correct

98.    Under CFTC Rule 1.16, M&P was supposed to review "the practices and procedures followed by [Sentinel] in making . . . daily computations of the segregation requirements of section 4d(a)(2) of the [CEA and CFTC regulations]." 17 C.F.R. § 1.16(d) (emphasis added).

99.    However, M&P had no audit evidence to support Sentinel's daily segregation computations.    Indeed, M&P consciously disregarded evidence that showed that those computations could not have been correct.

100.    The audit work papers do not reveal that M&P employed any audit procedures or gathered any audit evidence pertaining to Sentinel's daily segregation computations, other than noting the name of the Sentinel employee who made the computations.

101.    Given the information it had, M&P knew or should have known that Sentinel's daily segregation computations included the securities that were pledged as collateral for the BONY loan, in violation of the CEA and CFTC regulations.

26

### M&P Failed to Implement Any Audit Procedures with Respect to
### Sentinel's Allocation of Interest Income

102.    M&P knew that Sentinel was a cash management firm and that its investment objective was to deliver interest income to customers.  Sentinel represented to customers that interest earned in each segregated customer account was allocated on a pro rata basis among all customers with an interest in that segregated account.  However, the audit work papers do not reflect that M&P undertook any audit procedures to test whether Sentinel properly allocated interest among its customer and House accounts.

103.    If M&P had performed even minimal testing, it would have learned that the Sentinel Insiders pooled all interest from all securities (segregated or not, repo'd or owned), then applied that interest first to pay the BONY loan interest, then to pay for certain fees, and then to meet arbitrarily determined "return" targets for each customer group.  Thus, each and every day, Sentinel Insiders commingled returns among the different segregated accounts and among customer and House accounts.  Often, the return on securities in one SEG group was used to subsidize income allocations made to other SEG groups.  Interest earned on securities in each segregated account should have been attributed only to customers with funds in each segregated account – assuming of course that securities were in fact in the proper account.

104.    As a result of this commingling and misallocation of interest income, the interest reported on customer statements and the House interest reflected on the 2006 financial statements did not reflect the actual interest earned on securities in the respective accounts.  Sentinel's financial statements therefore were materially misstated because the income statement reported arbitrarily-determined interest revenue.  This misallocation of income was an additional segregation violation that went unreported on Sentinel's financial statements or to the regulatory authorities.

27

### *M&P's Audit Deficiencies Violated GAAS and CFTC Rule 1.16*

105.    M&P's deficient audit procedures relating to the above-described violations of segregation regulations violated, at a minimum, SAS 105, SAS 99, CFTC Rule 1.16, and the audit standards set forth in the AICPA Guide.

### D.    Resulting Material Misstatements In The Financial Statements

106.    As a result of M&P's deliberate or, at best, reckless disregard of its audit duties, M&P certified Sentinel financial statements for the year ended December 31, 2006 that contained numerous material misstatements, including (1) listing securities which should have been segregated for customers as Sentinel assets; (2) stating that over $207 million in securities pledged for the BONY loan were being held in segregation when they were not; (3) misstating the value of securities pledged to collateralize the BONY loan; (4) misstating the true purpose of the BONY loan; and (5) falsely reporting the amount of Sentinel's interest revenue.

### *Material Misstatements Regarding the Listing of Securities Allocated to Customers as Assets*

107.    The 2006 financial statements represented that Sentinel had $233,268,260 in "securities pledged" as assets. In other words, the financial statements purported to list the amount of securities collateralizing Sentinel's loan from BONY as Sentinel assets. This statement was misleading and not in conformance with GAAP.

108.    The $233,268,260 in securities pledged consisted of securities allocated to customers – securities that were included on customer statements and should have been segregated for customers. Those securities should not have been included as assets *of Sentinel* in the financial statements.

109.    For the reasons stated above, there also was no adequate audit evidence supporting the $233,268,260 value assigned to those securities. Clearly, there was no basis for including as a Sentinel asset any of the securities allocated to customers, much less only a

28

portion of those securities. In reality, the amount of securities listed as assets of Sentinel was arbitrarily chosen simply to offset the amount of the BONY loan and cause the financial statements to balance.

110.    M&P's certification of Sentinel's financial statements therefore violated SAS 105, SAS 99, SAS 107, and the audit standards set forth in the AICPA Guide, and the financial statements themselves failed to conform with GAAP, including but not limited to FAS 5, FAS 140, and CON 6.

### M&P Knew or Should Have Known that the Financial Statements Materially Misstated the Amount of Securities Held in Segregation

111.    Note 2 to the 2006 financial statements, entitled "Customers' Cash and Securities Segregated and Held in Trust," stated that total assets segregated for customers included $207 million in securities "pledged" for the BONY loan. However, those securities were not "segregated" or "held in trust." Rather, there were approximately $257 million (par value) or $245 million cost plus accrued interest – not $207 million – in securities that should have been segregated but were actually pledged as collateral. As described above, based on the information M&P reviewed during its audit, M&P consciously disregarded those material misstatements in certifying Sentinel's financial statements.

