**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **FREDERICK J. GREDE**, as Chapter 11 Trustee for Sentinel Management Group, Inc., | ) ) ) |
| Plaintiff, | ) Case No. 08 C 2205 ) ) |
| v. | ) ) Honorable James B. Zagel |
| **MCGLADREY & PULLEN LLP** and **G. VICTOR JOHNSON,** | ) ) ) |
| Defendants. | ) |

**TRUSTEE'S RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION TO WITHDRAW THE REFERENCE**

Defendants McGladrey & Pullen LLP ("M&P") and G. Victor Johnson have moved this Court to withdraw the reference to the Bankruptcy Court of the adversary proceeding filed against them by Frederick J. Grede, chapter 11 trustee for Sentinel Management Group., Inc. (the "Trustee"). According to Defendants, withdrawal of the reference is mandated at this time because they have a Seventh Amendment right to a trial by jury and because the Trustee's complaint raises "'significant open and unresolved issues' regarding non-bankruptcy federal statutes." (Mem. at 1.) Neither argument has merit.

Assuming that Defendants have a right to a jury trial on both of the Trustee's claims, that simply does not support immediate withdrawal of the reference. It is well-settled in this District and elsewhere that withdrawal of the reference to the bankruptcy court on grounds that the defendant has a right to a jury trial should not occur until the case is "trial ready." *See, e.g., Union Carbide Corp. v. Viskase Corp.* (*In re Envirodyne Indus., Inc.*), 1994 WL 654662, at *2 (N.D. Ill. Nov. 10, 1994) (Zagel, J.); *Business Communications, Inc. v. Freeman*, 129 B.R. 165, 166 (N.D. Ill. 1991); *see also Keene Corp. v. Williams Bailey & Wesner, LLP*, 182 B.R. 379,

384-85 (S.D.N.Y. 1995). Thus, withdrawal of the reference is inappropriate at this time. Instead, the Bankruptcy Court should handle all pre-trial matters, and Defendants can renew their motion to withdraw the reference when the case proceeds to trial.

Defendants' contention that withdrawal of the reference is required because of so-called open and unresolved issues of federal law also is unavailing. It is undisputed that Sentinel was registered as an Investment Adviser with the SEC and as a futures commission merchant ("FCM") with the CFTC. The Trustee's complaint alleges that Defendants consciously disregarded conduct that violated the Investment Advisers Act of 1940 ("IAA") and Commodity Exchange Act ("CEA") and failed to report those violations of law to Sentinel's regulators, as it was required to do. (Trustee Cmplt. (attached as Ex. A to Defendants' Mot.), ¶¶ 2, 15-18, 23-24, 80-104, 156-60, 175.) In their motion, Defendants contend that, because Sentinel was a "special purpose" FCM that did not engage in commodities trading, there are significant open and unresolved issues regarding how the IAA and CEA apply to Sentinel. (Mem. at 7.) Defendants' argument is makeweight. Defendants do not identify any specific open and unresolved issue because there are none. Indeed, for over twenty-five years, both the SEC and CFTC regulated Sentinel under the relevant provisions of the IAA and CEA, and those statutes and the accompanying regulations contain no special provisions pertaining to so-called "special purpose" FCMs.

Moreover, year after year, Johnson and M&P and its predecessors audited Sentinel's financial statements and submitted audit reports to the SEC and CFTC certifying that Sentinel was in compliance with the very laws and regulations about which they now seek to create uncertainty. (Exs. D-F.) Not once during any of those audits or in any of their audit reports did Defendants suggest to either Sentinel or its regulators that the laws and regulations under which

they were conducting their audits and filing reports with regulators were unclear or somehow might not apply to Sentinel.  Now, after the Trustee has alleged that Defendants committed malpractice by consciously disregarding and failing to report violations of SEC and CFTC regulations, and after both the SEC and CFTC have both filed complaints alleging violations of their regulations, Defendants have, for the first time, purported to raise questions about the applicability of those regulations.  Defendants' "newly-found uncertainty" lends no support to their motion to withdraw the reference to the Bankruptcy Court.

Finally, Defendants contend that even if not required, this Court should exercise its discretion to withdraw the reference to the Bankruptcy Court because of judicial economy.  On the contrary, judicial economy weighs in favor of allowing the Bankruptcy Court, before which several other adversary proceedings involving the same facts and law are pending, to coordinate pre-trial matters in this case with the other pending adversary proceedings.

The Trustee respectfully requests that this Court deny Defendants' motion without prejudice or, in the alternative, if the Court grants the motion, all pre-trial matters should be referred back to the Bankruptcy Court.  *See Baldi v. Longview Aluminum*, 2002 WL 31834491, at *1 (N.D. Ill. Dec. 12, 2002) (granting motion to withdraw the reference but "postpon[ing] withdrawal until pre-trial matters and discovery have been completed") (Zagel, J.).

## RELATED LITIGATION

Before turning to the merits of Defendants' Motion, this Court should be aware that the Trustee has filed a motion to reassign this case to the judge before whom the SEC's related, earlier-filed case against Sentinel is pending (Case No. 07 C 4684, J. Kocoras).  The CFTC has also filed a motion to reassign the case it filed against Sentinel and certain of its former officers and directors (Case No. 08 C 2410, J. Shadur) to Judge Kocoras.  Defendants have opposed the

Trustee's motion for reassignment.[1]   When Judge Kocoras set the briefing scheduling on the motion for reassignment, he advised the parties that he did not believe that the reassignment motion needed to be resolved before the instant motion is decided.

Obviously there is some overlap of issues between the motion to withdraw the bankruptcy reference and the motion to reassign.  The existence of that overlap underscores the need for a practical approach to managing multiple lawsuits that have arisen out of the collapse of Sentinel.  Practicality dictates that it is premature to withdraw any reference in any adversary proceeding at this point and that all pre-trial matters should remain with the Bankruptcy Court at this time.  Practicality further dictates that to the extent any matters in any of these related cases need to be addressed by the District Court, those matters should be addressed by a single judge of this Court in order to maximize efficiencies in case management and consistency in legal rulings.  The need for this practical approach is particularly acute because Sentinel is no longer an operational entity.  It owes its creditors hundreds of millions of dollars more than the value of the assets it has to distribute.  The Trustee has an obligation to Sentinel's creditors to seek to maximize the value of the estate while minimizing its expenses.  These duties obligate the Trustee to urge this Court and the other judges to whom these related cases are assigned to adopt the most practical approach for the expeditions and cost-effective resolution of these matters.

---

[1] In addition to the present adversary proceeding against Defendants, the Trustee has also commenced an adversary proceeding against The Bank of New York ("BONY").  BONY has moved to withdraw the reference to the bankruptcy court of that adversary proceeding, which motion was recently assigned to this Court (Case No. 08 C 2582).  It appears that BONY's motion to withdraw the reference was assigned to this Court because on the civil cover sheet, BONY indicated that its motion was "associated [with a] bankruptcy matter perviously [sic] adjudicated by a judge of this Court" – namely, the present matter. The Trustee believes that BONY's motion to withdraw the reference should be denied for many of the same reasons that Defendants' motion should be denied.  No briefing schedule has been set on BONY's motion to withdraw the reference, and Your Honor has advised the parties that notice will be given if a response is needed.  The Trustee also moved to reassign the BONY matter (Case No. 08 C 2582) as a related case to the SEC matter.  Judge Kocoras denied that motion without prejudice pending Your Honor's ruling on BONY's motion to withdraw the reference.

## ARGUMENT

**I.     The Relief Defendants Seek Is Premature.**

Defendants spend three pages of their brief arguing that they have a right to a jury trial and therefore that the Bankruptcy Court may not conduct trial on the Trustee's claims.  (Mem. at 3-5.)  But, even if true, that hardly requires withdrawal of the reference at this point in time, before any responsive pleading has been filed or any discovery has taken place.  Defendants' argument ignores authority from this Court squarely addressing this issue and refusing to withdraw the reference until the case is "trial ready."

In *Business Communications*, 129 B.R. at 165-66, the defendant demanded a jury trial and moved to withdraw the reference to the bankruptcy court.  The court denied the motion, holding that the question of whether the reference to the bankruptcy court should be withdrawn on Seventh Amendment grounds "will become a question ripe for determination if and when the case becomes trial-ready."  *Id.* at 166 (quotations omitted).  Until that time, even with respect to non-core claims for which the defendant has the right to trial by jury, the bankruptcy court may handle pre-trial matters and "resolve pretrial interlocutory questions."  *Id.*  The Court rejected the defendant's argument that judicial economy warranted immediate withdrawal of the reference: "The bankruptcy judge is in the best position to monitor the progress of the litigation as he is overseeing the bankruptcy.  From his vantage point, the bankruptcy judge can ensure the uniform, efficient administration of the bankruptcy estate."  *Id.*

Likewise, in *ABC-NACO, Inc. v. Klos Trucking*, 2004 WL 728190, at *2 (N.D. Ill. Mar. 31, 2004), the court denied a motion to withdraw the reference despite the fact that the defendant had a right to a jury trial.  The court held:

> [I]t would be imprudent to withdraw the reference at this early stage in the litigation.  First, it is not clear at this point that the case will even proceed to trial,

> and withdrawal of the reference will only become mandatory if a trial is ultimately held. Second, as has been stated before by courts in this district, the bankruptcy court is in a better position to monitor the progress of this litigation because it has its finger on the pulse of all of the proceedings related to the . . . bankruptcy.

*Id.* "A rule that would require a district court to withdraw a reference simply because a party is entitled to a jury trial, regardless of how far along toward trial a case may be, runs counter to the policy favoring judicial economy that underlies the statutory scheme governing the relationship between the district courts and bankruptcy courts." *Kenai Corp. v. Nat'l Union Fire Ins. Co.*, 136 B.R. 59, 61 (S.D.N.Y. 1992); *see also In re Dreis & Krump Mfg. Co.*, 1995 WL 41416, at *3 (N.D. Ill. Jan. 31, 1995); *Keene*, 182 B.R. at 385 (denying motion to withdraw reference to allow "bankruptcy judge [to] adjudicate pre-trial matters not requiring the 'final order or judgment' reserved to the district court").

Denying a motion to withdraw the reference to the bankruptcy court despite the existence of a right to a jury trial is particularly appropriate where the defendant has raised bankruptcy-related defenses. For example, in *Envirodyne*, 1994 WL 654662, at *1-2, a defendant raised 18 affirmative defenses (including three bankruptcy-related defenses) to a claim brought against it, and moved to withdraw the reference because it had demanded a jury trial. This Court denied the motion, holding that "the possibility of a jury trial is not sufficient cause for relinquishing an opportunity to have [a party's] bankruptcy-based defenses considered by a court with general expertise in bankruptcy law and particular familiarity with the Chapter 11 proceedings in this case." *Id.*; *see also Kenai*, 136 B.R. at 61-62 (denying motion to withdraw the reference so that dispositive motions would be before bankruptcy court).

Here, there is no basis for withdrawing the reference to the Bankruptcy Court at this stage, and Defendants' authority does not even support that relief.[2]  Instead, as in *Business Communications*, *ABC-NACO*, and *Dreis*, the Bankruptcy Court is in better position than the District Court to handle pre-trial matters, including discovery, which it will be able to coordinate with pre-trial matters in the other adversary proceedings pending before it.  Moreover, Defendants have asserted that they will be raising "Title 11 issues" in response to the Trustee's claims, including "whether, under the circumstances alleged, the bankruptcy trustee has proper standing to bring these claims, and whether the doctrine of *in pari delicto* bars a bankruptcy trustee from bringing these claims."  (Mem. at 6 n.3.)  Accordingly, under this Court's decision in *Envirodyne*, Defendants' motion to withdraw the reference should be denied to allow the Bankruptcy Court to resolve those bankruptcy-based issues; *see also Business Communications*, 129 B.R. at 166; *Matter of R.D. Kushnir & Co.*, 274 B.R. 768, 781-82 (Bankr. N.D. Ill. 2002) (denying accountants' motion to dismiss trustee's malpractice claim on standing and *in pari delicto* grounds); *see also Kenai*, 136 B.R. at 61.[3]

---

[2] *In re Grabill Corp.*, 967 F.2d 1152 (7th Cir. 1992), merely stands for the unremarkable proposition that a bankruptcy court may not conduct a jury trial, but says nothing about its authority to handle pre-trial matters.  Moreover, cases cited by Defendants from this District that granted motions to withdraw the reference based upon the defendants' right to a jury trial involve entirely different factual and procedural contexts.  For example, in *Keck v. Bowytz* (*In re Keck*), 2001 WL 292559 (N.D. Ill. Mar. 19, 2001), the Court withdrew the reference to the bankruptcy court nearly two years after the adversary proceeding was filed, not before any responsive pleading, discovery, or other pre-trial matters had taken place.  In *Maxwell v. Leavelaw.com* (*In re Marchfirst, Inc.*), 2003 WL 22244982 (N.D. Ill. Sept. 22, 2003), the trustee based his opposition solely on the issue of whether the defendant had a right to a jury trial and conceded that if it did, then the reference should be withdrawn; *see also In re FMG*, 1991 WL 247595, at *1, 1991 WL 230390, at *1 (N.D. Ill. Oct. 28 and Nov. 14, 1991) (granting unopposed motion to withdraw the reference).  In contrast, here judicial efficiencies dictate that the reference not be withdrawn at this time.

[3] On May 21, 2008, Defendants filed a motion to dismiss primarily on grounds that the Trustee's claims were barred by *in pari delicto*.  Defendants' motion to dismiss did not raise any non-Title 11 issues of federal law and only raised issues that the Bankruptcy Court is in the best position to decide.

## II.     Withdrawal Of The Reference Is Not Required Under Section 157(d).

The Trustee alleges that Defendants consciously disregarded commingling, pledging, and leveraging activity that violated the segregation requirements imposed by the IAA and CEA, and audited and certified financial statements, including those they knew were submitted to the CFTC, that they knew were patently false.  (Cmplt., ¶¶ 80-104, 156-60, 175.)  In response, Defendants contend that withdrawal of the reference is mandatory under § 157(d) because the "Trustee's claims will require the Court to undertake analysis of 'significant open and unresolved issues' regarding the Investment Advisers Act of 1940, 15 U.S.C. §§ 80b-1—80b-21 and the Commodity Exchange Act, 7 U.S.C. §§ 1-25 ('CEA')."  (Mem. at 6.)  The only "significant open and unresolved issue" of federal law that Defendants identify is "how these federal laws and regulations apply to a special purpose futures commission merchant, such as Sentinel" that "did not engage in commodities trading."  (*Id.* at 7.)[4]  But Defendants' "recently professed confusion" as to the applicability of the IAA and CEA fails to demonstrate that the reference to the bankruptcy court should be withdrawn under § 157(d).  Defendants' own audit conduct over the past several years belies their contention that the Trustee's claims involve significant open and unresolved issues of law.

Motions to withdraw the reference cannot rest on "speculative" and "completely hypothetical" contentions that federal claims "might involve novel issues."  *Matter of Vicars Ins. Agency, Inc.*, 96 F.3d 949, 954 (7th Cir. 1996) (quotations omitted); *Matter of Lissner Corp.*, 115 B.R. 604, 610-11 (N.D. Ill. 1990) (motions to withdraw the reference should not rest on "hasty predictions as to the applicability of non-title 11 federal law").  Instead, the movant must show that the non-Title 11 federal claims "involve more than mere application of existing law to new

---

[4] Defendants do not explain how Sentinel's status as a special purpose FCM registered with the CFTC would have any impact whatsoever on issues arising under the Investment Advisers Act.

facts" and specifically identify significant open and unresolved issues regarding how the federal law at issue should be interpreted. *Vicars*, 96 F.3d at 953-54. Here, there are no significant and open interpretive issues under the IAA and CEA. Neither Act contains any exceptions or special provisions for so-called "special purpose" FCMs. Disposition of the Trustee's claims merely requires the Court to apply the plain language of the statutes and regulations to the facts at bar. Accordingly, under unequivocal, binding Seventh Circuit authority, withdrawal of the reference is not mandated. *See Vicars*, 96 F.3d at 953-54.

Despite Defendants' wholly-unsupported assertion, there is no doubt how the IAA and CEA apply to Sentinel. Indeed, as Defendants are aware, both the SEC and CFTC have made that crystal clear. On August 20, 2007, the SEC filed a civil action against Sentinel, alleging violations of Sections 206(1), 206(2) and 206(4) of the IAA and violations of SEC Rule 206(4)-2 as a result of the "commingling and transferring [of] client funds and securities between the various client segregated accounts and between client accounts and a 'house' account," and the pledging of those assets "as collateral in order to obtain a line of credit from the Bank of New York" as well as additional leveraged financing in the form of repo transactions. (Ex. A, ¶¶ 2, 16, 24, 26-31); *see also SEC v. Slocum, Gordon, & Co.*, 334 F. Supp. 2d 144, 157-59, 178 (D.R.I. 2004) (holding that investment adviser violated Rule 206(4)-2 by commingling customer and house assets in omnibus clearing account).

On April 28, 2008, the CFTC also filed a civil action against Sentinel and certain of its former directors and officers, alleging that "[a]s a registered FCM, Sentinel was required under the [CEA] and [CFTC] Regulations to adhere to the standards of segregation and handling of customer funds as outlined in Sections 4d(a)(2) and 4d(b) of the Act, 7 U.S.C. §§ 6d(a)(2) and 6d(b) (2002), and Commission Regulations 1.20, 1.22 and 1.23" and that Sentinel, through the

acts of certain insiders, violated those laws and regulations by "improperly commingl[ing] customer segregated assets with its assets and the assets of others and misappropriat[ing] such customers' assets by using them to secure, extend or pay Sentinel's debt." (Ex. B, ¶¶ 2, 17);[5] *see also Premex, Inc. v. CFTC*, 785 F.2d 1403, 1406 n.7 (9th Cir. 1986) (duty to comply with CFTC regulations "flows from the registrant's status as an FCM and not from the nature of its current activities").