112.    M&P's certification of financial statements that included the inaccurate statements in Note 2 violated SAS 105, SAS 99, SAS 107, and the audit standards set forth in the AICPA Guide, and the financial statements themselves were not in conformance with GAAP, including without limitation, FAS 5, FAS 140, and CON 6.

29

### M&P Knew or Should Have Known that Note 3
### to the Financial Statements Was Materially Misleading

113. Note 3 to the financial statements contained a description of the securities collateralizing the BONY loan that obfuscated the fact that securities that were supposed to be segregated for customers were actually collateralizing the loan.

114. Notes to financial statements are supposed to amplify and clarify the information on the balance sheet. However, describing the securities as "securities pledged" in Note 3 was materially misleading because instead of clarifying whose securities these were or disclosing that it was securities that should have been segregated for customers that were pledged as collateral for the loan, the description instead obscured the segregation violations.

115. In addition, Note 3 to the 2006 financial statements incorrectly stated that the purpose of the BONY loan was "to meet short-term liquidity needs."

116. M&P either knew or should have known that the BONY loan was actually being used to finance repo haircuts and purchase additional securities. The failure to accurately describe the use of the BONY loan was a critical deficiency given that the Sentinel Insiders' actual use of the BONY loan was a key component of the leveraging scheme that ultimately led to Sentinel's demise.

117. M&P's certification of financial statements that materially misstated the purpose of the bank loan violated SAS 105, SAS 99, SAS 107, and the audit standards set forth in the AICPA Guide, and the financial statements themselves failed to comply with GAAP, including but not limited to FAS 5, FAS 140, and CON 6.

30

## II.   M&P CERTIFIED MATERIALLY MISSTATED STATEMENTS OF SEGREGATION AND MINIMUM NET CAPITAL

### A.   M&P Certified a Materially Misstated Statement of Segregation on Form 1-FR

118.    As described above, M&P certified the 2006 year-end Form 1-FR that was filed with the CFTC.  The 2006 Form 1-FR stated that Sentinel had approximately $1.4 billion in customer liabilities and a corresponding amount of securities in segregation.  In other words, the Form 1-FR submitted to the CFTC represented that Sentinel had enough securities in segregation to meet all of its customer liabilities.

119.    As alleged above, the Active & Matured and BONY position reports that M&P reviewed during its audit demonstrated that this statement was false.  Those reports show that as of December 31, 2006, only approximately $1.17 billion worth of securities (cost basis plus accrued interest) were being maintained in segregated accounts at BONY.  The failure to keep adequate securities in segregation to offset customer liabilities violated CFTC Rule 1.20.

120.    M&P knew, or should have known, that Sentinel's statement of segregation was false.  As discussed below, this error carried over to the Statement of Computation of Minimum Capital Requirements included in the year-end Form 1-FR.  Had the year-end Form 1-FR submitted to the CFTC contained a correct statement of segregation, the CFTC would have seen that Sentinel had in excess of $200 million more in customer liabilities than securities that were being maintained in segregated accounts to satisfy those liabilities.  As a result, either Sentinel would have corrected its segregation deficiency or the CFTC would have shut down Sentinel, and the losses and related damages that followed would have been avoided.

121.    M&P's certification of the false statement of segregation in the 2006 Form 1-FR violated SAS 105, SAS 99, SAS 107, CFTC Rule 1.16, and the audit standards set forth in the AICPA Guide.

31

**B.**   **M&P Improperly Certified Materially Misstated
Net Capital Calculations on Sentinel's Year-End Form 1-FR**

122.   As part of its audit, M&P was supposed to review Sentinel's compliance with the CFTC's net capital requirements. As described below, M&P failed to fulfill those audit responsibilities and instead certified Sentinel's materially misstated computations of net capital. Those net capital computations were materially misstated because the calculations of net capital included assets that should not have been included and excluded liabilities that should have been included and failed to take applicable haircuts.

123.   Had proper calculations of net capital been submitted to the CFTC, Sentinel either would have corrected its net capital deficiency or would have been shut down immediately given its substantial net capital deficiency.

124.   M&P's certification of grossly misstated net capital calculations violated, at a minimum, SAS 105, SAS 107, CFTC Rules 1.10 and 1.16, and the audit standards set forth in the AICPA Guide.

*M&P Certified Net Capital Computations That Were Materially Misstated Because They
Improperly Omitted the BONY Loan and Included Customer Securities Pledged For the Loan*

125.   In computing net capital, FCMs like Sentinel are required to subtract from assets certain liabilities, including bank loans. However, Sentinel's net capital computations did not subtract the $230 million BONY loan from net assets, even though there is a specific line-item on Form 1-FR for secured loans from banks.

126.   A related material misstatement in Sentinel's net capital calculations is that they listed approximately $1.4 billion of securities as assets segregated or in separate accounts pursuant to the CEA and CFTC regulations.

127.   However, by virtue of the pledging of customer securities as collateral for the bank loan, the amount of securities actually in segregation was approximately $1.17 billion, not

the $1.4 billion included in Sentinel's net capital computations. Thus, in excess of $200 million in non-segregated securities should not have been included as assets in Sentinel's net capital calculations.