The CFTC complaint also alleges that Sentinel's CFTC Form 1-FRs "falsely reported that Sentinel owned no securities purchased under resale agreements and had no amounts payable, including no amounts payable to BONY, despite the existence of the BONY loan" of several hundred million dollars. (*Id.*, ¶ 32.) As part of their audits of Sentinel's financial statements, Defendants reviewed Sentinel's monthly 1-FRs and certified Sentinel's annual 1-FR, which also were false. (Trustee Cmplt., ¶¶ 125, 132, 159; *see also* Ex. C, monthly and annual Form 1-FRs dated 12/31/06.)

Moreover, Johnson, M&P and its predecessors (with whom Johnson was also employed) conducted audits of Sentinel's year-end financials statements, including its financial statements submitted to the CFTC on Form 1-FR, and separate securities audits under SEC Rule 206(4)-2 every year between 2002 and 2006. Each of those audits related in part to Sentinel's compliance with provisions of the IAA or CEA.[6]

For example, the engagement letter for M&P's audit of Sentinel's financial statements for the year ended December 31, 2006 provides that M&P would "perform an audit of [Sentinel's]

---

[5] The SEC action is pending before Judge Kocoras, and the CFTC has filed a motion to reassign its case pending before Judge Shadur to Judge Kocoras. Thus, to the extent there are significant open and unresolved issues regarding the IAA and CEA (which there are not), then at least some if not all of those issues will already be before another Court in this District.

[6] In fact, M&P touts itself as having particular expertise in the financial services industry, including with respect to regulatory agencies such as the SEC. (Ex. G.)

statement of financial condition . . . and the schedules supporting such financial statements required under Regulation 1.10 of the [CEA]. Also, as required by Regulation 1.16(d) under the [CEA], we will make a study of the practices and procedures, including tests of compliance with such practices and procedures, followed by [Sentinel] that we consider relevant to the objectives stated in Regulation 1.16(d)." (Ex. D.) In addition, the engagement letter states that M&P would "report whether we believe your procedures are adequate for the [CFTC's] purposes. In addition, our report will set forth those conditions, if any, which we believe are material weaknesses in relation to Regulation 1.16(d)." (*Id.*) M&P also provided an independent auditors' report that it knew Sentinel submitted to the CFTC stating that M&P had audited Sentinel's financial statements and accompanying CFTC Form 1-FR pursuant to CFTC Regulations 1.10 and 1.16 and that they were correct in all material respects. (Ex. E.)

Similarly, Johnson and M&P's predecessors performed separate audits under SEC rules, and issued independent accountant's reports it knew would be provided to the SEC on Form ADV-E, stating that they had examined whether Sentinel "complied with certain provisions of rules 204-2(b) and 206(4)-2 of the Investment Advisers Act of 1940" and opining "that Sentinel Management Group, Inc. complied with the requirements of subparagraphs (1) of rule 206(4)-2 under the Investment Advisers Act of 1940 . . . and has complied with rule 204-2(b) and the requirements of subparagraphs (2) and (3) of rule 206(4)-2(a) under the Investment Advisers Act of 1940 . . . ." (Ex. F.) Both the Trustee's claims against Defendants and the SEC's and CFTC's claims relate to violations of these very sections of the CEA and IAA.

Defendants certified Sentinel's financial statements, including those Defendants knew would be provided to the CFTC, and reported no violations of or material weaknesses with respect to the IAA, CEA or applicable SEC and CFTC regulations, including in independent

auditors' reports they knew would be provided to both the CFTC and SEC. (Exs. E-F.) For Defendants to now contend that there are open questions regarding the applicability of either of those regulatory schemes is specious given that they previously represented that they were auditing compliance with those very regulatory requirements. It is only after having been sued for $550 million for its grossly deficient audit conduct that Defendants have expressed the position that the laws and regulations under which they were conducting their audits and reporting to Sentinel and regulators were now uncertain in some undefined way and might not somehow apply to Sentinel because Sentinel was a "special purpose" FCM. Defendants' newly-discovered uncertainty regarding the IAA and CEA is simply disingenuous and does not support withdrawal of the reference.[7]

Finally, even if the Trustee's claims did involve substantial open and unresolved issues of federal law (which they do not), that still would not be reason to withdraw the reference to the Bankruptcy Court at this time. For the same reasons discussed in Section I above, courts deny motions to withdraw the reference as premature despite the presence of non-Title 11 federal law issues. For example, in *Envirodyne*, 1994 WL 654662, at *2, this Court held that the presence of issues under CERCLA did not require withdrawal under § 157(d), and instead denied the motion to withdraw so that the bankruptcy court could handle pre-trial matters. *See also Mishkin v. Ageloff* (*In re Adler, Coleman Clearing Corp.*), 270 B.R. 562, 564-66 (S.D.N.Y. 2001) (assuming "that the adversary proceeding in fact raises substantial and novel issues of non-bankruptcy [federal] law" but denying the motion to withdraw the reference as premature).

---

[7] If in fact there is some uncertainty as to the applicability of the IAA or CEA, then this would reflect further deficiencies in Defendants' audit because Defendants did not disclose that in their audit reports and certified financial statements that fail to note any such uncertainty.

**III.    There Is No Cause For Permissive Withdrawal.**

In addition to contending that withdrawal of the reference to the Bankruptcy Court is mandatory, Defendants also request that this Court exercise its discretion and withdraw the reference "for cause" under 28 U.S.C. § 157(d).   According to Defendants, "cause" for withdrawal of the reference exists because the Trustee's claims are non-core and because withdrawal of the reference would promote judicial economy.  (Mem. at 8-9.)

Defendants' first argument is easily disposed of.  The fact that the Trustee's claims are non-core does not warrant withdrawal of the reference at this time.  Indeed, the cases discussed in Section I above that held that withdrawal of the reference was premature until the case was "trial ready" involved non-core, state law claims.  *See, e.g., Dreis*, 1995 WL 41416, at *3; *Business Communications*, 129 B.R. at 166.  For the same reasons, withdrawal of the reference to the Bankruptcy Court of the Trustee's non-core, state law claims is not warranted at this time.

By the same token, Defendants' argument that the reference should be withdrawn because the Bankruptcy Court's proposed findings and conclusions will be subject to *de novo* review is unavailing.  The efficiencies that would be achieved by allowing the Bankruptcy Court to handle pre-trial matters vastly outweigh the issues involved with the extra layer of judicial review.  Moreover, under Section 157(c), a denial of Defendants' motion to dismiss would not be subject to *de novo* review in any event.

As discussed in Section I above, there is a strong policy in favor of having bankruptcy courts coordinate discovery and resolve pre-trial interlocutory issues.  *See ABC-NACO,* 2004 WL 728190, at *2;    *Kenai*, 136 B.R. at 61.  That is especially true here.  The Bankruptcy Court is already overseeing Sentinel's complex bankruptcy case and several related adversary proceedings.   Those adversary proceedings involve the same commingling, pledging, and

leveraging conduct that the Trustee alleges the Defendants consciously disregarded and failed to report in certifying Sentinel's financial statements.  Obviously it promotes judicial efficiency to allow the Bankruptcy Court, which is already familiar with the complex facts surrounding Sentinel's demise, to handle pre-trial matters relating to the Trustee's various adversary proceedings.  Not only would this allow the coordination of discovery, but it would prevent the need for another judge to learn the same set of facts, would prevent the potential for inconsistent decisions involving those facts, and would preserve the resources of the estate.[8]  Defendants' assertions to the contrary ring hollow.

## **CONCLUSION**

For the foregoing reasons, the Trustee respectfully requests that this Court deny Defendants' motion without prejudice or, in the alternative, grant the motion but refer all pre-trial matters back to the Bankruptcy Court.

Dated: May 29, 2008                                Respectfully submitted,

                                                   FREDERICK J. GREDE, not individually
                                                   but as Chapter 11 Trustee of Sentinel
                                                   Management Group, Inc.


                                                   By:  s/ J. Kevin McCall
                                                        One of his attorneys


J. Kevin McCall (ARDC # 3125685)
Chris C. Gair (ARDC # 6190781)
Vincent E. Lazar (ARDC # 6204916)
JENNER & BLOCK LLP
330 N. Wabash Ave.
Chicago, IL  60611
Phone: (312) 222-9350
Facsimile: (312) 527-0484

---

[8] For similar reasons, withdrawal of the reference only makes sense if all of the related cases pending in this District will be before a single judge.

## <u>CERTIFICATE OF SERVICE</u>

I, Jeffrey S. Eberhard, an attorney, certify that on May 29, 2008 I caused a copy of the foregoing **Response in Opposition to Defendants' Motion to Withdraw the Reference** to be served by ECF to:

> Richard J. Mason
> Patricia K. Smoots
> Michael E. Schmahl
> McGuire Woods, LLP
> 77 W. Wacker Drive, Suite 4400
> Chicago, Illinois 60601
>
> Steven M. Farina
> Thomas H.L. Selby
> Williams & Connolly LLP
> 725 12th Street, N.W.
> Washington, D.C. 20005

s/Jeffrey S. Eberhard

# EXHIBIT A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

AUG 2 0 2007   **NF**
8-20-07

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES SECURITIES
AND EXCHANGE COMMISSION,

Plaintiff,

v.

SENTINEL MANAGEMENT GROUP, INC.

Defendant.

:

07CV 4684
JUDGE KOCORAS
MAGISTRATE JUDGE MASON

:       **JURY DEMANDED**
:
:
:

## COMPLAINT

Plaintiff United States Securities and Exchange Commission ("SEC" or "Commission")

alleges as follows:

## NATURE OF THE ACTION

1.      This action involves the ongoing fraud and misappropriation and misuse of client

assets by the investment advisory firm Sentinel Management Group, Inc. ("Sentinel" or

"Defendant"). Sentinel, which claims to have $1.2 billion in assets under management,

defrauded its clients by improperly commingling, misappropriating and leveraging their

securities without their knowledge in violation of the Investment Advisers Act of 1940,

("Advisers Act").

2.      Sentinel's fraudulent conduct has placed its clients at risk of serious and

irreparable loss. Among its improper activities, Sentinel transferred at least $460 million in

securities from client investment accounts to Sentinel's proprietary "house" account. Sentinel

also used securities from client accounts as collateral to obtain a $321 million line of credit as

well as additional leveraged financing. The bank that extended the $321 million line of credit to Sentinel informed Sentinel that it is in default under the credit agreement and therefore the bank intends to sell securities currently sitting in Sentinel's "house" account that were pledged as collateral for the loan beginning as soon as August 22, 2007. The securities to be sold may include securities that were fraudulently transferred to the "house" account from client accounts. At the very least, Sentinel has not kept accurate books and records, required to be kept under the federal securities laws, necessary to verify the ownership of the securities in its client and "house" accounts and to prevent the firm from selling assets that it is not entitled to sell and distributing the sale proceeds persons not entitled to receive them.

3.     Sentinel did not disclose to its clients its practices of commingling, transferring and misappropriating their assets, or inform them that their investment portfolios were highly-leveraged as a result of Sentinel's financing activities. To the contrary, Sentinel provided its clients with daily account statements that did not reflect the improper activities.

4.     Through the activities alleged in this Complaint, Sentinel has, and unless enjoined, will continue to, directly and indirectly, engage in transactions, acts, practices or courses of business which are violations of Sections 206(1), 206(2) and 206(4) of the Advisers Act [15 U.S.C. § 80b-6(1), 80b-6(2) and 80b-6(4)], and Rule 206 (4)-2 promulgated thereunder [17 C.F.R. 275.206(4)-2].

## JURISDICTION AND VENUE

5.     The SEC brings this action pursuant to the authority conferred upon it by Section 209(d) of the Investment Advisers Act of 1940 (the "Advisers Act") [15 U.S.C. § 80b-9(d)].

6.     This Court has jurisdiction pursuant to Section 214 of the Investment Advisers Act of 1940 [15 U.S.C. § 80b-14] and 28 U.S.C. § 1331.

2

7. Venue is proper in this Court pursuant to Section 214 of the Advisers Act [15 U.S.C. § 80b-14].

8. The acts, practices and courses of business constituting the violations alleged herein occurred within the jurisdiction of the United States District Court for the Northern District of Illinois and elsewhere.

9. Defendants, directly and indirectly, have made, and are making, use of the means and instrumentalities of interstate commerce and of the mails in connection with the acts, practices and courses of business alleged herein in the Northern District of Illinois and elsewhere.

## DEFENDANT

10. Sentinel, an Illinois corporation headquartered in Northbrook, Illinois, provides investment advisory and discretionary money management services to various types of client clients, including financial institutions, private investment firms, pension funds and individuals. Sentinel is an investment adviser registered with the SEC and a futures commission merchant ("FCM") registered with the Commodity Futures Trading Commission ("CFTC"). It is also a member of National Futures Association ("NFA"), a self-regulatory organization. As of August 13, 2007, Sentinel claimed to have $1.2 billion of client interests in assets under management.

## FACTS

11. Sentinel is a registered investment adviser that primarily manages investments of short-term cash for various advisory clients, including FCMs, hedge funds, financial institutions, pension funds, and individuals. Sentinel's website claims that since 1979, Sentinel has "never lost a dime of client funds, or delayed even one day in returning the full amount of a client's cash regardless of prevailing market conditions." Additionally, Sentinel states that it "buys only the

3

highest quality and most liquid securities." Sentinel's objective "is to achieve the highest yield
consistent with preservation of principal and daily liquidity, not simply the highest yield." As of
August 13, 2007, Sentinel claimed to have $1.2 billion of client assets under management.

12.     On August 13, 2007, Sentinel sent a letter to clients announcing that it was halting
all redemptions due to the "liquidity crisis" in the credit markets. In the letter, Sentinel
represented that the "liquidity crisis" prevented Sentinel from meeting redemption requests
"without selling securities at deep discounts to their fair value and therefore causing unnecessary
losses" to clients.

13.     Sentinel's explanation of its redemption suspension was false and misleading. As
described below, for a period of at least several months up to and including the week of August
13, 2007, Sentinel's advisory clients suffered undisclosed losses and risks of losses due to
Sentinel's undisclosed use of leverage and commingling and misappropriation of clients'
securities. As of August 13, 2007, the account statements Sentinel provided to clients listed
hundreds of millions of dollars in securities that were not held by Sentinel at all, were held by
Sentinel and treated as its own assets, or were pledged as collateral for loans extended to
Sentinel.

## A.     The Programs

14.     Sentinel offered clients the opportunity to participate in a variety of investment
programs, each of which had its own investment policy designed to meet the requirements and
preferences of different types of clients. Regardless of which investment program a particular
client chose, Sentinel had the general practice of pooling the client's assets with those of similar
types of clients in one of three segregated client custodial accounts held at the Bank of New
York. The accounts were referred to within Sentinel as Seg 1, Seg 2 and Seg 3.

15.     Seg 1 contained assets of registered FCMs with only domestic customer deposits. FCMs are futures brokers that are members of the NFA and investments are subject to the rules of the CFTC. The customer deposit accounts are required to adhere to strict investment standards embodied in Rule 1.25 promulgated under the Commodities Futures Trading Act and are commonly referred to as "125 accounts." Seg 2 contained assets of FCMs with foreign customer deposits. Seg 3 contained assets of all other types of clients, including hedge funds, trust accounts, endowments and individuals.

16.     Under Rule 206(4)-2 promulgated under the Advisers Act, a registered investment adviser such as Sentinel is not allowed to have custody of any client funds or securities unless, among other requirements, the funds and securities are held in segregated accounts that hold only clients' funds and securities. Sentinel routinely violated this requirement, by commingling and transferring client funds and securities between the various client segregated accounts and between client accounts and a "house" account, which also contained securities which Sentinel claimed it owned.

**B.     Sentinel's Representations to Clients**

17.     Sentinel made written representations to its clients through at least four means: an advisory agreement with clients; client account statements provided daily to clients; its investment policies on Sentinel's website; and Part II of Sentinel's Form ADV filed with the Commission.

18.     From at least July 2005, in its standard investment advisory agreement with clients, Sentinel represented that the clients in each segregated portfolio owned an indirect, pro rata interest in their particular segregated investment portfolio. The Agreement also provided discretionary authority to Sentinel to buy and sell securities without requesting authority from

5

clients before executing the trades. The Agreement often had an Addendum specifying the investment policy that was to be used to invest the client's funds. For example, the Addendum for the largest client in Seg 3 stated that its funds would be invested consistent with the limitations of CFTC Rule 1.25. This rule restricted investments to highly-rated debt instruments and other highly rated and relatively liquid investments.

19. The version of the Agreement provided to clients prior to 2005 did not state that any form of leverage would be utilized by Sentinel in managing the clients' accounts. At some point in late 2004 or early 2005, Sentinel typically added to the Agreement a provision allowing the use of leverage, but did not disclose to what extent it would be used.

## C.    Undisclosed Misappropriation and Commingling of Client Assets

20. Sentinel represented on its Website that "Sentinel clients receive a daily account statement (by email or fax), which shows, down to the penny, precisely what securities they own." This was on Sentinel's website as late as August 14, 2007. Sentinel did send daily account statements to its clients but they were materially false and misleading, as detailed below.