128.    As described above, M&P clearly knew about the BONY loan and the fact that customer securities were pledged for the loan, but consciously disregarded those facts – and the resulting massive net capital deficiency – in certifying Sentinel's materially misstated net capital computations.

### M&P Failed to Adequately Test Current v. Non-Current Assets

129.    CFTC regulations require that securities included as assets in the net capital calculations be marked-to-market and that, in many instances, securities with no readily-available market price be excluded as non-current assets. Under CFTC and SEC regulations, a security does not have a readily-available market price unless it can be nearly-instantaneously priced.

130.    M&P was undoubtedly aware of the net capital rules and the possible effects that non-current assets would have on Sentinel's net capital calculations. Classifying assets as "non-current" will in most instances result in a dollar-for-dollar reduction in an FCM's net capital. For a thinly-capitalized FCM like Sentinel, this could easily lead to a net capital deficiency – a risk that M&P plainly should have recognized.

131.    A review of M&P's work papers demonstrates that M&P conducted only minimal testing of the value of the securities that were, and that should have been, included as current assets in Sentinel's net capital computations. In addition, the audit work papers do not reflect that M&P performed any testing on the procedures Sentinel itself used to determine whether securities could be included as current assets on its Form 1-FR.

33

132.    Sentinel had approximately $1.4 billion in securities held in BONY accounts valued on a cost plus accrued interest basis, which were included as assets in its net capital computations.  Sentinel's net capital computations improperly failed to include any of the securities it had on repo that had a face value of approximately $2.4 billion, even though Form 1-FR has a specific line-item for securities sold under agreements to repurchase.  In addition, Sentinel had $12.5 million in noncustomer-owned securities (*i.e.*, securities allocated to Sentinel Insiders and entities they controlled), and over $16 million in unallocated securities and reconciling items.

133.    Of those $3.83 billion in securities that should have been tested and potentially marked-to-market, M&P only tested the purchase price of 15 securities totaling $56 million.  The audit work papers do not reflect that M&P did anything to test the market value of the billions of dollars of additional securities on repo or held by Sentinel.  Remarkably, M&P completely passed on testing any of the over $2 billion of securities sold subject to repo agreements.

134.    Had M&P conducted even minimal testing, it would have learned that many of the securities held by Sentinel could not be nearly instantaneously priced, did not have a readily-available market price, were highly illiquid, and were unrated.  For example, as of December 31, 2006, there were hundreds of millions of dollars in illiquid collateralized debt obligations that Sentinel was obligated to repurchase from repo counterparties.  Classifying even a small portion of those assets – or a small portion of the $28 million in noncustomer-owned and unallocated securities – as non-current would have meant that Sentinel had insufficient adjusted net capital and would either have corrected its net capital deficiency or have been shut down by regulators.

### *M&P Failed to Determine That Applicable Haircuts Should be Taken*

135.    Similarly, M&P failed to address whether Sentinel's net capital computations took the "haircuts" required under CFTC and SEC regulations.  A "haircut" is a percentage

34

deduction in value that is intended to account for the possibility that the FCM may not be able to realize the stated value of the security.

136.    Sentinel's Form 1-FR only included one $232,682.73 haircut on a single security valued at $2,585,363.    M&P reviewed the mathematical calculation of that haircut and determined that it "appear[ed] to be materially correct."

137.    M&P's audit work papers do not reflect any analysis of whether Sentinel's net capital computations should have taken other haircuts under applicable CFTC and SEC regulations. In fact, Sentinel's net capital computations should have taken numerous haircuts, which would have resulted in a substantial net capital deficiency.

138.    Under CFTC and SEC regulations, a haircut must be taken on certain securities that are neither segregated for customers nor used to collateralize loans. As discussed above, Sentinel had over $12 million in noncustomer-owned securities that needed to be analyzed for potential haircuts. Based on the audit work papers, M&P did nothing to analyze those securities for applicable haircuts. In fact, based on the type and maturity of those securities, a haircut of nearly one million dollars should have been taken on the noncustomer-owned securities.

139.    In addition, under CFTC and SEC regulations, market-value and risk-based haircuts must be taken on repo obligations. Again, Sentinel had approximately $2.4 billion in repo'd securities that should have been analyzed for potential haircuts. And, again, M&P's audit work papers do not reveal any analysis as to whether those repo positions were subject to haircuts.

140.    In fact, Sentinel's net capital calculations should have included additional haircuts of as much as tens of millions of dollars due to the fact that numerous securities held by repo counterparties were not "readily marketable" under CFTC and SEC regulations and because, according to Sentinel's records, the value of the securities held by its repo counterparties

35

substantially exceeded Sentinel's repayment obligations to those counterparties. The amount by which the value of repo'd securities exceeds the repayment obligations is often referred to as the repo equity. Haircuts are applied to repo equity to reflect the fact that the full value of the "equity" may not be realized.

141.    If the net capital computations had been audited properly, M&P would have determined that Sentinel's year-end net capital calculations were materially misstated because they did not take applicable haircuts on noncustomer-owned and repo'd securities, and therefore that Sentinel had a massive net capital deficiency.