21. On August 13, 2007, Sentinel e-mailed customer account statements to its clients that were materially false and misleading. For example, the customer statements sent to clients whose assets were supposedly held in the Seg 3 account represented that the face value of the securities held in their accounts was, in the aggregate, more than $670 million. The accounts reported no liabilities corresponding to these assets. Contrary to these representations, the Bank of New York custodial statement for the Seg 3 account on August 13 showed only approximately $94 million of securities held on behalf of all Seg 3 clients. SEC examiners asked Sentinel's representatives about the discrepancy between the customer statements and the custodial

statement, and were informed that the customer accounts would not "tie out" because Sentinel had moved securities among the Seg accounts and its own "house" account.

22.     On information and belief, for at least several months before August 13, 2007, Sentinel routinely falsely represented to its clients the amount of securities held in their accounts.

23.     Before August 13, 2007, Sentinel placed at least $460 million of clients' securities properly belonging in segregated customer accounts in Sentinel's "house" account. The "house" account also contained securities owned by Sentinel and, significantly, was available to be pledged as collateral. The placement of these clients' securities in a commingled account was not disclosed to clients on the account statements. When SEC examiners asked Sentinel representatives to identify which securities in the "house" account were owned by clients or Seg accounts, Sentinel representatives responded that it could not determine who owned those securities.

## D.     Undisclosed Leveraging of Client Assets

24.     Sentinel pledged securities belonging to clients as collateral in order to obtain a line of credit from the Bank of New York for its own benefit. The credit extended under this line of credit reached as high as $500 million in June 2007 and is now $321 million. The client account statements, which should have accurately reflected the portfolio holdings, the value of the portfolio and all transactions in the portfolio, did not reflect the fact that the securities had been encumbered in this manner. In other words, the clients had no way of knowing that their assets had been used by Sentinel to obtain financing for its own purposes.

25.     Sentinel used client assets to obtain additional leveraged financing. A representative of Sentinel told a member of the SEC's examination staff that since 2004 Sentinel had used $1.5 billion in securities owned by the clients to obtain financing totaling three times

7

the value of those securities. Sentinel representatives told SEC examiners that the financing was used to purchase additional securities. However, the client account statements prepared and distributed by Sentinel did not reflected any of this activity.

## COUNT I

### Violations of Sections 206(1) and 206(2) of the Advisers Act

26. Paragraphs 1 through 25 are re-alleged and incorporated by reference herein.

27. Defendant, while acting as an investment adviser, by the use of the means and instrumentalities of interstate commerce and of the mails, directly and indirectly, has employed and is employing devices, schemes and artifices to defraud its clients and prospective clients; and has engaged and is engaging in transactions, practices and courses of business which operate as a fraud or deceit upon its clients and prospective clients.

28. By reason of the foregoing, Defendant has violated, and unless restrained and enjoined will continue to violate, Sections 206(1) and (2) of the Advisors Act [15 U.S.C. § 80b-6(1) and 80b-6(2)].

## COUNT II

### Violations of Section 206(4) of the Advisers Act and Rule 206(4)-2 Thereunder

29. Paragraphs 1 through 25 are realleged and incorporated by reference herein.

30. Defendant Sentinel, while acting as an investment adviser, by use of the mails or the means or instrumentalities of interstate commerce, directly or indirectly, engaged in acts, practices or courses of business which are fraudulent, deceptive or manipulative, as those terms have been defined by the SEC by rules and regulations, by taking custody of client funds or securities that were not maintained in a separate client account for each client under that client's

name; or in accounts that contain only the clients' funds and securities, under Defendant Sentinel's name as agent or trustee for the clients.

31. By reason of the foregoing, Defendant Sentinel has violated, and unless restrained and enjoined will continue to violate, Section 206(4) of the Advisers Act [15 U.S.C. §80b-6(4)] and Rules 206(4)-2 thereunder [17 C.F.R. 275.206(4)-2].

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that this Court:

### I.

Find that Defendant Sentinel committed the violations charged and alleged herein.

### II.

Grant Orders of Preliminary and Permanent Injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, restraining and enjoining Defendant Sentinel and its officers, agents, servants, employees, attorneys and those persons in active concert or participation with them who receive actual notice of the Orders of Preliminary and Permanent Injunction, by personal service or otherwise, and each of them, from, directly or indirectly, engaging in the acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Sections 206(1), 206(2) and 206(4) of the Advisers Act [15 U.S.C. § 80b-6(1), 80b-6(2) and 80b-6(4)] and Rule 206(4)-2 [17 C.F.R. § 275.206(4)-2] thereunder.

### III.

Issue an Order requiring Defendant to disgorge all profits or ill-gotten gains that it has received as a result of the acts and courses of conduct complained of herein, with prejudgment interest.

### IV.

Issue an Order directing Defendant to pay civil fines and/or penalties pursuant to Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

### V.

Retain jurisdiction of this action in accordance with the principals of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

### VI.

Grant Orders for such further relief as the Court may deem appropriate.

Dated: August 20, 2007

Respectfully submitted,

Andrea R. Wood, IL Bar No. 6256883
James A. Davidson, IL Bar No.6206786
John E Birkenheier, IL Bar No. 6270993
Attorneys for Plaintiff
U.S. SECURITIES AND
EXCHANGE COMMISSION
175 W. Jackson Blvd., Suite 900
Chicago, IL 60604
Telephone: (312) 353-7390
Facsimile: (312) 353-7398

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**

<table>
<tr><td>

**COMMODITY FUTURES TRADING**
**COMMISSION,**

          **Plaintiff,**

v.

**SENTINEL MANANAGEMENT**
**GROUP, INC.,**
**ERIC A. BLOOM, and**
**CHARLES K. MOSLEY,**

          **Defendants.**

</td><td>

**CIVIL ACTION NO.**

FILED: APRIL 28, 2008
08CV2410      TG
JUDGE SHADUR
MAGISTRATE JUDGE BROWN

</td></tr>
</table>

**COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND**
**FOR CIVIL MONETARY PENALTIES UNDER THE COMMODITY**
**EXCHANGE ACT**

## I.    SUMMARY

1.    This action involves fraud and misuse of futures commission merchant

("FCM") commodity customer funds by the Defendants, Sentinel Management Group,

Inc. ("Sentinel"), its president, Eric A. Bloom ("Bloom"), and its senior vice president,

Charles K. Mosley ("Mosley"), from at least May 21, 2007 through August 17, 2007

("the relevant time").  Sentinel is registered as a FCM with plaintiff Commodity Futures

Trading Commission ("Commission" or "CFTC") and is registered as an investment

adviser with the Securities and Exchange Commission ("SEC").  Sentinel provided

investment advisory and money management services.

2.      During at least the relevant time, Sentinel improperly commingled customer segregated assets with its assets and the assets of others and misappropriated such customers' assets by using them to secure, extend or pay Sentinel's debt.

3.      Sentinel has engaged, is engaging, or is about to engage in acts or practices that violate the anti-fraud and segregation of customer assets sections of the Commodity Exchange Act, as amended ("Act"), 7 U.S.C. §§ 1 *et seq.* (2002), and Commission Regulations thereunder, 17 C.F.R. §§ 1.1 *et seq.* (2007).  Mosley aided and abetted Sentinel's violations and is liable for those violations pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a).  Bloom is a controlling person of Sentinel and is liable for Sentinel's violations pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2002).

4.      Accordingly, pursuant to Section 6c(a) of the Act, 7 U.S.C. § 13a-1 (2002), the Commission brings this action to enjoin Defendants' unlawful acts and practices, and compel Defendants' compliance with the provisions of the Act and regulations thereunder.  In addition, the CFTC seeks civil monetary penalties against Bloom and Mosley and such other equitable relief as to all defendants as this Court may deem necessary or appropriate.

## II.      <u>JURISDICTION AND VENUE</u>

5.      This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2002), which provides that whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order promulgated thereunder, the Commission may bring an action in the proper District

Court of the United States against such person to enjoin such practice, or to enforce compliance with the Act, or any rule, regulation or order thereunder.

6.      Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2002), because Sentinel's principal place of business is in this District and acts and practices in violation of the Act and Commission Regulations have occurred within this District.

### III.      THE PARTIES

7.      Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged with administering and enforcing the Act, 7 U.S.C. §§ 1 *et seq*. (2002), and the regulations promulgated thereunder, 17 C.F.R. §§ 1.1 *et seq*. (2007).

8.      Defendant **Sentinel Management Group, Inc.** is an Illinois corporation with its principal place of business located in Northbrook, Illinois.  Sentinel provides investment advisory and money management services to various institutional, corporate and individual customers, including FCMs.  Sentinel has been registered with the Commission as a FCM since June 1980 and also has been registered with the SEC as an investment adviser since December 1980.  Sentinel has also been a member of the National Futures Association ("NFA"), a self-regulatory organization for the U.S. futures industry, since July 1982.  Sentinel is currently the subject of a bankruptcy proceeding in the bankruptcy court for this district.  *See In re: Sentinel Management Group, Inc.,* (No. 07-14987, Bankr. N.D. Ill.).

9.      Defendant **Eric A. Bloom** resides in Chicago, Illinois.  Bloom was a principal, director, president and chief executive officer of Sentinel during the relevant time.  Bloom has never been registered with the CFTC in any capacity.

10.     Defendant **Charles K. Mosley** resides in Vernon Hills, Illinois.  Mosley was a director, senior vice-president and a principal of Sentinel during the relevant time. Mosley ceased employment with Sentinel, and his status as a principal was withdrawn on August 15, 2007.  Mosley has not been registered with the CFTC in any capacity since April 1989, when he was registered as an associated person of another registered FCM.

## IV.      FACTS

### A.  Statutory and Regulatory Background

11.     A FCM is defined in Section 1a(20) of the Act, 7 U.S.C. § 1a(20), and Commission Regulation 1.3(p), 17 C.F.R. § 1.3(p), with certain qualifications, as an individual, association, partnership, corporation, or trust that is engaged in soliciting or in accepting orders for the purchase or sale of any commodity for future delivery on or subject to the rules of any contract market or derivatives transaction execution facility; and in or in connection with such solicitation or acceptance of orders, accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom.

12.     The NFA is a not-for-profit membership corporation and is a self-regulatory organization that is registered with the Commission as a futures association under Section 17 of the Act, 7 U.S.C. § 21.  The NFA conducts audits and investigations of NFA member firms, including registered FCMs, to monitor them for compliance with NFA rules, some of which incorporate by reference Commission Regulations.

**B. Background**

      13.     Sentinel managed investments of short-term cash for various customers, including hedge funds, pension funds, other FCMs, customers of other FCMs, individuals and others. As of August 13, 2007, Sentinel claimed to have $1.2 billion of customer assets under management.

      14.     Sentinel offered customers the opportunity to participate in a variety of investment programs, each of which had its own investment policy depending on the needs and preferences of its customers. Sentinel's general practice was to pool a customer's assets with those of other customers participating in the same investment program in custodial accounts held both at the Bank of New York ("BONY") and J.P. Morgan Chase. These investment programs and their related accounts were referred to within Sentinel as "Seg 1", "Seg 2" and "Seg 3", depending on the type of customer it serviced.

      15.     The Seg 1 program invested and kept segregated the segregated assets of domestic customers of other FCMs registered with the Commission, whose deposits were held for the purchase of commodity futures contracts or options on commodity futures contracts. The investments for the customers of the FCMs were subject to the rules of the Commission, in particular to the investment standards embodied in Commission Regulation 1.25, 17 C.F.R. § 1.25 (2007). As relevant here, those standards include restrictions on the investment of the segregated customer funds of the other FCMs consistent with the objectives of preserving principal and maintaining liquidity.

      16.     Sentinel expressly acknowledged this duty to adhere to the investment standards of Regulation 1.25 when, in 1981, it also requested the Commission's Division

of Trading and Markets to take a "no-action" position regarding Sentinel's maintenance of adjusted net capital. As set forth in Commission Regulation 1.17, 17 C.F.R. § 1.17, a FCM's adjusted net capital is calculated by deducting total liabilities from total current assets to arrive at net capital, from which certain charges are deducted as a cushion against potential decreases in market value to arrive at adjusted net capital. Based partially on Sentinel's representation that it was registered as a FCM solely so that it may hold customers' funds deposited with it by other FCMs for the exclusive purpose of investing such funds in Regulation 1.25 approved obligations for the benefit of such other FCMs, and its representation that customers' funds are segregated, the Commission issued a "no-action" letter to Sentinel dated May 7, 1981 that, allowed Sentinel to operate under certain net capital provisions and other restrictions.

17. As a registered FCM, Sentinel was required under the Act and Commission Regulations to adhere to the standards of segregation and handling of customer funds as outlined in Sections 4d(a)(2) and 4d(b) of the Act, 7 U.S.C. §§ 6d(a)(2) and 6d(b) (2002), and Commission Regulations 1.20, 1.22 and 1.23, 17 C.F.R. §§ 1.20, 1.22 and 1.23 (2007).

18. The Seg 2 program invested the assets of customers of FCMs that traded foreign futures and options.

19. The Seg 3 program invested the assets of all other types of customers, including hedge funds, trust accounts, pension funds, individuals and others.

20. From at least July 2005 to August 17, 2007, in its standard investment advisory agreement ("Agreement") with all of its customers, Sentinel represented that the customers in each portfolio owned a pro rata interest in their particular investment

6

portfolio.  The Agreement also provided discretionary authority to Sentinel to buy and sell securities without requesting authority from customers before executing the trades. The Agreement often had an Addendum specifying the investment policy that was to be used to invest the customer's funds.

**C. Misuse and Misappropriation of Customer Segregated Funds For Sentinel's Benefit**

21.     During the relevant time, Sentinel maintained a line of credit with BONY (the "BONY loan").  The credit extended under this line of credit varied during the time period, reaching as high as $500 million in June 2007.  One of the purposes of the BONY loan was to allow Sentinel to draw upon the loan to immediately honor Seg 1 FCM redemption requests.

22.     Associated with the BONY loan was a house account in Sentinel's name at BONY.  The house account was not segregated and any assets placed in that account were pledged as collateral for the BONY loan.

23.     Sentinel used the BONY loan for various purposes.  Among other things, if sufficient Seg 1 cash was not available in the Seg 1 account to honor redemption requests, then Sentinel drew upon the BONY loan to honor the Seg 1 FCMs' redemption requests.  On those occasions when house account funds were required to meet FCM redemption requests, a corresponding amount of Seg 1 segregated securities was to be transferred to the house account, held until eventually liquidated, and the proceeds used to pay down the BONY loan.

24.     Sentinel also used the BONY loan to obtain additional leveraged financing for its security purchases.

25.     Sentinel was required to hold in segregated accounts sufficient funds and securities to meet its obligations to customers at all times.  During the relevant time, Sentinel routinely used its Seg 1 FCM segregated customer funds to secure its loan with the BONY by improperly transferring and holding Seg 1 securities in the nonsegregated house account.

26.     Sentinel frequently held customer securities in the nonsegregated house account in excess of the amount required to honor the redemption requests of Seg 1 FCMs for that day.  Sentinel's holding of Seg 1 securities in the nonsegregated house account in excess of the amount previously used to honor the redemption requests of Seg 1 FCMs, absent sufficient excess segregated funds in the Seg 1 account meant that Sentinel thereby pledged or made available those Seg 1 segregated securities as collateral for the BONY loan.  For example:

a)  On May 21, 2007, Sentinel held at least $86 million of Seg 1 customer securities in Sentinel's "house" account at BONY.  On that date, Seg 1 FCM redemptions were approximately $14 million, however, FCM deposits in Seg 1 were in excess of $20 million.  Hence, Sentinel's holding of $86 million of Seg 1 securities in the house account on that date was not necessary to honor Seg 1 redemptions.

b)  On June 29, 2007, Sentinel held at least $410 million of Seg 1 customer securities in Sentinel's "house" account at BONY.  On that date, Seg 1 FCM redemptions were approximately $27 million, however, FCM deposits to Seg 1 were in excess of $28 million.  Hence, Sentinel's holding of $410 million of

Seg 1 securities in the house account was not necessary to honor Seg 1 redemptions.

c) On July 18, 2007, Sentinel held at least $449 million of Seg 1 customer securities in Sentinel's "house" account at BONY. On that date, Seg 1 FCM redemptions were approximately $14 million and FCM deposits to Seg 1 were $9 million. Hence, Sentinel had approximately $444 million of Seg 1 securities in the house account in excess of the amount required to honor the redemptions for that day.

d) On August 7, 2007, Sentinel held at least $137 million of Seg 1 customer securities in Sentinel's "house" account at BONY. On that date, Seg 1 FCM redemptions were approximately $18 million, however, FCM deposits to Seg 1 were in excess of $29 million. Hence, Sentinel's holding of approximately Seg 1 $137 million securities in the house account was not necessary to honor Seg 1 redemptions.

e) On August 13, 2007, Sentinel held at least $148 million of Seg 1 customer securities in Sentinel's "house" account at BONY. On that date, Seg 1 FCM redemptions were approximately $70 million, however, FCM deposits to Seg 1 were $68 million. Hence, Sentinel had approximately $146 million of Seg 1 securities in the house account in excess of the amount required to honor the redemptions for that day.

27. Sentinel's use of segregated securities belonging to the customers of the Seg 1 FCMs as collateral in order to obtain or maintain a line of credit with BONY constituted a misappropriation of Seg 1 customer property for Sentinel's own benefit.