III.    **M&P'S AUDIT DEFICIENCIES REGARDING SENTINEL'S REPO ACTIVITY**

142.    In addition to failing to analyze the effects of Sentinel's repo positions on its net capital computations, M&P also failed to assure that Sentinel's financial statements fairly presented both Sentinel's "House" repo positions and the financial risks associated with its full repo positions.

143.    At year-end 2006, Sentinel had approximately $2.4 billion in repo positions. According to Sentinel's Active & Matured report, approximately $2.3 billion of those repo positions were for the SEG accounts and $155 million of those repo positions were House positions.

144.    Sentinel's financial statements did not fairly reflect those repo positions in two respects. First, the financial statements did not reflect that the "House" had any repo positions at all. Thus, the $155 million in House repo positions was not reflected anywhere on the financial statements. In addition, M&P should have known that the only manner in which Sentinel could have financed the $155 million in House repo positions was through the use as collateral of securities that should have been segregated for customers.

36

145.   Second, Note 2 to the financial statements generally referenced Sentinel's repo positions, but it obfuscated the fact that the Company's internal records reflected these repos as customer positions. Nor did it note that customer statements did not reflect any repo positions for any customers.

146.   This inconsistency in Sentinel's internal records and customer statements was a red flag if not a smoking gun. At a bare minimum, this inconsistency reflected a material weakness in Sentinel's internal controls that should have been reported to Sentinel and to its regulators.

147.   Had M&P treated this "inconsistency" with an appropriate level of importance, it should have refused to certify Sentinel's financial statements absent acceptable audit evidence that the $2.3 billion in supposedly "customer" repo positions were not in reality Company positions.

148.   Nonetheless, M&P certified Sentinel's financial statements without seeking confirmation from a single customer that it was aware that its SEG account was allocated certain repo positions.

149.   In addition to the above-described material misstatements, the financial statements made no disclosure of any of the market risk associated with Sentinel's $2.4 billion in repo positions.

150.   Sentinel's repo positions entailed precisely the type of market risk that M&P knew it was supposed to assess as part of its audit. The leverage associated with Sentinel's repo positions had the potential of magnifying Sentinel and/or customer losses if the market moved unfavorably. These risks were magnified even further because the repo haircuts were financed with the BONY loan and not with Sentinel's own equity. Given Sentinel's thin capital, even the slightest market fluctuations would mean that Sentinel had no means of meeting the liabilities it

incurred. This very substantial and undisclosed risk was further magnified because hundreds of millions of dollars worth of the securities on repo were highly illiquid.

151.   M&P certified financial statements that failed to disclose the very market risks associated with the repo positions that ultimately led to the Company's demise. Note 2 of Sentinel's financial statements stated, "At December 31, 2006, the aggregate fair value of collateral pledged under repurchase agreements is substantially equal to the aggregate carrying value." However, as described above, M&P performed no market testing of any securities purchased under repo agreements, and therefore had no basis for accepting this statement.

152.   Ultimately, the illiquidity of the repo'd securities coupled with the extensive leverage reflected in the $2.4 billion in repos and the $230 million BONY loan were the driving forces behind Sentinel's collapse. As repo counterparties demanded repayment of their loans or new security as collateral, Sentinel was unable to simultaneously meet its repo obligations, pay back its bank loan, and redeem customer requests. Sentinel's thin capital gave it no ability to handle even a slight market downturn or liquidity crunch.

153.   In the face of the compelling inconsistencies in Sentinel's financial records and Sentinel's "three wheels over the cliff" leverage posture, M&P did nothing. And, in so doing, it was grossly derelict in fulfilling its obligations as an auditor.

154.   M&P's deficient audit conduct relating to Sentinel's repo activity violated SAS 105, SAS 99, SAS 107, and the audit standards set forth in the AICPA Guide, and M&P certified financial statements that violated GAAP, including, without limitation, FAS 5, FAS 140, and CON 6.

155.   Had M&P properly performed its audit obligations and either refused to certify the materially misstated financial statements or even required footnote disclosure of all of the

38

risks associated with Sentinel's repo obligations, Sentinel's subsequent losses and related damages would have been avoided.

## M&P'S FAILURE TO REPORT
## VIOLATIONS OF CFTC AND SEC REGULATIONS AND THE
## MATERIAL INADEQUACIES IN SENTINEL'S INTERNAL CONTROLS

156.     Under CFTC regulations, applicable auditing standards, and the terms of M&P's engagement letter, M&P was required to report known violations of law, including violations of CFTC and SEC regulations, and material inadequacies in Sentinel's internal controls and procedures.

157.     M&P failed to fulfill that obligation. M&P knew or should have known, at a minimum, of Sentinel's violation of (a) CFTC Rule 1.20's segregation requirements; (b) CFTC Rule 1.20's prohibition against the pledging of securities that should have been segregated for customers to collateralize a bank loan; (c) CFTC Rule 1.17's net capital requirements; (d) SEC Rule 206(4)-2's custody requirements; and (e) SEC Rule 206(4)-4's requirement to provide customers with information regarding financial conditions reasonably likely to impair Sentinel's ability to meet commitments to customers.