9

Sentinel was not authorized by its Seg 1 customers or the FCMs to use or encumber the securities in this manner.

28.     Mosley customarily was in charge of Sentinel's securities trading for the Seg 1, Seg 2 and Seg 3 portfolios.  During at least the relevant time, Mosley drew upon the BONY loan to fund various securities transactions and received daily reports regarding the amount and status of the BONY loan.  To collateralize the BONY loan, Mosley willfully caused excess Seg 1 securities to be moved from Sentinel's Seg 1 segregated account to Sentinel's house account.

29.     Bloom, president and chief executive officer of Sentinel, was informed on a daily basis of Mosley's trading, and reviewed the daily statements regarding the liability of the BONY loan and transfer of excess Seg 1 assets to the house account.  Consequently, he knew that Seg 1 assets were being used improperly to secure Sentinel's loan with BONY.  He also had control over the persons that determined what assets were pledged to secure that loan, including, but not limited to, Mosley.

**D.  Filing of False Reports with the Commission**

30.     Section 4g(a) of the Act, 7 U.S.C. § 6g(a), requires FCMs to make such reports as are required by the Commission regarding its transactions and positions, and the transactions and positions of customers.  Pursuant to Commission Regulation 1.10(b), 17 C.F.R. § 1.10(b), FCMs are required to prepare and file periodic statements of financial condition on Form 1-FRs with the Commission.  These reports are required to contain, *inter alia*, a statement of financial condition as of the date the report was made and a statement of computation of the firm's minimum capital requirements, including its adjusted net capital and its excess adjusted net capital.  Commission Regulation

10

1.10(d)(1), 17 C.F.R. § 1.10(d)(1), requires that Form 1-FRs be prepared in accordance with generally accepted accounting principles ("GAAP"), except where the regulations specify otherwise, applied on a basis consistent with that of the FCM's preceding financial report, and include all disclosures necessary to make the report a clear and complete statement of the FCM's financial position under the Commission's rules.

31.    Pursuant to its letter agreements with the Commission and Commission Regulation 1.10, 17 C.F.R. § 1.10, Sentinel was required to file Form 1-FR financial reports with the Commission on a monthly basis.  The Form 1-FR reports expressly required Sentinel to disclose securities purchased under resale agreements – *i.e.*, repos – and liabilities, including amounts payable to banks.

32.    During the period of at least September 2005 through July 2007, Sentinel filed with the Commission at least 23 Form 1-FRs that falsely reported that Sentinel owned no securities purchased under resale agreements and had no amounts payable, including no amounts payable to BONY, despite the existence of the BONY loan.

**E.  Bankruptcy of Sentinel**

33.    On August 13, 2007, Sentinel issued a letter announcing that it was requesting authority from the Commission to suspend customer requests for redemptions ("August 13 letter").  In that letter, Sentinel stated that the reason for the redemption freeze was its fear that redemption requests could force Sentinel to sell securities at deep discounts to their fair value due to the downturn in the credit markets, and this could cause losses to customers.

34.     In fact, Sentinel never requested such authority from the Commission and the Commission did not grant Sentinel any such authority.  Nevertheless, Sentinel did not allow redemptions of investments.

35.     On August 17, 2007, Sentinel filed a voluntary petition for protection under Chapter 11 of the Bankruptcy Code, in the U.S. Bankruptcy Court for the Northern District of Illinois.

36.     According to Sentinel's records, on August 15, 2007, Sentinel owed its Seg 1 customers approximately $561 million.  Since that time, Sentinel has paid its Seg 1 customers approximately $431 million leaving a balance due to its Seg 1 customers of approximately $130 million.

## V.

## VIOLATIONS OF THE ACT AND COMMISSION'S REGULATIONS

### COUNT ONE

### VIOLATIONS OF SECTION 4b(a)(2)(i) OF THE ACT:  FRAUD BY MISAPPROPRIATION

37.     The allegations set forth in paragraphs 1 through 36 are re-alleged and incorporated herein.

38.     Section 4b(a)(2)(i) of the Act, 7 U.S.C. § 6b(a)(2)(i), makes it unlawful in or in connection with orders to make, or the making of, contracts of sale of commodities, for future delivery, made, or to be made, for or on behalf of such other persons where such contracts for future delivery were or may have been used for (a) hedging any transaction in interstate commerce in such commodity, or the products or byproducts thereof, or (b) determining the price basis of any transaction in interstate commerce in

such commodity, or (c) delivering any such commodity sold, shipped, or received in interstate commerce for the fulfillment thereof to cheat or defraud such other person.

39.    On various occasions from May 21, 2007 to August 13, 2007, Sentinel willfully violated Section 4b(a)(2)(i) of the Act, 7 U.S.C. § 6b(a)(2(i), by removing Seg 1 assets from segregation and misappropriating them for use as collateral for its loan with BONY.

40.    Sentinel engaged in the conduct described in paragraphs 1 through 36 above, in or in connection with orders to make, or the making of, contracts of sale of commodities for future delivery, made, or to be made, for or on behalf of other persons where such contracts for future delivery were or may have been used for (a) hedging any transaction in interstate commerce in such commodity, or the products or byproducts thereof, or (b) determining the price basis of any transaction in interstate commerce in such commodity, or (c) delivering any such commodity sold, shipped, or received in interstate commerce for the fulfillment thereof.

41.    During the relevant time, Mosley willfully aided and abetted Sentinel's violations of Section 4b(a)(i) of the Act and, therefore, pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a) (2002), Mosley is liable for the violations described in this Count One as a principal.

42.    During the relevant time, Bloom directly and indirectly controlled Sentinel and its employees, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the violations described in this Count One.  Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2002), Bloom is liable for the violations described in this Count One.

43.     Each misappropriation of Seg 1 customer funds during the relevant time period, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4b(a)(i) of the Act, 7 U.S.C. § 6b(a)(i) (2002).

### COUNT TWO

### VIOLATIONS OF SECTION 4d(a)(2) OF THE ACT AND COMMISSION REGULATIONS 1.20, 1.22 AND 1.23: FAILURE TO SEGREGATE AND OTHER MISUSE OF CUSTOMER FUNDS

44.     Paragraphs 1 through 36 are realleged and incorporated herein by reference.

45.     Section 4d(a)(2) of the Act, 7 U.S.C. § 6(a)d(2) (2002), requires a FCM to treat and deal with all customer money, securities and property as belonging to such customers and to separately account for such money, securities and property.  Section 4d(a)(2) of the Act further prohibits a FCM from commingling customer money, securities and property with its own funds and from using customer money, securities and property to margin or guarantee the trades or contracts or to secure or extend the credit of any customer or person other than those for whom the same are held.

46.     Commission Regulation 1.20, 17 C.F.R. § 1.20 (2007), requires that all customers' funds be separately accounted for, properly segregated and treated as belonging to such customers, and not commingled with the funds of any other person.

47.     Commission Regulation 1.22, 17 C.F.R. § 1.22 (2007), prohibits a FCM from using, or permitting the use of, funds of a customer to secure or extend the credit of any person other than such customer.

48.     Commission Regulation 1.23, 17 C.F.R. § 1.23 (2007), prohibits a FCM from withdrawing upon customer segregated funds beyond its actual interest therein and the use of such funds of a customer to extend the credit of any other person.

49.     The customers of the other FCMs whose funds were invested by those FCMs with Sentinel were in turn customers of Sentinel.

50.     Throughout the relevant time, Sentinel violated Section 4d(a)(2) of the Act, 7 U.S.C. § 6d(a)(2) (2002), and Commission Regulations 1.20, 1.22 and 1.23, 17 C.F.R. §§ 1.20, 1.22 and 1.23 (2007), by:  commingling Seg 1 customer funds with those of Sentinel and others; using those Seg 1 customer funds to secure the BONY loan of Sentinel; failing to treat, deal with, and account for Seg 1 customer funds as belonging to the customer; and withdrawing customer segregated funds beyond Sentinel's actual interest therein.

51.     During the relevant time, Mosley willfully aided and abetted Sentinel's violations of  Section 4d(a)(2) of the Act, 7 U.S.C. § 6d(a)(2) (2002), and Commission Regulations 1.20, 1.22 and 1.23, 17 C.F.R. §§ 1.20, 1.22 and 1.23 (2007).  Therefore, Mosley is liable for the violations described in this Count Two as a principal.

52.     During the relevant time, Bloom directly and indirectly controlled Sentinel and its employees, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the violations described in this Count Two.  Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Bloom is liable for the violations described in this Count Two.

53.     Each removal from segregation and commingling of Seg 1 customer funds with those of Sentinel during the relevant time, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Sections 4d(a)(2) of the Act, 7 U.S.C. § 6d(a)(2) (2002), and Commission Regulation 1.20, 17 C.F.R. § 1.20 (2007).

54.     Each use of Seg 1 customer funds to secure Sentinel's BONY loan during the relevant time period, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4d(a)(2) of the Act, 7 U.S.C. § 6d(a)(2) (2002), and Commission Regulation 1.22, 17 C.F.R. § 1.22 (2007).

55.     Each withdrawal of Seg 1 customer funds beyond Sentinel's actual interest therein at the relevant point in time, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4d(a)(2) of the Act, 7 U.S.C. § 6d(a)(2) (2002), and Commission Regulation 1.23, 17 C.F.R. § 1.23 (2007).

## COUNT THREE

### VIOLATIONS OF SECTION 4d(b) OF THE ACT:
### MISUSE OF CUSTOMER FUNDS

56.     Paragraphs 1 through 36 are realleged and incorporated herein by reference.

57.     Section 4d(b) of the Act, 7 U.S.C. § 6d(b) (2002), makes it unlawful for any person including any depository, that has received any money, securities, or property for deposit in a separate account as provide for in Section 4d(a)(2) of the Act, to hold, dispose of, or use any such money, securities, or property as belonging to the depositing futures commission merchant or any person other than the customers of such FCM.

58.     Throughout the relevant time, Sentinel violated Section 4d(b) of the Act, 7 U.S.C. § 6d(b) (2002), by using Seg 1 customer funds to secure the BONY loan of Sentinel.

59.     During the relevant time, Mosley willfully aided and abetted Sentinel's violations of Section 4d(b) of the Act, 7 U.S.C. § 6d(b) (2002).  Therefore, Mosley is liable for the violations described in this Count Three as a principal.

60.     During the relevant time, Bloom directly and indirectly controlled Sentinel and its employees, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the violations described in this Count Three.  Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Bloom is liable for the violations described in this Count Three.

61.     Each use of Seg 1 customer funds to secure Sentinel's BONY loan during the relevant time period, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section  4d(b) of the Act, 7 U.S.C. § 6d(b) (2002).

## COUNT FOUR

### VIOLATIONS OF SECTION 4g(a) OF THE ACT AND COMISSION REGULATION 1.10(d): FILING FALSE REPORTS WITH THE COMMISSION

62.     The allegations set forth in paragraphs 1 through 36 are re-alleged and incorporated herein.

63.     During the period of at least September 2005 through July 2007, Sentinel violated Section 4g(a) of the Act, 7 U.S.C. § 6g(a), and Commission Regulation 1.10(d), 17 C.F.R. § 1.10(d), by filing with the Commission at least 23 Form 1-FRs that falsely reported that Sentinel owned no securities purchased under resale agreements and had no amounts payable.

64.     During the relevant time, Bloom directly and indirectly controlled Sentinel and its employees, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the violations described in this Count Four.  Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Bloom is liable for the violations described in this Count Four.

17

65.     The filing of each Form 1-FR that falsely reported that Sentinel owned no securities purchased under resale agreements and/or had no amounts payable is alleged as a separate and distinct violation of Section 4g(a) of the Act, 7 U.S.C. § 6g(a), and Commission Regulation 1.10(d), 17 C.F.R. § 1.10(d).

## COUNT FIVE

## VIOLATIONS OF SECTION 6(c) OF THE ACT: WILLFULLY MAKING FALSE REPORTS TO THE COMMISSION

66.     The allegations set forth in paragraphs 1 through 36 are re-alleged and incorporated herein.

67.     Section 6(c) of the Act, 7 U.S.C. § 9, prohibits, *inter alia*, the willful making of a false or misleading statement of material fact in any registration application or any report filed with the Commission under the Act.

68.     During the period of at least September 2005 through July 2007, in at least 23 Form 1-FRs that Sentinel filed with the Commission, Sentinel violated Section 6(c) of the Act by willfully making false statements that Sentinel owned no securities purchased under resale agreements and had no amounts payable.

69.     During the relevant time, Bloom directly and indirectly controlled Sentinel and its employees, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the violations described in this Count Four.  Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Bloom is liable for the violations described in this Count Four.

70.     The filing of each Form 1-FR in which Sentinel willfully made false statements that Sentinel owned no securities purchased under resale agreements and/or

had no amounts payable is alleged as a separate and distinct violation of Section 6(c) of the Act, 7 U.S.C. § 9.

## VI.    RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 12a-1, and pursuant to its own equitable powers:

(1)    Find Sentinel liable for violating Sections 4b(a)(2)(i), 4d(a)(2), 4d(b), 4g(a) and 6(c) of the Act, 7 U.S.C. §§ 6b(a)(2)(i), 6d(a)(2), 6d(b), 6g(a) and 9 (2002), and Commission Regulations 1.10(d), 1.20, 1.22 and 1.23, 17 C.F.R. §§ 1.10(d), 1.20, 1.22 and 1.23 (2007).

(2)    Find Mosley liable as a principal for aiding and abetting Sentinel's violations of Sections 4b(a)(2)(i), 4d(a)(2) and 4d(b) of the Act, 7 U.S.C. §§ 6b(a)(2)(i), 6d(a)(2) and 6d(b) (2002), and Commission Regulations 1.20, 1.22 and 1.23, 17 C.F.R. §§ 1.20, 1.22 and 1.23 (2007).

(3)    Find Bloom liable as a controlling person for Sentinel's violations of Sections 4b(a)(2)(i), 4d(a)(2), 4d(b), 4g(a) and 6(c) of the Act, 7 U.S.C. §§ 6b(a)(2)(i), 6d(a)(2), 6d(b), 6g(a) and 9 (2002), and Commission Regulations 1.10(d), 1.20, 1.22 and 1.23, 17 C.F.R. §§ 1.10(d), 1.20, 1.22 and 1.23 (2007).

(4)    Enter an order of permanent injunction prohibiting the Defendants and any other person or entity associated with them, including any successor thereof, from:

a)  engaging in conduct in violation of Sections 4b(a)(2)(i), 4d(a)(2) and 4d(b) of Act, 7 U.S.C. §§ 6b(a)(2)(i), 6d(a)(2) and 6d(b), and Commission Regulations 1.20, 1.22 and 1.23, 17 C.F.R. §§ 1.20, 1.22 and 1.23 (2007); and

b)  applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9), or acting as a principal, agent, officer or employee of any person registered, required to be registered, or exempted from registration with the Commission, except as provided for in Regulation 4.14(a)(9).  This includes, but is not limited to, soliciting, accepting, or receiving any funds, revenue or other property from any other person, giving commodity trading advice for compensation, except as provided in Regulation 4.14(a)(9), or soliciting prospective customers related to the purchase or sale of commodity futures or options.

(5)     Enter an additional order of permanent injunction prohibiting Sentinel and Bloom and any other person or entity associated with them, including any successor thereof, from engaging in conduct in violation of Sections 4g(a) and 6(c) of the Act, 7 U.S.C. §§ 6g(a) and 9, and Regulation 1.10(d), 17 C.F.R. §1.10(d) (2007).

(6)     Enter an order directing Bloom and Mosley to make full restitution to every customer whose funds were lost as a result of the acts and practices that constituted violations of the Act and Commission Regulations, as described herein, including pre-judgment interest.

(7)     Enter an Order directing Bloom and Mosley to each pay a civil monetary penalty in the amount of not more than the higher of (i) triple the monetary gain to that Defendant or (ii) $130,000 for each violation of the Act and Commission Regulations.

20

(8)     Enter an Order providing such other and further remedial ancillary relief as

the Court may deem appropriate.


Date: 04/28/2008                                    Respectfully submitted,


                                                    s/ Mark H. Bretscher
                                                    Mark Bretscher
                                                    A.R.D.C. No. 6194945

                                                    s/ William P. Janulis
                                                    William P. Janulis
                                                    A.R.D.C. No. 1326449

                                                    s/Rosemary Hollinger
                                                    Rosemary Hollinger
                                                    Regional Counsel
                                                    A.R.D.C. No. 3123647

                                                    Attorneys for Plaintiff
                                                    Commodity Futures Trading Commission
                                                    525 W. Monroe Street, Suite 1100
                                                    Chicago, IL 60661
                                                    312-596-0529 (Bretscher)
                                                    312 596-0545 (Janulis)
                                                    (312) 596-0520 (Hollinger)
                                                    (312) 596-0700 (office number)
                                                    (312) 596-0714 (facsimile)

# EXHIBIT C

CFTC FORM 1-FR-FCM    | 0005 |

| Name of Company: | | Employer ID No: | | NFA ID No: |
|---|---|---|---|---|
| Sentinel Management Group, Inc. | 0010 | 363083123 | 0020 | 0002526 | 0030 |

| Address of Principal Place of Business: | | Person to Contact Concerning This Report: | |
|---|---|---|---|
| 650 Dundee Rd | | T.C. Arana | 0040 |
| Suite 460 | | Telephone No: 312-412-4424 | 0060 |
| Northbrook, IL 60062 | 0050 | E-Mail Address: tc@sentgroup.com | 0085 |

1. Report for the period beginning    12/01/2006 | 0070 | and ending    12/31/2006 | 0080 |

2. Type of report    | 0090 |    ☐ Certified        ☐ Regular quarterly/semiannual        ☐ Monthly 1.12(b)

                                  ☐ Special call by: _____        ☐ Other – Identify: _____

3. Check whether    | 0095 |    ☐ Initial filing        ☒ Amended filing

4. Name of FCM's Designated Self-Regulatory Organization:        NFA        | 0100 |

5. Name(s) of consolidated subsidiaries and affiliated companies:

| Name | Percentage Ownership | Line of Business |
|---|---|---|
| | 0110 | 0120 | 0130 |

The futures commission merchant, or applicant for registration therefor, submitting this Form and its attachments and the person whose signature appears below represent that, to the best of their knowledge, all information contained therein is true, correct and complete. It is understood that all required items, statements and schedules are integral parts of this Form and that the submission of any amendment represents that all unamended items, statements and schedules remain true, correct and complete as previously submitted. It is further understood that any intentional misstatements or omissions of facts constitute Federal Criminal Violations (see 18 U.S.C. 1001).