158.     Similarly, M&P failed to report the material inadequacies that caused or permitted the above violations and other activity that inhibited Sentinel's ability to satisfy its obligations to customers and had the potential to lead to material financial losses.

159.     Numerous documents M&P reviewed as part of its audit demonstrated violations of the above regulations and other material inadequacies, which Sentinel's financial statements and year-end Form 1-FR obfuscated and which M&P failed to report. In addition to the clear evidence of the violations and material inadequacies described above, M&P also reviewed as part of its audit each of the Form 1-FRs that Sentinel submitted to regulators on a monthly basis. For the same reasons discussed above, each and every one of the financial statements, statements

of segregation, and net capital computations on those monthly Forms 1-FR was false, thus providing M&P with yet additional evidence of regulatory violations.

160.    M&P not only failed to report the above-described violations and material inadequacies in its audit report, but it also failed to ensure that these violations and material inadequacies were reported to the CFTC and NFA. Had M&P fulfilled its responsibilities, Sentinel would not have been permitted to continue its operations and its subsequent losses and related damages would have been avoided.

### M&P'S PARTICIPATION IN THE CREATION OF A FICTITIOUS AGREEMENT TO SIPHON MONEY TO SENTINEL'S CEO

161.    In late 2006, Eric Bloom, Sentinel's CEO, decided to take money out of Sentinel in such a way as to hide those payments from his ex-wife. Rather than pay himself this money directly, Eric Bloom decided that he would cause Sentinel to pay an "administrative" or "management" fee to its parent company, Sentinel Investment Group ("SIG"), which Eric Bloom controlled.

162.    M&P knew that SIG performed no services, administrative or otherwise, for Sentinel and that the administrative fee was merely a bonus for Eric Bloom. In fact, in its own work papers, M&P refers to the administrative fee as a bonus that Eric Bloom took for personal reasons.

163.    Nevertheless, M&P participated in creating a fictitious, back-dated agreement between Sentinel and SIG to justify nearly $1 million paid to SIG. Even though M&P knew that SIG performed no services for Sentinel, M&P advised Sentinel that in order to justify the payments, an agreement would have to be drafted that included a substantive description of the services SIG provided for Sentinel and how the fee was determined.

40

164.   In March 2007, Eric Bloom caused outside counsel for Sentinel to draft a management services agreement. After receiving the initial draft, M&P informed Sentinel that it was not satisfied with the description of how the fee was determined and suggested that Sentinel request that its lawyers put in more "meat."

165.   Sentinel subsequently sent M&P a final, signed agreement, which M&P accepted even though it did not contain any additional detail regarding how the fee was determined. The agreement was nothing more than a pretext for the payments to SIG.

166.   M&P nevertheless certified financial statements that stated in Note 7 that "The Company has a management fee agreement with the Parent [SIG] to provide economic research, forecasting, and analysis in support of the Company's operations." But M&P knew that the payments were not a "management fee" and that SIG did not actually provide services to Sentinel, and therefore knew that Note 7 was false and that the payments to SIG were fraudulent transfers.

167.   M&P's participation in the creation of a fictitious agreement between SIG and Sentinel violated GAAS, including but not limited to SAS 105, SAS 99, and SAS 107, and the financial statements themselves failed to comport with, at a minimum, FAS 57's pronouncements regarding the fair presentation of related-party transactions and CON 6.

## THE COLLAPSE OF SENTINEL

168.   By turning a blind eye to the Sentinel Insiders' misconduct and regulatory violations, failing to properly assess the risks associated with Sentinel's operations, and certifying financial statements that concealed the misconduct and falsely portrayed Sentinel's financial condition, M&P substantially contributed to and caused hundreds of millions of dollars in losses and related damages in 2007. The material misstatements and omissions in Sentinel's

41

financial statements and deficiencies in M&P's audit procedures directly related to the financial circumstances and activity that led to Sentinel's demise.

169.    In late June and early July 2007, Sentinel's two primary repo counterparties decided to stop rolling forward higher-risk repo transactions with Sentinel and insisted on repayment of the repo loans. Because Sentinel could not finance those payments in any other way, on June 1, 2007, it borrowed an additional $94 million from BONY, increasing its total loan balance to more than $353 million.

170.    Shortly thereafter, Sentinel's repo counterparties refused to roll forward many more repo transactions. As a result, Sentinel continued borrowing money from BONY, and throughout June and July 2007, the outstanding loan balance ballooned. To collateralize the additional loan amounts, the Sentinel Insiders and BONY continued to transfer securities between the various SEG accounts and the BONY collateral account in an attempt to fill various shortfalls.

171.    Sentinel's severe financial stress continued through the end of July and into August as it was unable to simultaneously reduce its loan balance with BONY, sell the higher-risk securities it had received back from repo counterparties that had stopped financing such securities, and meet its redemption obligations to customers who wanted to withdraw funds. The financial risks coupled with its undercapitalization, neither of which was identified in Sentinel's financial statements or in M&P's audit report, crushed Sentinel, and the undisclosed segregation violations left Sentinel unable to fulfill its obligations to its customers.