Signed this _7th_ day of _March, 2007_

Manual signature _Theresa C. Arana_

Type or print name _Theresa C. Arana_

☐ Chief Executive Officer        ☒ Chief Financial Officer        Corporate Title _____

☐ General Partner        ☐ Sole Proprietor

AUTHORITY: Sections 4c, 4d, 4f, 4g, 5a, 8a, and 17 of the Commodity Exchange Act (7 U.S.C. 6c, 6d, 6f 6g, 7a, 12a and 21)

- 1 -

- 1 -

| Name of Company:<br>Sentinel Management Group, Inc. | Employer ID No:<br>363083123 | NFA ID No:<br>0002526 |
|---|---|---|

## CFTC FORM 1-FR-FCM
### STATEMENT OF FINANCIAL CONDITION
### AS OF 12/31/2006

#### Assets

| | Current | | Non-Current | | Total | |
|---|---|---|---|---|---|---|
| 1. Funds segregated or in separate accounts pursuant to the CEAct and the Regulations | | | | | | |
| A. U.S. exchanges (page 11, line 13) | $ 1,368,381,072 | 1000 | | | $ 1,368,381,072 | 1005 |
| B. Dealer options (page 12, line 2.C.) | 0 | 1010 | | | 0 | 1015 |
| C. Foreign exchanges (page 14, line 8) | 31,253,727 | 1020 | $ 0 | 1025 | 31,253,727 | 1030 |
| (Do not duplicate line 1. assets below) | | | | | | |
| 2. Cash | 986,821 | 1040 | 0 | 1045 | 986,821 | 1050 |
| 3. Securities, at market value | | | | | | |
| A. Firm owned | 2,567,768 | 1055 | 0 | 1060 | 2,567,768 | 1065 |
| B. Noncustomer-owned | 12,574,482 | 1070 | | | 12,574,482 | 1075 |
| C. Individual partners' and member's security accounts | 0 | 1090 | | | 0 | 1095 |
| D. Stock in clearing organizations | 0 | 1100 | 0 | 1105 | 0 | 1110 |
| 4. Securities purchased under resale agreements | 0 | 1115 | 0 | 1120 | 0 | 1125 |
| 5. Receivables from and deposits with U.S. derivatives clearing organizations | | | | | | |
| A. Margins | 0 | 1130 | | | 0 | 1135 |
| B. Settlement receivable | 0 | 1140 | | | 0 | 1145 |
| C. Guarantee deposits | 0 | 1150 | | | 0 | 1155 |
| D. Long options value | 0 | 1157 | | | 0 | 1158 |
| 6. Receivables from and deposits with foreign commodity clearing organizations | | | | | | |
| A. Margins | 0 | 1160 | 0 | 1165 | 0 | 1170 |
| B. Settlement receivable | 0 | 1175 | | | 0 | 1180 |
| C. Guarantee deposits | 0 | 1182 | 0 | 1185 | 0 | 1190 |
| D. Long options value | 0 | 1191 | 0 | 1192 | 0 | 1193 |
| 7. Receivables from registered FCMs | | | | | | |
| A. Net liquidating equity | 0 | 1195 | 0 | 1200 | 0 | 1205 |
| B. Security deposits | | | 0 | 1210 | 0 | 1215 |
| C. Other | 0 | 1220 | 0 | 1225 | 0 | 1230 |
| 8. Receivables from foreign commodity brokers | | | | | | |
| A. Net liquidating equity | 0 | 1235 | 0 | 1240 | 0 | 1245 |
| B. Security deposits | | | 0 | 1250 | 0 | 1255 |
| C. Other | 0 | 1260 | 0 | 1265 | 0 | 1270 |

9. Receivables from traders on U.S. commodity exchanges

| | | | | | |
|---|---|---|---|---|---|
| A. Customer debit and deficit accounts | 0 | 1275 | 0 | 1280 | 0 | 1285 |
| B. Noncustomer and proprietary accounts | 0 | 1290 | 0 | 1295 | 0 | 1300 |
| C. Other | 0 | 1305 | 0 | 1310 | 0 | 1315 |
| D. Allowance for doubtful accounts | | | 0 | 1320 | 0 | 1325 |

10. Receivables from traders on foreign boards of trade

| | | | | | |
|---|---|---|---|---|---|
| A. Customer debit and deficit accounts | 0 | 1330 | 0 | 1335 | 0 | 1340 |
| B. Noncustomer and proprietary accounts | 0 | 1345 | 0 | 1350 | 0 | 1355 |
| C. Other | 0 | 1360 | 0 | 1365 | 0 | 1370 |
| D. Allowance for doubtful accounts | | | 0 | 1375 | 0 | 1380 |

11. Inventories of cash commodities, raw materials, work in progress and finished goods

| | | | | | |
|---|---|---|---|---|---|
| A. Covered | 0 | 1385 | 0 | 1390 | 0 | 1395 |
| B. Not covered | 0 | 1400 | 0 | 1405 | 0 | 1410 |

12. Secured demand notes
(Value of collateral $0 [1415]
Safety factor $0 [1420] )

| 0 | 1425 | 0 | 1430 | 0 | 1435 |
|---|---|---|---|---|---|

13. Other receivables and advances

| | | | | | |
|---|---|---|---|---|---|
| A. Merchandising accounts receivable | 0 | 1440 | 0 | 1445 | | 1450 |
| B. Notes receivable | 0 | 1455 | 0 | 1460 | | 1465 |
| C. Commissions and brokerage receivable | 32,002 | 1470 | 0 | 1475 | 32,002 | 1480 |
| D. Receivables from employees and associated persons | 0 | 1485 | 0 | 1490 | 0 | 1495 |
| E. Advances on cash commodities | 0 | 1500 | 0 | 1505 | 0 | 1510 |
| F. Dividends and interest | 119,943 | 1515 | 0 | 1520 | 119,943 | 1525 |
| G. Taxes receivable | 0 | 1530 | 93,358 | 1535 | 93,358 | 1540 |
| H. Receivables from subsidiaries and affiliates | 0 | 1545 | 0 | 1550 | | 1555 |
| I. Other (itemize on a separate page) | 0 | 1560 | 27,726 | 1565 | 27,726 | 1570 |
| J. Allowance for doubtful accounts | | | 0 | 1575 | 0 | 1580 |

14. Unrealized gains on forward contracts and commitments

| 0 | 1585 | 0 | 1590 | | 1595 |
|---|---|---|---|---|---|

15. Exchange memberships, at cost
(Market value $0 [1600])

| | | 0 | 1805 | 0 | 1610 |
|---|---|---|---|---|---|

16. Investments in subsidiaries

| 0 | 1612 | 0 | 1615 | 0 | 1620 |
|---|---|---|---|---|---|

17. Plant, property, equipment and capitalized leases (cost net of accumulated depreciation and amortization of $474,045 [1625] )

| 0 | 1630 | 0 | 1635 | 0 | 1640 |
|---|---|---|---|---|---|

18. Prepaid expenses and deferred charges

| | | 119,445 | 1645 | 119,445 | 1650 |
|---|---|---|---|---|---|

19. Other assets (itemize on separate page)

| 0 | 1655 | 0 | 1660 | | 1665 |
|---|---|---|---|---|---|

20. Total Assets

| $ 1,415,915,815 | 1670 | $ 240,529 | 1675 | $ 1,416,156,344 | 1680 |
|---|---|---|---|---|---|

- 3 -

| Name of Company: Sentinel Management Group, Inc. | Employer ID No: 363083123 | NFA ID No: 0002526 |
|---|---|---|

CFTC FORM 1-FR-FCM
STATEMENT OF FINANCIAL CONDITION
AS OF 12/31/2006

Liabilities & Ownership Equity

Liabilities

| | | | |
|---|---|---|---|
| 2 | Payables to banks | $ 0 | 2000 |
| | A. Secured loans | 0 | 2010 |
| | 3. Unsecured loans | 0 | 2020 |
| | C. Overdrafts | | |
| 22. | Equities in commodity accounts | | |
| | A. Customers trading on U.S. commodity exchanges | 1,366,402,322 | 2030 |
| | B. Customers trading on foreign exchanges | 31,073,293 | 2040 |
| | C. Customers' dealer options accounts | 0 | 2050 |
| | D. Noncustomers' accounts | 12,501,990 | 2060 |
| | E. General partners' and member's trading accounts (not included in capital) | 0 | 2070 |
| 23. | Payable to U.S. commodity clearing organizations Including short option value of $0 [2075] | 0 | 2080 |
| 24. | Payable to foreign commodity clearing organizations Including short option value of $0 [2085] | 0 | 2090 |
| 25. | Payable to registered futures commission merchants | 0 | 2100 |
| 26. | Payable to foreign commodity brokers | 0 | 2110 |
| 27. | Accounts payable, accrued expenses and other payables | | |
| | A. Accounts payable and accrued expenses | 1,791,759 | 2120 |
| | B. Salaries, wages, commissions and bonuses payable | 778,629 | 2130 |
| | C. Taxes payable | 0 | 2140 |
| | D. Deferred income taxes | 0 | 2150 |
| | E. Security deposits held | 0 | 2160 |
| | F. Advances against commodities | 0 | 2170 |
| | G. Unrealized losses on forward contracts and commitments | 0 | 2180 |
| | H. Due to subsidiaries and affiliates | 350,000 | 2190 |
| | I. Notes, mortgages and other payables due within twelve months | 0 | 2200 |
| | J. Other (itemize on a separate page) | 0 | 2210 |
| 28. | Notes, mortgages and other payables not due within twelve months of the date of this statement | 0 | 2220 |
| | A. Unsecured | 0 | 2230 |
| | B. Secured | | |

- 4 -

| | | |
|---|---:|---|
| Securities sold under agreements to repurchase · | 0 | 2240 |
| 30. Securities sold not yet purchased, at market value | 0 | 2250 |
| 31. Liabilities subordinated to claims of general creditors | | |
| A. Subject to a satisfactory subordination agreement | 0 | 2260 |
| B. Not subject to a satisfactory subordination agreement | 0 | 2270 |
| 32. Total liabilities | $  1,412,897,993 | 2280 |

**Ownership Equity**

| | | | |
|---|---|---:|---|
| 33. Sole proprietorship | $ | 0 | 2500 |
| 34. Partnership or Limited Liability Company | | | |
| A. Partnership or LLC contributed and retained capital | $ | 0 | 2510 |
| B. Additional capital per partnership or membership agreement (equities in partners' or members' trading accounts, etc.) | | 0 | 2515 |
| C. Total | $ | 0 | 2520 |
| 35. Corporation | | | |
| A. Preferred stock | $ | 0 | 2530 |
| B. Common stock | | 259,818 | 2535 |
| C. Additional paid in capital | | 0 | 2540 |
| D. Retained earnings | | 2,998,533 | 2545 |
| E. Subtotal | $ | 3,258,351 | 2550 |
| F. Less: capital stock in treasury | | 0 | 2555 |
| G. Total | $ | 3,258,351 | 2560 |

| | | |
|---|---:|---|
| 36. Total ownership equity (line 33, 34.C. or 35.G) | $    3,258,351 | 2570 |
| 7. Total liabilities and ownership equity (add lines 32 and 36) | $  1,416,156,344 | 2580 |

| Name of Company:<br>Sentinel Management Group, Inc. | Employer ID No:<br>363083123 | NFA ID No:<br>0002526 |
|---|---|---|

CFTC FORM 1-FR-FCM
STATEMENT OF THE COMPUTATION OF THE MINIMUM CAPITAL REQUIREMENTS
AS OF 12/31/2006

Net Capital

1.  Current assets (page 3, line 20)                                                                 $  1,415,915,815  | 3000 |

2.  Increase/(decrease) to U.S. clearing organization stock to reflect margin value          0  | 3010 |

3.  Net current assets                                                                               $  1,415,915,815  | 3020 |

4.  Total liabilities (page 5, line 32)                          $  1,412,897,993  | 3030 |

5.  Deductions from total liabilities
    A.  Liabilities subject to satisfactory
        subordination agreements
        (page 5, line 31.A)                          $          0  | 3040 |
    B.  Certain deferred income tax liability
        (see regulation 1.17(c)(4)(iv))                         0  | 3050 |
    C.  Certain current income tax liability
        (see regulation 1.17(c)(4)(v))                          0  | 3060 |
    D.  Long term debt pursuant to
        regulation 1.17(c)(4)(vi)                               0  | 3070 |
    E.  Total deductions (add lines 5.A. - 5.D.)                          0  | 3080 |
    F.  Adjusted liabilities (subtract line 5.E from line 4)                        1,412,897,993  | 3090 |

6.  Net capital (subtract line 5.F. from line 3)                                            $      3,017,822  | 3100 |

Charges Against Net Capital (see regulation 1.17(c)(5))

7.  Excess of advances paid on cash commodity contracts over
    95% of the market value of commodities covered by such contracts                        $          0  | 3110 |

8.  Five percent (5%) of the market value of inventories covered by
    open futures contracts or commodity options (no charges applicable
    to inventories registered as deliverable on a contract market and
    which are covered by futures contracts)                                                             0  | 3120 |

9.  Twenty percent (20%) of the market value of uncovered inventories or
    lesser percentage charge for uncovered balances in specified foreign currencies               61,553  | 3130 |

10. Ten percent (10%) of the market value of commodities underlying
    fixed price commitments and forward contracts which are covered
    by open futures contracts or commodity options                                                     0  | 3140 |

11. Twenty percent (20%) of the market value of commodities underlying
    fixed price commitments and forward contracts which are not covered
    by open futures contracts or commodity options                                                     0  | 3150 |

- 6 -

2. Charges as specified in section 240.15c3-1(c)(2)(vi) and (vii) against securities owned by firm, including securities representing investments of domestic and foreign customers' funds:

|  | | Market Value | | Charge | |
|---|---|---|---|---|---|
| A. | U.S. and Canadian government obligations | $ 0 | 3160 | $ 0 | 3170 |
| B. | State and Municipal government obligations | 0 | 3180 | 0 | 3190 |
| C. | Certificates of deposit, commercial paper and bankers' acceptances | 0 | 3200 | 0 | 3210 |
| D. | Corporate obligations | 2,585,364 | 3220 | 232,683 | 3230 |
| E. | Stocks and warrants | 0 | 3240 | 0 | 3250 |
| F. | Other securities | 0 | 3260 | 0 | 3270 |
| G. | Total charges (add lines 12.A. - 12.F.) | | | 232,683 | 3280 |

13. Charges as specified in section 240.15c3-1(c)(2)(iv)(F)

| A. | Against securities purchased under agreements to resell | 0 | 3290 |
|---|---|---|---|
| B. | Against securities sold under agreements to repurchase | 0 | 3300 |

14. Charges on securities options as specified in section 240.15c3-1, Appendix A — 0 | 3310

15. Undermargined commodity futures and commodity options accounts - amount in each account required to meet maintenance margin requirements, less the amount of current margin calls in that account and the amount of any noncurrent deficit in the account

| A. | Customer accounts | 0 | 3320 |
|---|---|---|---|
| B. | Noncustomer accounts | 0 | 3330 |
| C. | Omnibus accounts | 0 | 3340 |

16. Charges against open commodity positions in proprietary accounts

| A. | Uncovered exchange-traded futures and granted options contracts | | | | |
|---|---|---|---|---|---|
| | i    percentage of margin requirements applicable to such contracts | $ 0 | 3350 | | |
| | ii    Less: equity in proprietary accounts included in liabilities | 0 | 3360 | 0 | 3370 |

| B. | Ten percent (10%) of the market value of commodities which underlie commodity options not traded on a contract market carried long by the applicant or registrant which has value and such value increased adjusted net capital (this charge is limited to the value attributed to such options) | 0 | 3380 |
|---|---|---|---|

| C. | Commodity options which are traded on contract markets and carried long in proprietary accounts. Charge is the same as would be applied if applicant or registrant was the grantor of the options (this charge is limited to the value attributed to such options) | 0 | 3390 |
|---|---|---|---|
| | | 0 | 3410 |

17. Five percent (5%) of all unsecured receivables from foreign brokers — 0 | 3420

18. Deficiency in collateral for secured demand notes — 0 | 3430

19. Adjustment to eliminate benefits of consolidation (explain on separate page) — $ 294,236 | 3440

20. Total charges (add lines 7 through 20)

Net Capital Computation

21.  Adjusted net capital (subtract line 20 from line 6)                                                $   2,723,586  | 3500 |

22.  Net capital required

    A.  Risk Based Requirement

        i    Amount of Customer Risk
             Maintenance Margin                              $           0  | 3515 |

        ii   Enter 8% of line 22.A.i                                              $           0  | 3525 |

        iii  Amount of Non-Customer Risk
             Maintenance Margin                              $           0  | 3535 |

        iv   Enter 4% of line 22.A.iii                                            $           0  | 3545 |

        v    Enter the sum of 22.A.ii and 22.A.iv                                 $           0  | 3555 |

    B.  Minimum Dollar Amount Requirement (Enter $500,000 if a member of NFA)   $     500,000  | 3565 |

    C.  Other NFA Requirement                                            $           0  | 3575 |

    D.  Enter the greater of lines 22.A.v, 22.B. or 22.C.                               $     500,000  | 3600 |

23.  Excess net capital (line 21 less line 22.D.)                                          $   2,223,586  | 3610 |

Computation of Early Warning Level

24.  Enter the greatest of 110% of line 22.A.v. or 150% of 22.B. or 150% of 22.C.         $     750,000  | 3620 |

    This is your early warning capital level.  If this amount is greater that the amount on line 21,
    you must immediately notify your DSRO and the Commission pursuant to section 1.12 of the regulations.