172.    This final carnage could have and would have been avoided if M&P had done its job.

42

## COUNT ONE
### (Negligence/Malpractice against M&P and Johnson)

173.    Plaintiff restates and realleges paragraphs 1 through 172 of this Complaint as though fully set forth herein.

174.    At all relevant times, M&P acted as Sentinel's independent auditor and owed Sentinel a duty to, among other things, perform an independent, objective, and thorough audit of Sentinel's financial statements in accordance with GAAS, take appropriate action to satisfy itself that Sentinel's financial statements were prepared in accordance with GAAP, and report violations of, at a minimum, the segregation and minimum net capital requirements of the CFTC and SEC. Defendant Johnson was responsible for ensuring that the M&P audit team fulfilled those duties.

175.    With respect to the audit of Sentinel for December 31, 2006, M&P breached its duties to Sentinel by:

      a.    failing to adequately plan for the audit;

      b.    failing to properly understand and report on Sentinel's internal controls;

      c.    failing to conduct its audit in accordance with GAAS and the relevant CFTC regulations;

      d.    consciously disregarding evidence of commingling and other misuse of customer funds that were evident in the information and materials provided to or made available to M&P;

      e.    consciously disregarding Sentinel's net capital deficiency;

      f.    consciously disregarding the risks associated with Sentinel's repo activity;

      g.    certifying Sentinel's financial statements despite the numerous misstatements and departures from GAAP contained therein;

43

h.    participating in the creation of a fictitious agreement between Sentinel and SIG to justify a bonus to Sentinel's CEO; and

i.    failing to report Sentinel's violations of CFTC and SEC regulations regarding segregation and minimum net capital and other material inadequacies and weaknesses to Sentinel and the appropriate regulatory authorities.

176.    Sentinel was damaged as a direct and proximate consequence of M&P's and Johnson's negligent breaches of its duties. Absent M&P's various acts of misfeasance and malfeasance, Sentinel would not have suffered hundreds of millions of dollars in losses and related damages in 2007.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and against each of the defendants for actual and consequential damages, plus interest, costs and attorneys' fees, and grant such other equitable relief as may be just and appropriate.

## COUNT TWO
### (Aiding and Abetting/Knowing Participation in Breach of Fiduciary Duty against M&P and Johnson)

177.    Plaintiff restates and realleges paragraphs 1 through 176 of this Complaint as though fully set forth herein.

178.    At all times relevant to this Complaint, the Sentinel Insiders were officers and directors of Sentinel.

179.    As officers and directors of Sentinel, the Sentinel Insiders owed fiduciary duties to Sentinel, including a duty of loyalty, and a duty to act with due care and to deal honestly and fairly with Sentinel.

180.    The Sentinel Insiders caused Sentinel to engage in a risky leveraged trading strategy and commingled and misused client funds for their own financial gain, causing Sentinel

44

to violate the CEA and CFTC regulations, and Investment Advisers Act and SEC regulations, and to incur hundreds of millions of dollars in losses and related damages.

181.    Specifically, the Sentinel Insiders breached their fiduciary duties to Sentinel by, among other things: commingling customer securities and money with securities and money belonging to the House, commingling customer securities and money from one segregated account with those from another segregated account, pledging customer funds to secure the BONY loan, clearing and maintaining customer funds and securities in accounts that were not registered in Sentinel's name as agent or trustee of its clients, transferring securities out of segregation to collateralize the BONY loan, pledging customer securities to collateralize a loan for the benefit of the Sentinel Insiders themselves, borrowing funds from BONY far in excess of Sentinel's ability to repay, concealing from customers the use of leveraging through bank loans and repurchase agreements, providing false reports to federal regulators, and creating a fictitious agreement to justify bonus payments made to Eric Bloom.

182.    M&P and Johnson knowingly participated in, aided, assisted and benefited from Philip Bloom's, Eric Bloom's and Charles Mosley's breaches of their fiduciary duties to Sentinel by, among other things:

a.    consciously disregarding Sentinel's violations of CFTC and SEC segregation requirements and failing to report those violations to Sentinel and the appropriate regulators;

b.    consciously disregarding Sentinel's providing the CFTC with materially misstated minimum net capital computations, certifying those incorrect computations, and failing to report those material inadequacies to Sentinel and the appropriate regulators;

c.    consciously disregarding the risks associated with Sentinel's repo activity and certifying financial statements that did not disclose those risks and that were materially

misstated, and failing to report those material inadequacies to Sentinel and the appropriate regulators; and

        d.     participating in the creation of a bogus agreement in order to provide a pretext for Sentinel's CEO to siphon money from the Company, and certifying financial statements that falsely described the nature of those payments.

     183.    The same auditors involved in the 2006 audit had been involved in prior Sentinel audits. M&P profited from the continued business relationship with Sentinel and certified Sentinel's 2006 financial statements despite its knowledge of numerous material misstatements for the purpose of continuing the relationship with Sentinel. M&P used its audit relationship with Sentinel to secure additional business and market itself as having particular expertise in auditing companies subject to SEC and CFTC regulations.