Guaranteed Introducing Brokers

25.  List all IBs with which guarantee agreements have been entered into by the FCM and which are currently in effect.   | 3650 |
    See Attached

| | | |
|---|---|---|
| Name of Company: Sentinel Management Group, Inc. | Employer ID No: 363083123 | NFA ID No: 0002526 |

**CFTC FORM 1-FR-FCM**

**STATEMENT OF INCOME (LOSS)**

**FOR THE PERIOD FROM 12/1/2006 THROUGH 12/31/2006**

**Revenues**

1. Commissions and brokerage — $ 0 | 4000
   - A. Commodity transactions on U.S. commodity exchanges — 0 | 4010
   - B. Commodity transactions on foreign commodity exchanges — 0 | 4020
   - C. Securities transactions — 0 | 4030
   - D. Other brokerage activities (describe on a separate page)
2. Firm trading accounts — 0 | 4040
   - A. Commodity transactions — 0 | 4050
   - B. Securities transactions — 0 | 4060
   - C. Other firm trading (describe on a separate page) — 0 | 4070
3. Income from advisory services
4. Interest and dividends — 0 | 4080
   - A. Interest earned on investments of customers' funds — 3,156 | 4090
   - B. Interest earned on investments of other than customers' funds — 0 | 4100
   - C. Dividends — 1,842,735 | 4110
5. Other income (itemize on a separate page) — $ 1,845,893 | 4120
6. Total revenue

**Expenses**

7. Sales personnel commissions — $ 17,852 | 4200
   — 0 | 4210
8. Floor brokerage — 18,319 | 4220
9. Clerical and administrative employees' expenses — 0 | 4230
10. Commissions to other FCMs — 0 | 4240
11. Exchange clearance fees — 7,744 | 4250
12. Occupancy and equipment costs — 56,310 | 4260
13. Promotional costs — 5,013 | 4270
14. Communications — 531 | 4280
15. Data processing — 0 | 4290
16. Bad debt expense
17. Trade Errors — 0 | 4300
    - A. Customers' accounts — 0 | 4310
    - B. Other — 1,360,732 | 4320
18. Interest — 237,397 | 4330
19. Other expenses (itemize on a separate page) — $ 1,703,898 | 4340
20. Total expenses
21. Income (loss) before income taxes and items below — $ 141,995 | 4400
22. Provision for income taxes — 58,788 | 4410
23. Equity in earnings (losses) of unconsolidated subsidiaries, less applicable tax — 0 | 4420
24. Extraordinary gains (losses), less applicable tax — 0 | 4430
25. Cumulative effect of changes in accounting principles, less applicable tax — 0 | 4440
26. Net income (loss) — $ 83,207 | 4450

| Name of Company: Sentinel Management Group, Inc. | Employer ID No: 363083123 | NFA ID No: 0002526 |
|---|---|---|

### CFTC FORM 1-FR-FCM
### STATEMENT OF THE CHANGES IN OWNERSHIP EQUITY
### FOR THE PERIOD FROM 12/ 1/2006 THROUGH 12/31/2006

| | | | |
|---|---|---|---|
| 1. | Total ownership equity as previously reported | $ 3,175,144 | 4500 |
| 2. | Net Income (loss) for period | 83,207 | 4510 |
| 3. | Other additions to capital (explain below) | 0 | 4520 |
| 4. | Dividends | 0 | 4530 |
| 5. | Other deductions from capital (including partner and proprietary withdrawals) ( Explain below) | 0 | 4540 |
| 6. | Balance (page 5, line 36) | $ 3,258,351 | 4550 |

See attached for date, explanation and amount.

---

### STATEMENT OF CHANGES IN LIABILITIES
### SUBORDINATED TO THE CLAIMS OF GENERAL CREDITORS
### PURSUANT TO A SATISFACTORY SUBORDINATION AGREEMENT
### FOR THE PERIOD FROM 12/ 1/2006 THROUGH 12/31/2006

| | | All Satisfactory Subordinated Debt | | Debt that Qualifies as Equity Capital * | |
|---|---|---|---|---|---|
| 1. | Total subordinated borrowings as previously reported | $ 0 | 4600 | $ 0 | 4605 |
| 2. | Increases (explain below) | 0 | 4610 | 0 | 4615 |
| 3. | Decreases (explain below) | 0 | 4620 | 0 | 4625 |
| 4. | Balance (page 5, line 31.A) | $ 0 | 4630 | $ 0 | 4635 |

* Equity capital is defined in regulation 1.17(d)

See attached for date, explanation and amount.

- 10 -

| Name of Company: | Employer ID No: | NFA ID No: |
|---|---|---|
| Sentinel Management Group, Inc. | 363083123 | 0002526 |

**CFTC FORM 1-FR-FCM**
**STATEMENT OF SEGREGATION REQUIREMENTS AND FUNDS IN SEGREGATION**
**FOR CUSTOMERS TRADING ON U.S. COMMODITY EXCHANGES**
**AS OF 12/31/2006**

SEGREGATION REQUIREMENTS (Section 4d(2) of the CEAct)

1. Net ledger balance $ 0 [5000]
   A. Cash 1,366,402,322 [5010]
   B. Securities (at market) 0 [5020]
2. Net unrealized profit (loss) in open futures contracts traded on a contract market 0 [5020]
3. Exchange traded options
   A. Market value of open option contracts purchased on a contract market 0 [5030]
   B. Market value of open option contracts granted (sold) on a contract market 0 [5040]
4. Net equity (deficit) (add lines 1, 2, and 3) $ 1,366,402,322 [5050]
5. Accounts liquidating to a deficit and accounts with
   debit balances - gross amount $ 0 [5060]
   Less: amount offset by customer owned securities 0 [5070]
6. Amount required to be segregated (add lines 4 and 5) $ 1,366,402,322 [5090]

FUNDS IN SEGREGATED ACCOUNTS
7. Deposited in segregated funds bank accounts $ 1,978,750 [5100]
   A. Cash 1,366,402,322 [5110]
   B. Securities representing investments of customers' funds (at market) 0 [5120]
   C. Securities held for particular customers or option customers in lieu of cash (at market)
8. Margins on deposit with derivatives clearing organizations of contract markets 0 [5130]
   A. Cash 0 [5140]
   B. Securities representing investments of customers' funds (at market) 0 [5150]
   C. Securities held for particular customers or option customers in lieu of cash (at market) 0 [5160]
9. Net settlement from (to) derivatives clearing organizations of contract markets 0 [5160]
10. Exchange traded options
    A. Value of open long option contracts 0 [5170]
    B. Value of open short option contracts 0 [5180]
11. Net equities with other FCMs 0 [5190]
    A. Net liquidating equity 0 [5200]
    B. Securities representing investments of customers' funds (at market) 0 [5210]
    C. Securities held for particular customers or option customers in lieu of cash (at market) 0 [5215]
12. Segregated funds on hand (describe:     ) $ 1,368,381,072 [5220]
13. Total amount in segregation (add lines 7 through 12) $ 1,978,750 [5230]
14. Excess (deficiency) funds in segregation (subtract line 6 from line 13)

| Name of Company: | Employer ID No: | NFA ID No: |
|---|---|---|
| Sentinel Management Group, Inc. | 363063123 | 0002526 |

CFTC FORM 1-FR-FCM
STATEMENT OF SEGREGATION REQUIREMENTS AND FUNDS
IN SEGREGATION FOR CUSTOMERS' DEALER OPTIONS ACCOUNTS
AS OF 12/31/2006

1. Amount required to be segregated in accordance with Commission regulation 32.6     $         0   5400

2. Funds in segregated accounts

   A.  Cash                                                      $         0   5410

   B.  Securities (at market)                                              0   5420

   C.  Total                                                                      0   5430

3. Excess (deficiency) funds in segregation (subtract line 1. from line 2.C.)     $         0   5440

| Name of Company: | Employer ID No: | NFA ID No: |
|---|---|---|
| Sentinel Management Group, Inc. | 363083123 | 0002526 |

CFTC FORM 1-FR-FCM

STATEMENT OF SECURED AMOUNTS AND FUNDS HELD IN SEPARATE ACCOUNTS
FOR FOREIGN FUTURES AND FOREIGN OPTIONS CUSTOMERS
PURSUANT TO COMMISSION REGULATION 30.7
AS OF 12/31/2006

FOREIGN FUTURES AND FOREIGN OPTIONS SECURED AMOUNTS - SUMMARY

I.   Check the appropriate box to identify the amount shown on line 1, below:

   [ ] 5600   Secured amounts in only U.S.-domiciled customers' accounts

   [ ] 5610   Secured amounts in U.S. and foreign-domiciled customers' accounts

   [X] 5620   Net liquidating equities in all accounts of customers
             trading on foreign boards of trade

   [ ] 5630   Amount required to be set aside pursuant to law, rule or regulation
             of a foreign government or a rule of a self-regulatory organization
             authorized thereunder

II.  Has the FCM changed the method of calculating the amount to be set aside in separate
     accounts since the last financial report it filed?

   [ ] Yes   [X] No   5640        If Yes, explain the change below.


| | | |
|---|---|---|
| 1. | Amount to be set aside in separate section 30.7 accounts | $ 31,073,293 | 5660 |
| 2. | Total funds in separate section 30.7 accounts (page 14, line 8) | 31,253,727 | 5670 |
| 3. | Excess (deficiency) - (subtract line 1 from line 2) | $ 180,434 | 5680 |

- 13 -

| Name of Company: Sentinel Management Group, Inc. | Employer ID No: 363083123 | NFA ID No: 0002526 |
|---|---|---|

**CFTC FORM 1-FR-FCM**
**STATEMENT OF SECURED AMOUNTS AND FUNDS HELD IN SEPARATE ACCOUNTS**
**FOR FOREIGN FUTURES AND FOREIGN OPTIONS CUSTOMERS**
**PURSUANT TO COMMISSION REGULATION 30.7**
**AS OF 12/31/2006**

FUNDS DEPOSITED IN SEPARATE REGULATION 30.7 ACCOUNTS

1. Cash in Banks
   A. Banks located in the United States     $ 180,434 `5700`
   B. Other banks designated by the Commission
      Name(s): See Attached `5710`     0 `5720`   $ 180,434 `5730`

2. Securities
   A. In safekeeping with banks located in the United States     $ 31,073,293 `5740`
   B. In safekeeping with other banks designated by the Commission
      Name(s): See Attached `5750`     0 `5760`   31,073,293 `5770`

3. Equities with registered futures commission merchants
   A. Cash     $ 0 `5780`
   B. Securities     0 `5790`
   C. Unrealized gain (loss) on open futures contracts     0 `5800`
   D. Value of long option contracts     0 `5810`
   E. Value of short option contracts     0 `5815`   0 `5820`

   Amounts held by clearing organizations of foreign boards of trade
   Name(s): _ `5830`
   A. Cash     $ 0 `5840`
   B. Securities     0 `5850`
   C. Amount due to (from) clearing organization - daily variation     0 `5860`
   D. Value of long option contracts     0 `5870`
   E. Value of short option contracts     0 `5875`   0 `5880`

5. Amounts held by members of foreign boards of trade
   Name(s): _ `5890`
   A. Cash     $ 0 `5900`
   B. Securities     0 `5910`
   C. Unrealized gain (loss) on open futures contracts     0 `5920`
   D. Value of long option contracts     0 `5930`
   E. Value of short option contracts     0 `5935`   0 `5940`

6. Amounts with other depositories designated by a foreign board of trade
   Name(s): _ `5950`     0 `5960`

7. Segregated funds on hand (describe): _     0 `5965`

8. Total funds in separate section 30.7 accounts (to page 13, line 2)     $ 31,253,727 `5970`

A. If any securities shown above are other than the types of securities referred to in Commission regulation 1.25, attach a separate schedule detailing the obligations shown on each such line.

| Name of Company:<br>Sentinel Management Group, Inc. | Employer ID No:<br>363083123 | NFA ID No:<br>0002526 |
|---|---|---|

**CFTC FORM 1-FR-FCM**
**EXCHANGE SUPPLEMENTARY INFORMATION**

| | | | |
|---|---|---|---|
| 1. | Capital to be withdrawn within 6 months | $ 0 | 8000 |
| 2. | Subordinated Debt maturing within 6 months | 0 | 8010 |
| 3. | Subordinated Debt due to mature within 6 months that you plan to renew | 0 | 8020 |

If Adjusted Net Capital is less than $2,000,000 please complete the lines 4 through 7:

| | | | |
|---|---|---|---|
| 4. | Number of Associated Persons | 1 | 8100 |
| 5. | Number of Branch Offices | 0 | 8110 |
| 6. | Number of Guaranteed Introducing Brokers | 0 | 8120 |
| 7. | Number of Guaranteed Introducing Broker Branch Offices | 0 | 8130 |

Futures Commission Merchants offering off-exchange foreign currency futures and options ("forex") to retail customers

| | | | |
|---|---|---|---|
| 8. | Gross revenue from Forex transactions with retail customers | 0 | 8140 |
| 9. | Total net aggregate notional value of all open Forex transactions in retail customer and non-customer (not proprietary) accounts | 0 | 8150 |

General Comments:

- 15 -

| Name of Company: Sentinel Management Group, Inc. | Employer ID No: 363083123 | NFA ID No: 0002526 |
|---|---|---|

CFTC FORM 1-FR-FCM
STATEMENT DETAILS
AS OF 12/31/2006

**Box 1565**  Other Receivables and Advances, Other - Non-Current

| | | |
|---|---|---|
| Taxes Receivable from Reserve Account | | 27,726 |
| | Total | $ 27,726 |

**Box 4110**  Other Income

| | | |
|---|---|---|
| Service Fee Income | | 319,413 |
| Gains on Security Transactions | | 72,492 |
| Overdraft Income | | 1,393,393 |
| Transaction Fee Income | | 56,058 |
| Wire Fees Collected | | 1,379 |
| | Total | $ 1,842,735 |

**Box 4330**  Other Expenses

| | | |
|---|---|---|
| Custody Fees | | 17,689 |
| Other Expenses | | 1,517 |
| Professional Services | | 16,479 |
| Quotation Expense | | 16,512 |
| Office Supplies | | 2,833 |
| Equipment Leases | | 536 |
| Publications | | 1,723 |
| Association Dues | | 706 |
| Office Furniture & Equipment | | 26,823 |
| Administrative Fees | | 150,000 |
| F/X Gain/Loss | | 2,579 |
| | Total | $ 237,397 |

**Box 5010**  5010

| | | |
|---|---|---|
| | | 0 |
| Sum of Box 5120 + Box 5150 + Box 5210 + Box 5215c | | 1,366,402,322 |
| Customer Securities | | |
| | Total | $ 1,366,402,322 |

**Amendment Comment:**

We are ammending our year ended 12/31/06 Form 1-FR for changes made to our Bonus Calculation and Deferred Compensation payable to our Head Trader as of that date. These figures were revised and finalized for his bonus payment due to be paid on 3/8/07. There were some other changes that were made to the Federal, State and Deferred Tax accruals as well as adjustments to the Reserve accounts and Taxes Payable for taxes charged to the Reserve accounts for Customer Reserve Gains during the month of December 2006.

| Name of Company:                   | Employer ID No: | NFA ID No: |
|------------------------------------|-----------------|------------|
| Sentinel Management Group, Inc.    | 363083123       | 0002526    |

CFTC FORM 1-FR-FCM
LISTING OF GUARANTEED INTRODUCING BROKERS
AS OF 12/31/2006

| Name of Company:<br>Sentinel Management Group, Inc. | Employer ID No:<br>363083123 | NFA ID No:<br>0002526 |
|---|---|---|

CFTC Form 1-FR-FCM
### STATEMENT OF THE COMPUTATION OF THE MINIMUM CAPITAL REQUIREMENTS
As of December 31, 2006

**Net Capital**

1. Current assets (page 3, line 20) — $ 1,415,975,815 [3000]

2. Increase (decrease) to U.S. clearing organization stock to reflect margin value — _____ [3010]

3. Net current assets — 1,415,975,815 [3020]

4. Total liabilities (page 5, line 32) — $ 1,412,957,993 [3030]

5. Deductions from total liabilities
   A. Liabilities subject to satisfactory subordination agreements (page 5, line 31.A.) — $ _____ [3040]
   B. Certain deferred income tax liability (see regulation 1.17(c)(iv)) — _____ [3050]
   C. Certain current income tax liability (see regulation 1.17(c)(4)(v)) — _____ [3060]
   D. Long-term debt pursuant to regulation 1.17(c)(4)(vi) — _____ [3070]
   E. Total deductions (add lines 5.A.-5.D.) — _____ [3080] — 1,412,957,993 [3090]
   F. Adjusted liabilities (subtract line 5.E. from line 4) — 1,412,957,993 [3090]

6. Net capital (subtract line 5.F. from line 3) — 3,017,822 [3100]

**Charges Against Net Capital (see regulation 1.17(c)(5))**

7. Excess of advances paid on cash commodity contracts over 95% of the market value of commodities covered by such contracts — _____ [3110]

8. Five percent (5%) of the market value of inventories covered by open futures contracts or commodity options (no charges applicable to inventories registered as deliverable on a contract market and which are covered by futures contracts) — _____ [3120]

9. Twenty percent (20%) of the market value of uncovered inventories or lesser percentage charge for uncovered balances in specific foreign currencies — 61,553 [3130]

10. Ten percent (10%) of the market value of commodities underlying fixed price commitments and forward contracts which are covered by open futures contracts or commodity options — _____ [3140]

11. Twenty percent (20%) of the market value of commodities underlying fixed price commitments and forward contracts which are not covered by open futures contracts or commodity options — _____ [3150]

> There are no material differences between the above computation and the Company's corresponding unaudited 1-FR-FCM filing, as amended.