     184.    Sentinel has been damaged as a result of M&P's and Johnson's knowing participation in and aiding and abetting of the Sentinel Insiders' breaches of their fiduciary duties. Absent M&P's and Johnson's various acts of misfeasance and malfeasance, Sentinel would not have suffered hundreds of millions of dollars in losses and related damages in 2007.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of

Plaintiff and against each of the defendants for actual and consequential damages, plus interest,

costs and attorneys' fees, and grant such other equitable relief as may be just and appropriate.

Dated: March 20, 2008                              Respectfully submitted,

                                                   FREDERICK J. GREDE, not individually
                                                   but as Chapter 11 Trustee of Sentinel
                                                   Management Group, Inc.


                                          By: _____
                                                   One of his attorneys


J. Kevin McCall (ARDC # 3125685)
Catherine L. Steege (ARDC # 6183529)
Chris C. Gair (ARDC # 6190781)
Vincent E. Lazar (ARDC # 6204916)
JENNER & BLOCK LLP
330 N. Wabash Ave.
Chicago, IL 60611
Phone: (312) 222-9350
Facsimile: (312) 527-0484


47

# EXHIBIT B

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>**SENTINEL MANAGEMENT GROUP, INC.,**<br><br>Debtor.<br><br>---<br><br>**FREDERICK J. GREDE,** as Chapter 11 Trustee for Sentinel Management Group, Inc.,<br><br>Plaintiff,<br><br>v.<br><br>**MCGLADREY & PULLEN LLP,** and G. VICTOR JOHNSON,<br><br>Defendants. | Chapter 11<br><br>**CASE NO. 07 B 14987**<br>Hon. John H. Squires<br><br><br><br>**JURY TRIAL DEMANDED**<br><br>Adversary No. 07-00167<br>Hon. John H. Squires |

## DEMAND FOR JURY TRIAL

McGladrey & Pullen LLP and G. Victor Johnson ("Defendants") demand trial by jury in this adversary proceeding of all issues, claims, and defenses triable by a jury in this matter. Defendants do not consent to a jury trial before the Bankruptcy Court. Nothing in this demand is intended to confer upon the bankruptcy court any jurisdiction that would not otherwise exist.

\31282\0001 J\CH359471.DOC-1

Dated: April 16, 2008

Respectfully Submitted By:

MCGUIRE WOODS, LLP


By:    /s/ Michael M. Schmahl

Richard J. Mason (ARDC #1787659)
Patricia K. Smoots (ARDC #6194076)
Michael M. Schmahl (ARDC #06275860)
McGuireWoods LLP
77 W. Wacker Drive, Suite 4400
Chicago, Illinois  60601
Tel:  312.849-8100

and

*Of Counsel*
Steven M. Farina
Thomas H. L. Selby
WILLIAMS & CONNOLLY LLP
725 12th Street, N.W.
Washington, D.C.  20005
Phone:  (202) 434-5526
Facsimile: (202) 434-5029

*Counsel to the Defendants*

\\FIN\207908.1

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| SENTINEL MANAGEMENT GROUP, INC. | ) Case No. 07 B 14987 |
| | ) |
| Debtor | ) Hon. John H. Squires |
| | ) |
| FREDERICK J. GREDE, as Chapter 11 Trustee for | ) |
| Sentinel Management Group, Inc. | ) |
| | ) DIST COURT NO. _____ |
| Plaintiff, | ) |
| | ) Adv. No. 08 A 00167 |
| v. | ) |
| | ) JURY TRIAL DEMANDED |
| MCGLADREY & PULLEN LLP and | ) |
| G. VICTOR JOHNSON, | ) |
| | ) |
| Defendants. | ) |

<u>NOTICE OF FILING</u>

**PLEASE TAKE NOTICE** that on **Wednesday, April 16, 2008,** the undersigned caused **Defendant's McGladrey & Pullen LLP and G. Victor Johnson's Memorandum in Support of Motion to Withdraw the Reference** to be filed with the Clerk of the United States Bankruptcy Court for the Northern District of Illinois, a copy of which is attached hereto and herewith served upon you.

Dated: April 16, 2008

McGladrey & Pullen, LLP and
G. Victor Johnson

By:/s/  Michael M. Schmahl
One of his Attorneys

Richard J. Mason, P.C. (ARDC #01787659)
John F. Pollick (ARDC # 03128122)
Michael M. Schmahl (ARDC #06275860)
McGuireWoods LLP
77 West Wacker Drive, Suite # 4100
Chicago, Illinois  60601-1815
(312) 849-8100
Attorneys for McGladrey & Pullen, LLP and
G. Victor Johnson

The Undersigned, an attorney, hereby certifies that he caused a copy of this **Notice of Filing** and the **Defendant's McGladrey & Pullen LLP and G. Victor Johnson's Memorandum in Support of Motion to Withdraw the Reference** to be served on the parties listed below by depositing the same in the U.S. mail, proper postage prepaid, on this 16th day of April, 2008.