9

SENTTR 0081745

12. Charges as specified in section 240.15c3-1(c)(2)(vi) and (vii) against securities owned by firm, including securities representing investments of domestic and foreign customers' funds:

| | Market Value | | Charge | |
|---|---|---|---|---|
| A. U.S. and Canadian government obligations | | [3160] | | [3170] |
| B. State and Municipal government obligations | | [3180] | | [3190] |
| C. Certificates of deposit, commercial paper and bankers' acceptances | | [3200] | | [3210] |
| D. Corporate obligations | 2,585,364 | [3220] | 232,683 | [3230] |
| E. Stocks and warrants | | [3240] | | [3250] |
| F. Other securities | | [3260] | | [3270] |
| G. Total charges (add lines 12.A.-12.F.) | | | $ 232,683 | [3280] |

13. Charges as specified in section 240.15c3-1(c)(2)(iv)(F)
   A. Against securities purchased under agreements to resell _____ [3290]
   B. Against securities sold under agreements to repurchase _____ [3300]

14. Charges on securities options as specified in section 240.15c3-1, Appendix A _____ [3310]

15. Undermargined commodity futures and commodity option accounts—amount in each account required to meet maintenance margin requirements, less the amount of current margin calls in that account and the amount of any noncurrent deficit in the account
   A. Customer accounts _____ [3320]
   B. Noncustomer accounts _____ [3330]
   C. Omnibus accounts _____ [3340]

16. Charges against open commodity positions in proprietary accounts
   A. Uncovered exchange traded futures and granted options contracts
      i.   percentage of margin requirements applicable to such contracts _____ [3350]
      ii.  less equity in proprietary accounts included in liabilities _____ [3360]   _____ [3370]
   B. Ten percent (10%) of the market value of commodities which underlie commodity options not traded on a contract market carried long by the applicant or registrant which has value and such value increased adjusted net capital (this change is limited to the value attributed to such options) _____ [3380]
   C. Commodity options which are traded on contract markets and carried long in proprietary accounts. Charge is the same as would be applied if applicant or registrant was the grantor of the options (this change is limited to the value attributed to such options) _____ [3390]

17. Five percent (5%) of all unsecured receivables from foreign brokers _____ [3410]

18. Deficiency in collateral for secured demand notes. _____ [3420]

19. Adjustment to eliminate benefits of consolidation (explain on separate page) _____ [3430]

20. Total charges (add lines 7 through 19) $ 294,236 [3440]

10

SENTTR 0081746

Net Capital Computation

21. Adjusted net capital (subtract line 20 from line 6)      $   2,723,586   [3500]

22. Net capital required

    A. Risk based requirement
      i.  Amount of customer risk maintenance margin      [3515]
      ii.  Enter 8% of line 22.A.i.      [3525]
      iii.  Amount of noncustomer risk maintenance margin      [3535]
      iv.  Enter 4% of line 22.A.iii.      [3545]
      v.  Enter the sum of 22.A.ii. and 22.A.iv.      [3555]

    B. Minimum Dollar Amount Requirement (Enter $500,000 if a member of NFA)      500,000   [3565]
    C. Other NFA Requirement      [3575]

    D. Enter the greater of line 22.A.v. or 22.B. or 22.C.      $   500,000   [3600]

23. Excess net capital (line 21 less line 22.D.)      $   2,223,586   [3610]

Computation of Early Warning Level

24. Enter the greatest of line 22.A.v. or 110% of 22.B. or 150 of 22.C.      $   750,000   [3620]

    This is your early warning capital level. If this amount is greater than the amount on line 21, you must immediately notify your DSRO and the Commission pursuant to section 1.12 of the regulations.

Guaranteed Introducing Brokers

25. List all IBs with which guarantee agreements have been entered into by the FCM and which are currently in effect.      [3650]
    See attached.

SENTTR 0081747

**Sentinel Management Group, Inc.**
Reconciliation of the Statement of Financial Condition and the
Statement of Computation of the Minimum Capital Requirements
December 31, 2006

Current assets are as follows
  Total assets reflected in the statement of financial condition      $    236,806,740
  Stated value of securities owned by customers and noncustomers      1,179,409,605
  Less noncurrent assets included in total assets
    Income taxes receivable from Parent      121,085
    Other assets      119,445
       **$ 1,415,975,815**

Current liabilities are as follows
  Total liabilities reflected in the statement of financial condition      $    233,548,388
  Stated value of securities owned by customers and noncustomers      1,179,409,605
       **$ 1,412,957,993**

12

SENTTR 0081748

| Name of Company: | Employer ID No: | NFA ID No: |
|---|---|---|
| Sentinel Management Group, Inc. | 363083123 | 0002526 |

CFTC Form 1-FR-FCM
## STATEMENT OF SEGREGATION REQUIREMENTS AND FUNDS IN SEGREGATION
### FOR CUSTOMERS TRADING ON U.S. COMMODITY EXCHANGES
As of December 31, 2006

**SEGREGATION REQUIREMENTS (Section 4(d)(2) of the CEAct)**

| | | | | |
|---|---|---|---|---|
| 1. | Net ledger balance | | | |
| | A. Cash | | $                - | [5000] |
| | B. Securities (at market) | | 1,366,402,322 | [5010] |
| 2. | Net unrealized profit (loss) in open futures contracts traded on a contract market | | | [5020] |
| 3. | Exchange traded options | | | |
| | A. Market value of open option contracts purchased on a contract market | | | [5030] |
| | B. Market value of open option contracts granted (sold) on a contract market | | | [5040] |
| 4. | Net equity (deficit) (add lines 1, 2 and 3) | | 1,366,402,322 | [5050] |
| 5. | Accounts liquidating to a deficit and accounts with debit balances - gross amount | $           [5060] | | |
| | Less: amount offset by customer owned securities | [5070] | | [5080] |
| 6. | Amount required to be segregated (add lines 4 and 5) | | 1,366,402,322 | [5090] |

**FUNDS IN SEGREGATED ACCOUNTS**

| | | | | |
|---|---|---|---|---|
| 7. | Deposited in segregated funds bank accounts | | | |
| | A. Cash | | 1,978,750 | [5100] |
| | B. Securities representing investments of customers' funds (at market) | | 1,366,402,322 | [5110] |
| | C. Securities held for particular customers or option customers in lieu of cash (at market) | | | [5120] |
| 8. | Margins on deposit with clearing organizations of contract markets | | | |
| | A. Cash | | | [5130] |
| | B. Securities representing investments of customers' funds (at market) | | | [5140] |
| | C. Securities held for particular customers or option customers in lieu of cash (at market) | | | [5150] |
| 9. | Net settlement from (to) clearing organizations of contract markets | | | [5160] |
| 10. | Exchange traded options | | | |
| | A. Value of open long option contracts | | | [5170] |
| | B. Value of open short option contracts | | | [5180] |
| 11. | Net equities with other FCMs | | | |
| | A. Net liquidating equity | | | [5190] |
| | B. Securities representing investments of customers' funds (at market) | | | [5200] |
| | C. Securities held for particular customers or option customers in lieu of cash (at market) | | | [5210] |
| 12. | Segregated funds on hand (describe): _____ ) | | | [5215] |
| 13. | Total amount in segregation (add lines 7 through 12) | | 1,368,381,072 | [5220] |
| 14. | Excess (deficiency) of funds in segregation (subtract line 6 from line 13) | | $    1,978,750 | [5230] |

> There are no material differences between the above computation and the Company's corresponding unaudited 1-FR-FCM filing, as amended.

13

| Name of Company: | Employer ID No: | NFA ID No: |
|---|---|---|
| Sentinel Management Group, Inc. | 363083123 | 0002526 |

CFTC Form 1-FR-FCM

STATEMENT OF SEGREGATION REQUIREMENTS AND FUNDS IN SEGREGATION

FOR CUSTOMERS' DEALER OPTIONS ACCOUNTS

As of December 31, 2006

1. Amount required to be segregated in accordance with Commission regulation 32.6    $ _____ [5400]

2. Funds in segregated accounts

    A. Cash    $ _____ [5410]

    B. Securities (at market)    _____ [5420]

    C. Total    _____ [5430]

3. Excess (deficiency) of funds in segregation (subtract line 2.C. from line 1)    $ _____ [5440]

There are no material differences between the above computation and the Company's corresponding unaudited 1-FR-FCM filing, as amended.

14

SENTTR 0081750

| Name of Company:<br>Sentinel Management Group, Inc. | Employer ID No:<br>363083123 | NFA ID No:<br>0002526 |
|---|---|---|

CFTC Form 1-FR-FCM
STATEMENT OF SECURED AMOUNTS AND FUNDS HELD IN SEPARATE ACCOUNTS
FOR FOREIGN FUTURES AND FOREIGN OPTIONS CUSTOMERS
PURSUANT TO COMMISSION REGULATION 30.7
As of December 31, 2006

FOREIGN FUTURES AND FOREIGN OPTIONS SECURED AMOUNTS - SUMMARY

I.   Check the appropriate box to identify the amount shown on line 1. below.

☐ [5600]   Secured amounts in only U.S.-domiciled customers' accounts.

☐ [5610]   Secured amounts in U.S. and foreign-domiciled customers' accounts.

☒ [5620]   Net liquidating equities in all accounts of customers trading on foreign boards of trade.

☐ [5630]   Amount required to be set aside pursuant to law, rule or regulation of a foreign government or a rule of a self-regulatory organization authorized thereunder.

II.  Has the FCM changed the method of calculating the amount to be set aside in separate accounts since the last financial report it filed?

☐ Yes        ☒ No        [5640] If yes, please explain the change below.

| | | | |
|---|---|---|---|
| 1. | Amount to be set aside in separate section 30.7 accounts | $   31,073,293 | [5660] |
| 2. | Total funds in separate section 30.7 accounts (page 14, line 8) | 31,253,727 | [5670] |
| 3. | Excess (deficiency) - (subtract line 1 from line 2) | $      180,434 | [5680] |

There are no material differences between the above computation and the Company's corresponding unaudited 1-FR-FCM filing, as amended.

15

| Name of Company: | Employer ID No: | NFA ID No: |
|---|---|---|
| Sentinel Management Group, Inc. | 363083123 | 0002526 |

CFTC Form 1-FR-FCM

STATEMENT OF SECURED AMOUNTS AND FUNDS HELD IN SEPARATE ACCOUNTS
FOR FOREIGN FUTURES AND FOREIGN OPTIONS CUSTOMERS
PURSUANT TO COMMISSION REGULATION 30.7
As of December 31, 2006

FUNDS DEPOSITED IN SEPARATE REGULATION 30.7 ACCOUNTS

1. Cash in banks
   A. Banks located in the United States ......... 180,434 [5700]
   B. Other banks designated by the Commission
      Name(s): _____ [5710] _____ [5720] $ 180,434 [5730]

2. Securities
   A. In safekeeping with banks located in the United States ......... 31,073,293 [5740]
   B. In safekeeping with other banks designated by the Commission
      Name(s): _____ [5750] _____ [5760] 31,073,293 [5770]

3. Equities with registered futures commission merchants
   A. Cash _____ [5780]
   B. Securities _____ [5790]
   C. Unrealized gain (loss) on open futures contracts _____ [5800]
   D. Value of long option contracts _____ [5810]
   E. Value of short option contracts _____ [5815] _____ [5820]

4. Amounts held by clearing organizations of foreign
   boards of trade
   Name(s): _____ [5830]
   A. Cash _____ [5840]
   B. Securities _____ [5850]
   C. Amount due to (from) clearing organization - daily variation _____ [5860]
   D. Value of long option contracts _____ [5870]
   E. Value of short option contracts _____ [5875] _____ [5880]

5. Amounts held by members of foreign boards of
   trade
   Name(s): _____ [5890]
   A. Cash _____ [5900]
   B. Securities _____ [5910]
   C. Unrealized gain (loss) on open futures contracts _____ [5920]
   D. Value of long option contracts _____ [5930]
   E. Value of short option contracts _____ [5935] _____ [5940]

6. Amounts with other depositories designated by a
   foreign board of trade
   Name(s): _____ [5950] _____ [5960]

7. Segregated funds on hand (describe: _____ ) _____ [5965]

8. Total funds in separate section 30.7 accounts (to page 13, line 2) $ 31,253,727 [5970]

A. If any securities shown above are other than the types of securities referred to in Commission regulation 1.25, attach a separate schedule detailing the obligations shown on each such line.

16

SENTTR 0081752

# EXHIBIT D

# McGladrey & Pullen
## Certified Public Accountants

December 11, 2006

McGladrey & Pullen, LLP
One South Wacker Drive, Ste. 800, Chicago, IL 60606-3392
O 312.384.6000   F 312.634.3410
www.mcgladrey.com

Mr. Eric A. Bloom, President & CEO
Sentinel Management Group, Inc.
650 Dundee Road, Suite 460
Northbrook, IL  60062

Attention:  Mr. Eric A. Bloom

This letter is to explain our understanding of the arrangements for the services we are to perform for Sentinel Management Group, Inc. (the "Company") for the year ending December 31, 2006.  We ask that you either confirm or amend this understanding.

We will perform an audit of the Company's statement of financial condition as of December 31, 2006 and related statements of income, changes in stockholder's equity, and cash flows for the year then ending and the schedules supporting such financial statements required under Regulation 1.10 of the Commodity Exchange Act (the 'CEAct').  Also, as required by Regulation 1.16(d) under the CEAct, we will make a study of the practices and procedures, including tests of compliance with such practices and procedures, followed by the Company that we consider relevant to the objectives stated in Regulation 1.16(d).  We understand that the financial statements will be prepared in accordance with accounting principles generally accepted in the United States of America.  The objective of an audit of financial statements is to express an opinion on those statements.

We will conduct the audit in accordance with auditing standards generally accepted in the United States of America.  Those standards require that we plan and perform the audit to obtain reasonable, rather than absolute, assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud.  Accordingly, a material misstatement may remain undetected.  Also, an audit is not designed to detect errors or fraud that are immaterial to the financial statements.

An audit of financial statements also includes obtaining an understanding of internal control sufficient to plan the audit and to determine the nature, timing and extent of audit procedures to be performed.  An audit is not designed to provide assurance on internal control or to identify significant deficiencies or material weaknesses.  However, we will communicate to you and to management any significant deficiencies or material weaknesses that become known to us during the course of the audit.

We will also communicate any (a) fraud involving senior management and other fraud that causes a material misstatement of the financial statements, (b) illegal acts that come to our attention (unless they are clearly inconsequential), (c) disagreements with management and other serous difficulties encountered in performing the audit and (d) various matters related to the entity's accounting policies and financial statements to management prior to the issuance of our report on the financial statements.

McGladrey & Pullen, LLP is a member firm of RSM International –
an affiliation of separate and independent legal entities.

CONFIDENTIAL



We understand that procedures in conformity with the criteria referred to in Regulation 1.16(d) will be considered by the Commodity Futures Trading Commission to be adequate for their purpose in accordance with the Commodity Exchange Act and related regulations, and that procedures not in conformity with those criteria indicate some inadequacy for such purposes. Based on this understanding and on our study, we will report whether we believe your procedures are adequate for the Commission's purposes. In addition, our report will set forth those conditions, if any, which we believe are material weaknesses in relation to Regulation 1.16(d). In addition to any such weaknesses, other conditions, if any, that we believe are not in conformity with the criteria referred to above will be set forth in our report.

Management is responsible for establishing and maintaining internal control and the specific policies and procedures required by Regulation 1.16(d). In fulfilling this responsibility, estimates and judgments by management are required to assess the expected benefits and related costs of internal control policies and procedures. The objectives of internal control include providing management with reasonable, but not absolute, assurance that assets are safeguarded against loss from unauthorized use or disposition, and that transactions are executed in accordance with management's authorizations and recorded properly to permit the preparation of the financial statements in accordance with generally accepted accounting principles.

Management is responsible for the financial statements, including adjusting the financial statements to correct material misstatements, and for making all financial records and related information available to us. Management is also responsible for providing us with a written management representation letter confirming certain representations made during the course of our audit of the financial statements and affirming to us that it believes the effects of any uncorrected misstatements aggregated by us during the current engagement and pertaining to the latest period presented are immaterial, both individually and in the aggregate, to the financial statements taken as a whole.