/s/ Michael M. Schmahl

## SERVICE LIST

Catherine L. Steege, Esq.
Jenner & Block LLP
330 N. Wabash Avenue
Chicago, IL 60611
FAX: 312/527-0484
E-Mail: csteege@jenner.com

Chris C. Gair
Jenner & Block LLP
330 N. Wabash Avenue
Chicago, IL 60611
FAX: 312/527-0484
E-Mail: cgair@jenner.com

J. Kevin McCall
Jenner & Block LLP
330 N. Wabash Avenue
Chicago, IL 60611
FAX: 312/527-0484
E-Mail: jmccall@jenner.com

Vincent E. Lazar
Jenner & Block LLP
330 N. Wabash Avenue
Chicago, IL 60611
FAX: 312/840-7389
E-Mail: vlazar@jenner.com

Office of the U.S. Trustee
219 South Dearborn Street
Suite 873
Chicago, IL 60604
FAX: 312/886-5794

\5307998.1

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| **SENTINEL MANAGEMENT GROUP, INC.,** | **CASE NO. 07 B 14987**<br>Hon. John H. Squires |
| Debtor. | |
| **FREDERICK J. GREDE, as Chapter 11 Trustee for Sentinel Management Group, Inc.,** | |
| Plaintiff, | **JURY TRIAL DEMANDED**<br><br>Adversary No. 07-00167<br>Hon. John H. Squires |
| v. | |
| **MCGLADREY & PULLEN LLP, and G. VICTOR JOHNSON,** | |
| Defendants. | |

## DEMAND FOR JURY TRIAL

McGladrey & Pullen LLP and G. Victor Johnson ("Defendants") demand trial by jury in this adversary proceeding of all issues, claims, and defenses triable by a jury in this matter. Defendants do not consent to a jury trial before the Bankruptcy Court. Nothing in this demand is intended to confer upon the bankruptcy court any jurisdiction that would not otherwise exist.

Dated: April 16, 2008

Respectfully Submitted By:

MCGUIRE WOODS, LLP

By:    /s/ Michael M. Schmahl

Richard J. Mason (ARDC #1787659)
Patricia K. Smoots (ARDC #6194076)
Michael M. Schmahl (ARDC #06275860)
McGuireWoods LLP
77 W. Wacker Drive, Suite 4400
Chicago, Illinois 60601
Tel: 312.849-8100

and

*Of Counsel*
Steven M. Farina
Thomas H. L. Selby
WILLIAMS & CONNOLLY LLP
725 12th Street, N.W.
Washington, D.C. 20005
Phone: (202) 434-5526
Facsimile: (202) 434-5029

*Counsel to the Defendants*

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **SENTINEL MANAGEMENT GROUP, INC.** | ) | Case No. 07 B 14987 |
| | ) | |
| Debtor | ) | Hon. John H. Squires |
| | ) | |
| **FREDERICK J. GREDE, as Chapter 11 Trustee for Sentinel Management Group, Inc.** | ) ) ) | |
| | ) | Adv. No. 08 A 00167 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **MCGLADREY & PULLEN LLP and G. VICTOR JOHNSON,** | ) ) | |
| | ) | |
| Defendants. | ) | |

### NOTICE OF FILING

**PLEASE TAKE NOTICE** that on **Wednesday, April 16, 2008,** the undersigned caused **Demand for Jury Trial** to be filed with the Clerk of the United States Bankruptcy Court for the Northern District of Illinois, a copy of which is attached hereto and herewith served upon you.

Dated: April 16, 2008

McGladrey & Pullen, LLP and
G. Victor Johnson

By:/s/ Michael M. Schmahl
One of his Attorneys

Richard J. Mason, P.C. (ARDC #01787659)
John F. Pollick (ARDC # 03128122)
Michael M. Schmahl (ARDC #06275860)
McGuireWoods LLP
77 West Wacker Drive, Suite # 4100
Chicago, Illinois 60601-1815
(312) 849-8100
Attorneys for McGladrey & Pullen, LLP and
G. Victor Johnson

\5300069.1

The Undersigned, an attorney, hereby certifies that he caused a copy of this **Notice of Filing** and the **Demand for Jury Trial** to be served on the parties listed below by depositing the same in the U.S. mail, proper postage prepaid, on this 16th day of April, 2008.

/s/ Michael M. Schmahl _____

\5300069.1

## SERVICE LIST

Catherine L. Steege, Esq.
Jenner & Block LLP
330 N. Wabash Avenue
Chicago, IL  60611
FAX:  312/527-0484
E-Mail: csteege@jenner.com

Chris C. Gair
Jenner & Block LLP
330 N. Wabash Avenue
Chicago, IL  60611
FAX:  312/527-0484
E-Mail:  cgair@jenner.com

J. Kevin McCall
Jenner & Block LLP
330 N. Wabash Avenue
Chicago, IL  60611
FAX:  312/527-0484
E-Mail:  jmccall@jenner.com

Vincent E. Lazar
Jenner & Block LLP
330 N. Wabash Avenue
Chicago, IL  60611
FAX:  312/840-7389
E-Mail:  vlazar@jenner.com

Office of the U.S. Trustee
219 South Dearborn Street
Suite 873
Chicago, IL  60604
FAX:  312/886-5794