Management is responsible for establishing and maintaining effective internal control over financial reporting and for informing us of all significant deficiencies and material weaknesses in the design or operation of such controls of which it has knowledge.

Management is responsible for identifying and ensuring that the entity complies with laws and regulations applicable to its activities, and for informing us of any known material violations of such laws or regulations. In addition, management is responsible for the design and implementation of programs and controls to prevent and detect fraud, and for informing us about all known or suspected fraud affecting the entity involving management employees who have significant roles in internal control and others where fraud could have a material effect on the financial statements. Management is also responsible for informing us of its knowledge of any allegations of fraud or suspected fraud affecting the entity received in communications from employees, former employees, analysts, regulators, short sellers or others.

Management is responsible for informing us of its views about the risks of fraud within the entity, and its knowledge of any fraud or suspected fraud affecting the entity.

Page 2

CONFIDENTIAL

MP-SMG 000257



If circumstances arise relating to the condition of the Company's records, the availability of sufficient, competent evidential matter, or indications of a significant risk of material misstatement of the financial statements because of error, fraudulent financial reporting, or misappropriation of assets which in our professional judgment prevent us from completing the audit or forming an opinion, we retain the unilateral right to take any course of action permitted by professional standards, including declining to express an opinion or issue a report, or withdrawal from the engagement.

As you know, our firm's partners are co-employed by RSM McGladrey, Inc. (RSM), an indirectly wholly-owned subsidiary of H&R Block Inc. (Block), whose securities are publicly traded on the New York Stock Exchange. Because the members of our Firm are also employees of RSM, relationships and transactions you may have with RSM, Block, or their affiliates may impact our independence. In addition, our independence may be affected if you or your affiliates hold a direct or indirect financial interest in Block.

Block's operations consist of U.S. and international tax operations, mortgage operations (conducted through H&R Block Mortgage Corporation and Option One Mortgage Corporation), investment services (through H&R Block Financial Advisors), and business services offered through RSM branded businesses. Under the audit and related professional practice standards of the PCAOB, Block and its affiliates, including RSM, are subject to the same independence requirements as McGladrey & Pullen, LLP (M&P). Accordingly, the Company and its affiliates are prohibited from, and agree not to, obtain any services from, or enter into any business relationships with, Block and its affiliates that the Company could not obtain from or enter into with M&P.

From time to time and depending upon the circumstances, we may use third-party service providers to assist us in providing professional services to you. In such circumstances, it may be necessary for us to disclose confidential client information to them. We enter into confidentiality agreements with all third-party service providers and we are satisfied that they have appropriate procedures in place to prevent the unauthorized release of your confidential information to others.

During the course of our engagement, we may accumulate records containing data, which should be reflected in the Company's books and records. The Company will determine that all such data, if necessary, will be so reflected. Accordingly, the Company will not expect us to maintain copies of such records in our possession.

The assistance to be supplied by Company personnel, including the preparation of schedules and analyses of accounts, has been discussed and coordinated with T.C. Arana, Chief Financial Officer. The timely and accurate completion of this work is an essential condition to our completion of the audit and issuance of our audit report.

Our fees, exclusive of direct expenses, will be at 70 percent our standard rates. Interim billings will be submitted as work progresses and as expenses are incurred. Billings are due upon submission. This fee estimate will be subject to adjustments based on unanticipated changes in the scope of our work and/or the incomplete or untimely receipt by us of the information on the client participation list.

CONFIDENTIAL

MP-SMG 000258



In the event we are requested or authorized by the Company or are required by government regulation, subpoena, or other legal process to produce our documents or our personnel as witnesses with respect to our engagements for the Company, the Company will, so long as we are not a party to the proceeding in which the information is sought, reimburse us for our professional time and expenses, as well as the fees and expenses of our counsel, incurred in responding to such requests.

Professional standards and our firm policies require that we perform certain additional procedures whenever our reports are included, or we are named as accountants, auditors, or "experts" in a document used in a public or private offering of equity or debt securities. Accordingly, the Company agrees that it will not include our reports, or otherwise make reference to us, in any public or private securities offering without first obtaining our consent. Any request to consent is a matter for which separate arrangements will be necessary. After obtaining our consent, the Company also agrees to provide us with printer's proofs or masters of such offering documents for our review and approval before printing, and with a copy of the final reproduced material for our approval before it is distributed. In the event our auditor/client relationship has been terminated when the Company seeks such consent, we will be under no obligation to grant such consent or approval.

Any claim arising out of services rendered pursuant to this agreement shall be resolved in accordance with the laws of the State of Illinois.

It is our mutual understanding that your primary intent is to limit the use of our report solely to the owners and management of the Company. However, we understand that you will allow the Commodity Futures Trading Commission, and other regulatory bodies which rely upon their rules, to use our report.

Without informing us prior to such solicitation, the Company will not solicit for employment or for a position on its Board of Directors any current or former partner or professional employee of M&P, if such partner or professional employee has been involved in the performance of any service for the Company at any time during the two years preceding the date of such solicitation.

M&P's dedication to client service is carried out through its employees who are integral in meeting this objective. In recognition of the importance of our employees to each of our organizations, it is hereby agreed that neither the Company nor M&P will solicit each other's employees for employment or enter into an independent contractor arrangement with any individual who is or was an employee of either party for a period of twelve months following the date of conclusion of this engagement. If either party violates this non-solicitation clause, the "hiring party" will pay to the other party, a fee of 30 percent of the hired individual's new annual compensation within 30 days of such event.

This letter constitutes the complete and exclusive statement of agreement between M&P and the Company, superseding all proposals, oral or written, and all other communication, with respect to the terms of the engagement between the parties.

Page 4

MP-SMG 000259

If this letter defines the arrangements as the Company understands them, please sign and date the enclosed copy and return it to us. We appreciate your business.

McGladrey & Pullen, LLP

G. Victor Johnson

SENTINEL MANAGEMENT GROUP, INC:

Eric A. Bloom, President & CEO

January    8, 2007

Page 5

CONFIDENTIAL

MP-SMG 000260

# EXHIBIT E

# McGladrey & Pullen

Certified Public Accountants

**Independent Auditors' Report**

Board of Directors of
Sentinel Management Group, Inc.

We have audited the accompanying statement of financial condition of Sentinel Management Group, Inc. as of December 31, 2006 that you are filing pursuant to Regulation 1.16 of the Commodity Futures Trading Commission. This financial statement is the responsibility of the Company's management. Our responsibility is to express an opinion on this financial statement based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statement is free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statement. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the statement of financial condition referred to above presents fairly, in all material respects, the financial position of Sentinel Management Group, Inc. as of December 31, 2006 in conformity with accounting principles generally accepted in the United States of America.

Our audit was conducted for the purpose of forming an opinion on the statement of financial condition taken as a whole. The supplementary information is presented for purposes of additional analysis and is not a required part of the basic statement of financial condition, but is supplementary information required by Regulation 1.10 of the Commodity Futures Trading Commission. Such information has been subjected to the auditing procedures applied in the audit of the basic statement of financial condition and, in our opinion, is fairly stated in all material respects in relation to the basic statement of financial condition taken as a whole.

*McGladrey & Pullen, LLP*

Chicago, Illinois
March 30, 2007

McGladrey & Pullen, LLP is a member firm of RSM International —
an affiliation of separate and independent legal entities.

1



# EXHIBIT F

SECURITIES & EXCHANGE COMMISSION
RECEIVED

JAN     2007

MIDWEST REGIONAL OFFICE

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM ADV-E

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0361 |
| Expires: | June 30, 2009 |
| Estimated average burden hours per response . . . . . . . . . . . . . .0.05 | |

Certificate of Accounting of Client Securities and Funds in the Possession or Custody of an Investment Adviser
Pursuant to Rule 206(4)-2 [17 CFR 275.206(4)-2]

| 1. Investment Adviser Act SEC File Number: 801-15642 | Date examination completed:   October 13, 2006 |
|---|---|

2. State Identification Number:

| AL | AK | AZ | AR | CA |
|---|---|---|---|---|
| CO | CT | DE | DC | FL |
| GA | HI | ID | IL | IN |
| IA | KS | KY | LA | ME |
| MD | MA | MI | MN | MS |
| MO | MT | NE | NV | NH |
| NJ | NM | NY | NC | ND |
| OH | OK | OR | PA | RI |
| SC | SD | TN | TX | UT |
| VT | VI | VA | WA | WV |
| WI | WY | PUERTO RICO | Other (specify): | |

3. Full name of investment adviser (if individual, state last, first, middle name): Sentinel Managment Group, Inc.

4. Name under which business is conducted, if different from above:

5. Address of principal place of business (number, street, city, state, zip code):  650 Dundee Road, Suite 460  Northbrook, IL 60062

## INSTRUCTIONS

This Form must be completed by investment advisers who possess or have custody of client funds or securities.
This Form may not be used to amend any information included in an investment adviser's registration statement (e.g. business address).

**Investment Adviser**

1. All items must be completed by the investment adviser.
2. Give this Form to the independent public accountant who, in compliance with rule 206(4)-2(a)(3)(ii)(B) under the Act and applicable state law, examines client funds and securities in the custody or possession of the investment adviser.

**Accountant**

3. Submit this Form to the Securities and Exchange Commission and appropriate state securities administrators when filing the certificate of accounting required by Rule 206(4)-2(a)(3)(ii)(B) under the Act and applicable state law. File the original and one copy with the Securities and Exchange Commission's principal office in Washington, D.C., one copy with the regional office for the region in which the investment adviser's principal business operations are conducted, and one copy with the appropriate state administrator(s), if applicable.

### THIS FORM MUST BE GIVEN TO YOUR INDEPENDENT PUBLIC ACCOUNTANT

**SEC's COLLECTION OF INFORMATION.** An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid control number. Sections 203(c)(1) and 204 of the Advisers Act authorize the Commission to collect the information on this Form from applicants. See 15 U.S.C. §§ 80b-3(c)(1) and 80b-4. Filing of this Form is mandatory. The principal purpose of this collection of information is to make the examination certificates filed by an accountant pursuant to Rule 206(4)-2(a)(3)(ii)(B) under the Adviser Act (after that accountant has verified by actual examination the securities and funds of clients in the custody of an investment adviser) more accessible for inspection by the Commission staff and the public and will facilitate verification of compliance with examination requirements. See 17 CFR §275.206(4)-2(a)(3)(ii)(B). The Commission will maintain files of the information on Form ADV-E and will make the information publicly available. Any member of the public may direct to the Commission any comments concerning the accuracy of the burden estimate on page one of Form ADV-E, and any suggestions for reducing this burden. This collection of information has been reviewed by the Office of Management and Budget in accordance with the clearance requirements of 44 U.S.C. §3507. The applicable Private Act system of records is SEC-2, and the routine uses of the records are set forth at 40 FR 39255 (Aug. 27, 1975) and 41 FR 5318 (Feb. 5, 1976).

SEC 2223 (6-7-06)



## Altschuler, Melvoin and Glasser LLP
Certified Public Accountants

**Independent Accountant's Report**

Board of Directors of
Sentinel Management Group, Inc.

We have examined management's assertion, included in the accompanying Management Statement Regarding Compliance With Certain Provisions of the Investment Advisers Act of 1940, that Sentinel Management Group, Inc. (the "Company") complied with certain provisions of rules 204-2(b) and 206(4)-2 of the Investment Advisers Act of 1940 as of and during the period ended August 31, 2006. Management is responsible for the Company's compliance with those requirements. Our responsibility is to express an opinion on management's assertion about the Company's compliance based on our examination.

Our examination was conducted in accordance with attestation standards established by the American Institute of Certified Public Accountants and, accordingly, included examining, on a test basis, evidence about the Company's compliance with those requirements and performing such other procedures as we considered necessary in the circumstances. Included among our procedures were comparisons of total client funds and securities per internal records to third party and client statements to confirm management's reasonable belief that all client funds and securities are covered by surprise examination. Additionally, for those client funds and securities, included among our procedures were the following tests performed as of August 31, 2006:

- Confirmation of all cash and securities held by Bank of New York in the name of the Company as agent or trustee for clients.

- Review of the Company's reconciliation of all such cash and securities to books and records of client accounts maintained by the Company.

- Confirmation of approximately 65 percent of the cash and securities held by the Company on behalf of the Company's clients. All responses were returned without exception.

We believe that our examination provides a reasonable basis for our opinion. Our examination does not provide a legal determination on the Company's compliance with specified requirements.

In our opinion, management's assertion that Sentinel Management Group, Inc. complied with the requirements of subparagraph (1) of rule 206(4)-2(a) under the Investment Advisers Act of 1940 as of August 31, 2006, and has complied with rule 204-2(b) and the requirements of subparagraphs (2) and (3) of rule 206(4)-2(a) under the Investment Advisers Act of 1940 for the period from August 25, 2005 through August 31, 2006, is fairly stated, in all material respects.

This report is intended solely for the information and use of management and the Board of Directors of Sentinel Management Group, Inc. and the Securities and Exchange Commission and is not intended to be and should not be used by anyone other than these specified parties.

Chicago, Illinois
October 13, 2006

2



SENTINEL MANAGEMENT GROUP, INC.

**Management Statement Regarding Compliance with
Certain Provisions of the Investment Advisers Act of 1940**

I, as President and CEO of Sentinel Management Group, Inc. (the "Company") am responsible for complying with the requirements of rule 204-2(b), "Books and Records to be Maintained by Investment Advisers," and rule 206(4)-2, "Custody or Possession of Funds or Securities of Clients," of the Investment Advisers Act of 1940 (the "Act").   I am also responsible for establishing and maintaining effective internal controls over compliance with the rule 204-2(b) and rule 206(4)-2 requirements.  I have performed an evaluation of the Company's compliance with certain provisions of rule 204-2(b) and rule 206(4)-2 as of August 31, 2006, and during the period from August 25, 2005 through August 31, 2006.. Based on this evaluation, I assert that the Company was in compliance with the Act as described below:

Rule 204-2(b) under the Act requires that an investment adviser who has custody or possession of funds or securities of any client must record all transactions for such clients in a journal and in separate ledger accounts for each client and must maintain copies of confirmations of all transactions in such accounts and a position record for each security in which a client has an interest.

In addition, rule 206(4)-2(a) provides, in general, that it shall constitute a fraudulent, deceptive, or manipulative act, practice, or course of business for any investment adviser to have custody of client funds or securities unless (1) a qualified custodian maintains those funds and securities (i) in a separate account for each client under that client's name; or (ii) in accounts that contain only clients' funds and securities, under the investment adviser's name as agent or trustee for the clients; (2) the investment adviser opens an account with a qualified custodian on its client's behalf, either under the client's name or under the name of the investment adviser as agent, and the investment adviser notifies the client in writing of the qualified custodian's name, address, and the manner in which the funds or securities are maintained promptly when the account is opened and following any changes to this information; (3) the investment adviser sends a quarterly account statement to each client for whom it has custody of funds or securities, identifying the amount of funds and of each security of which the investment adviser has custody at the end of the period and setting forth all transactions during that period, if the investment adviser does not have a reasonable basis for believing that the qualified custodian sends such a statement directly to the client.

Sentinel Management Group, Inc.

By: _Eric A. Bloom_

Eric A. Bloom
President and CEO

EDENS CORPORATE CENTER
650 DUNDEE ROAD, SUITE 460
NORTHBROOK, IL 60062
TEL: (847) 412-4400
FAX: (847) 412-4409

3

# EXHIBIT G



# Offering a depth
# and breadth of services

| Locations | Select a State | | Go |

You are here: Home > Services > Financial Services

## Financial Services

Related Services

Banks and Savings
Institution Audit
Services

Credit Union Audit
Services



Reporting interest income
on impaired loans

Application of PCAOB
independence rules to
audits of non-issuers
required by FDICIA

*More...*



Audit Committee Guide
for Financial Services
Companies

Bank Notes
*Bank Notes*, a monthly
newsletter from RSM
McGladrey, delivers
news and information
critical to community
banking professionals.
RSM McGladrey, Inc. and
McGladrey & Pullen, LLP have
an alternative practice
structure. Though separate
and independent legal entities,
the two firms work together to
serve clients' business needs.

Contact Us

*More...*

We provide professional services to more than 2,000 financial
institutions. Our financial services professionals focus on and are
committed to serving the financial services industry, and have
been trained in our financial service-specific audit approach. We
are active in industry associations and have experience working
with regulatory agencies at both the federal and state levels.

Since we are one of the United State's largest accounting firms,
you benefit from the full range of knowledge and resources
available only from a national firm. We maintain professional
relationships with staff of the SEC and FASB. We also currently
have representation in many professional organizations, including:

- AICPA Accounting Standards Executive Committee

- SEC Regulations Committee

- AICPA Professional Ethics Executive Committee

- AICPA Auditing Standards Board

- FASB Emerging Issues Task Force

**Interim financial
reporting and the
audit committee**
Read this commentary
by our national
financial services
program director and
find out more about the
audit committee's
responsibility in the
interim financial
reporting process. Go...

RSM McGladrey Inc. and McGladrey & Pullen LLP have an alternative practice structure. Though separate and independent legal entities, the two firms work together to serve clients' business needs.

Home  |  About Us  |  Services/Resources  |  Media  |  Careers  |  Contact Us  |  Log-in

© 2006 McGladrey & Pullen, LLP All Rights Reserved. Contact us toll-free at 1.888.214.1416
Webmaster | Privacy Policy | Disclaimer