UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FREDERIC J. GREDE, as Chapter 11
Trustee for Sentinel Management Group,
Inc.,

    Plaintiff,

        v.

MCGLADREY & PULLEN LLP, *et al.*,

    Defendants.

No. 08 C 2205
Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

McGladrey & Pullen, LLP and G. Victor Johnson, one of its partners, seek dismissal of a lawsuit alleging their various failures as the auditors of the Sentinel Management Group, Inc. The claim originated in the Sentinel bankruptcy proceeding (07 B 14987). This motion to dismiss was filed in the adversary action (08 A 167). I withdrew the reference.

There are two counts. The first is for negligent accounting malpractice. The second is for aiding and abetting.

I.

The first stated reason for dismissal is that the suit is precluded by the doctrine of *in pari delicto* and by the related doctrine of imputation. This ground applies to both counts since one bad actor cannot sue another for aiding and abetting his own conduct. As the Seventh Circuit observed: "The Restatement (Second) of Torts . . . provides for civil liability for aiders and abettors by holding an actor liable for harm resulting *to a third person* from the tortious conduct of another if the actor knows the other's conduct constitutes a breach of duty and the actor gives substantial assistance or encouragement to the other." *Boim v. Quranic Literacy Inst. and Holy*

*Land Found. For Relief And Dev.*, 291 F.3d 1000, 1018 (7th Cir. 2002) (*citing* Restatement (Second) of Torts, § 876(b)) (emphasis added); *see also Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 181-82 (1994) ("[T]here is no general presumption that the plaintiff may also sue aiders and abettors.").

The Latin maxim, like nearly all of its *fratres*, is a concept, not a rule. Standing alone, it decides nothing and explains little.[1] The usefulness of the maxim depends on the context in which it is invoked.

A.

The complaint alleges that Sentinel Management Group, Inc. was a registered futures commission merchant ("FCM") with the Commodities Futures Trading Commission ("CFTC") and a registered investment advisor with the Securities and Exchange Commission ("SEC"). It was required, under regulation, to segregate assets for its customers and to maintain net capital adequate to meet its liabilities. The law prohibits pledging customer assets for the benefit of others. An outside audit was required by regulation, and Sentinel engaged McGladrey to audit its financial statements and perform tests of compliance with regulations of practices and procedures such as segregation of assets and maintenance of adequate net capital. If McGladrey discovered conditions which would (1) inhibit Sentinel's ability to fulfill its obligations to its customers; (2) result in material loss; or (3) result in failure to segregate, it was obliged to report these findings to Sentinel. If Sentinel failed to report them to regulators within three days, then McGladrey was required, itself, to notify regulators of regulatory violations. In any event, it is claimed the

---

[1] It does bring to mind a once-heard academic question which asks whether the estate of a thief could lawfully seek recovery from the suppliers of burglar tools or other claimed enablers of crime so the estate can make the thief's victims whole.

auditor must communicate to the appropriate regulators the existence of any illegal acts of which it is aware.

Under the terms of its engagement with McGladrey, Sentinel was responsible for ensuring its own legal and regulatory compliance, establishing and maintaining internal controls and policies required by regulation, providing properly stated financial statements, maintaining effective internal control over financial reporting, informing the auditors of known deficiencies and material weaknesses in such controls and informing the auditors of its view of risks of fraud and knowledge of any fraud or suspected fraud. McGladrey did tell Sentinel that the audit was "not designed to provide assurance on internal control or to identify significant deficiencies or material weaknesses."

Sentinel did not trade commodities, it managed investments. Its income was its management fees based on the assets it held under management. It marketed itself with an attractive and very commonplace objective "to achieve the highest yield consistent with the preservation of principal and daily liquidity." Its clients were supposed to be sophisticated investors and included hedge funds, futures commission merchants, financial institutions, pension plans and so forth. Sentinel had customer funds and a house account for its own securities and the benefit of insider investors. It was a privately held corporation, thinly capitalized, owned and operated by its founder, Philip Bloom, and his son, Eric Bloom, both of whom owned a significant percentage of its stock. Its chief trader, Charles Mosley, and the Blooms controlled day-to-day operations of Sentinel including its website, accounting systems, investments, dealings with Bank of New York (BNY), customer statements and various financial arrangements.

BNY extended a line of credit to provide liquidity to facilitate redemptions and to purchase securities. It is alleged, and presumed to be true for purposes of this motion, that McGladrey saw the bank records (as part of its audit program) showing where each security was lodged and cross-referenced them to Sentinel records, which showed that hundreds of millions of dollars of securities were not segregated as required by law and had been pledged to secure a loan from BNY to Sentinel. The auditors knew that Sentinel controlled $2.4 billion worth of securities on a highly leveraged basis using repurchase agreements; $155 million of these were Sentinel's own house account repurchase positions and the auditors knew that these positions were not accurately reflected in Sentinel's financial statements. It is also alleged that the auditors prepared footnotes to the financials wrongly asserting that securities were segregated for customers, falsely describing the BNY loan and concealing the extent of leverage which conceals the extent of risk. McGladrey issued its opinion, which it knew would be filed with the CFTC, that Sentinel's financial statements were "fairly stated in all material respects" when it knew this was wrong. McGladrey did not report Sentinel's violations of law and regulation to the regulators.

There is no dispute, at least between the parties here, that Sentinel fraudulently used customer assets for its own benefit and hid this fact with misstated financials and false reports to regulators. Indeed, it is not claimed that Sentinel's bosses were unaware of any of Sentinel's acts of misconduct. Its risky leveraging was hidden (in part, to allow payment of management fees) in that it was customer assets, not Sentinel equity, that was pledged to support the leveraging. The leveraging strategy (at least according to the complaint) started in 2003 and smacked of some desperation. Sentinel's repurchase agreement method of disguising its use of customer

securities for leverage had a price.  Sentinel would have to pay the difference between the value of securities it pledged and the cash it received from the repo lender.  Funds from the BNY loan covered this cost.  Sentinel achieved control of $2 billion in securities this way without using its own equity.  Without pledging customer assets BNY would not have made the loan.

Sentinel failed within some months after the 2006 audit, the single audit performed by McGladrey.  Its leveraged investments failed to the point that it was unable to meet its redemption obligations to its customers whose securities had not been segregated.  Had the auditors done the right thing, then, it is alleged, its loans would have been unwound and higher risk securities would have been liquidated and the result would have been, if not happy, at least happier than what did occur.

The Trustee for Sentinel's bankruptcy estate says that McGladrey and Johnson (the lead partner on the audit) are at fault for not properly reporting Sentinel's violations of law, misleading bookkeeping, leveraging scheme and bad internal controls to regulators (and, perhaps, to management to whom it would come as no surprise).  This because the auditors (a) "knew or should have known" that Sentinel had systematically violated segregation requirements; and (b) improperly opined on Sentinel's false financial statements.  The Trustee alleges that the auditors acted negligently in failing to disclose Sentinel's abuses.

McGladrey argues that a claim on behalf of a company that perpetrated a fraud brought against its auditors for participating in the fraud or failing to discover it is barred by the doctrine of *in pari delicto*.  *See Cenco v. Seidman & Seidman*, 686 F.2d 449 (7th Cir. 1982).  The complaint alleges, in detail, Sentinel's fraud.  Therefore, McGladrey argues, the Trustee has pled himself out of court.

The Trustee agrees with the general rule of *in pari delicto*. He simply says it does not apply to him since, as Sentinel's trustee, he is innocent, and therefore the bad acts of Sentinel cannot be held against the estate. And, even if they can, the application of the rule cannot be decided on the bare record created by a complaint which, by rule, is supposed to be short and plain.

B.

The claim here that an *in pari delicto* defense is barred against any bankruptcy trustee rests on *Schacht v. Brown*, 711 F.2d 1343 (7th Cir. 1983).[2] The case, cited now and then by bankruptcy trustees, did not deal with a trustee in bankruptcy but rather the Director of Insurance of Illinois, acting as the statutory liquidator of Reserve Insurance, in an arena where state, not federal, regulation is primary. The Court of Appeals held that state law rendered the Director immune from the defense based on the blatant fraud perpetrated by Reserve Insurance. It is difficult to imagine how one could read the opinion on the receiver's powers as rooted in any ground but state law.[3] The subsequent cases from our Court of Appeals have dealt with

---

[2] This is so because Illinois law is said to supply the substantive law that governs this case. There are other states that seem, explicitly, to deny auditors the right to use this defense. *See Thabault v. Chait*, No. 06-2209, 2008 WL 4138407 (3d Cir. 2008) (citing New Jersey law). State law on this point is often unclear. *See Official Comm. of Unsecured Creditors v. PriceWaterhouseCoopers, LLP*, No. 07-1397, 2008 WL 3895559 (3d Cir. 2008) (Court of Appeals certified to the Supreme Court of Pennsylvania the question of what test is to be applied to determine whether an agent's fraud should be imputed to a principal and whether the doctrine of *in pari delicto* prevents a corporation from recovering from its auditors).

[3] The distinguished judge who wrote the opinion offered a footnote explicating the reach of the receiver's powers under Illinois law and citing, in support, the law of other states. His focus on state law was made clear when, citing an earlier opinion of his own, he noted the wise principle that "[i]t is . . . incumbent upon this court not to effect innovation in what appeared to be settled state law." 711 F.2d at 1347 n.3.

receivers. *See, e.g., Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995). The point is not trivial. Receivers' powers are derived from state law; bankruptcy trustees garner their authority from federal law. *See Official Comm. of Unsecured Creditors v. Edwards,* 437 F.3d 1145 (11th Cir. 2006).

There is *dicta* in one case that indicates, at least in 1998, that our Court of Appeals thought that the bankruptcy trustee would stand in the same position as the receiver. *See Fisher v. Apostolou,* 155 F.3d 876 (7th Cir. 1998). The court restated the argument of the trustee and said only that such an argument "is convincing on the inapplicability of the *in pari delicto* doctrine here . . . ." *Id.* at 880. Yet what the court held was that the trustee was entitled to the injunction he had received from the bankruptcy judge to prevent the civil case on review from proceeding in District Court. The Court of Appeals wrestled with the difficult question of whether a civil suit by creditors seeking remedies (treble and punitive damages) unavailable in bankruptcy should have to wait until the bankruptcy was concluded (or at least until the bankruptcy judge allowed it to go forward) in light of the fact that the trustee had authority only to sue on behalf of a class of creditors and not an individual creditor.

If this *dicta* from our Court of Appeals were all that was said on this question, this might be some reason to follow it. A dictum becomes law most often when it is the only word on the issue. But there are other words in other opinions, and there seems a clear consensus that the bankruptcy trustee is not immune to using *in pari delicto* as a shield. A careful opinion of the Eleventh Circuit looking at the decided cases and carefully examining the statute found that *in pari delicto* may be asserted against bankruptcy trustees. *Edwards,* 437 F.3d at 1151; *see also Nisselson v. Lernout*, 469 F.3d 143, 153 (1st Cir. 2006) ("[T]here is no 'innocent successor'

exception available to a bankruptcy trustee in a case in which the defendant successfully could have mounted an in pari delicto defense against the debtor."). The Second, Third, Sixth and Eighth Circuits have so held.[4]  There are no cases in this or any other Circuits that reject these holdings.

None of this is surprising.  The essential principle of bankruptcy law is that the trustee stands in the exact place of the debtor. *Bank of Marin v. England*, 385 U.S. 99, 101 (1966); *In re Chi., Rock Island & Pac. R.R.*, 860 F.2d 267, 272 (7th Cir. 1988).  This rule can be modified by Congress, which has, on several occasions, overhauled the law.  However Congress has not done so because there are substantial policy reasons not to alter this longstanding principle.  In short, there is no statutory support for the trustee's right to shed a defense that would defeat the debtor in court.

C.

Is the case made for dismissal on grounds of the debtor's own fraud?  The basic elements of the debtor's fraud are plead in the complaint.  The fraud was accomplished through the actions of its Chairman and founder, its CEO and its chief trader benefitting Sentinel which gained control of two billion dollars worth of securities, reducing its debt with money due its customers and prolonging the fraud by filing false statements.  Those officers who ran the company perpetrated the fraud.  Since corporations act through their officers, the actions of the officers are, under the facts plead, imputed to the corporation. *Cf. Cenco*, 686 F.2d at 454.

---

[4] *Grassmueck v. Am. Shorthorn Assn.*, 402 F.3d 833, 836-37 (8th Cir. 2005); *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 158-66 (2d Cir. 2003); *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 356-57 (3d. Cir. 2001); *In re Dublin Securities, Inc.*, 133 F.3d 377, 381 (6th Cir. 1997) .

One way to escape from the *in pari delicto* box is to show that fraud was not perpetrated for the benefit of the debtor corporation, but rather only for the benefit of the wrongdoers. *In re CBI Holding Co., Inc.*, 529 F.3d 432 (2d. Cir. 2008), a Court of Appeals upheld, in light of a specific factual finding by a bankruptcy judge that the purpose of the fraud was to obtain a bigger bonus under an employment contract for (Chairman and President) Castello, a finding that management was acting for its own benefit and not that of the debtor CBI Holding. Castello owned a majority stake in CBI, but forty-eight percent of CBI was owned by Trust Company of the West, whose claims were at issue in the adversary proceeding against the auditor.[5] This legal escape route through which bankruptcy trustees in cases like these seek to run their claims is sometimes referred to as the "adverse interest exception."

The exception is applicable when the corporate officers act entirely for their own interests and the actions do not benefit the corporation. William M. Fletcher, 3 *Fletcher Cyclopedia of the Law of Private Corporations* § 821, p. 112 (2002). Some read this exception to mean that if the corporation received some benefit there is no immunity from assertions of an *in pari delicto* defense or from assertions that bad acts of the agent must be imputed to the corporation. The Restatements of Agency adopt the principle that imputation depends on the subjective intent of the corporate officer, and if one of the officer's motives is to serve the corporation then

---

[5] The Second Circuit indicated that it was quite persuaded of the invalidity of the innocent insider exception to *in pari delicto*, i.e. avoiding the application of the doctrine by proving that there was at least one innocent insider to whom the auditors could have reported their findings. 529 F.3d at 447 n.5 (noting the likely genesis of the innocent insider exception was a product of courts' confusion regarding the relationship between the normal rule of imputation, the adverse interest exception to that rule, and the sole actor exception to that exception). This manner of avoiding *in pari delicto* is referenced here by Sentinel's trustee but not, in my reading of his brief, relied upon by him.

imputation is proper. *See* Restatement of Agency (Third), § 5.04, comment c. (2006); Restatement of Agency (Second), § 282, comment c. (1958); Restatement of Agency (First), § 282, comment b. (1933).

The reason one must carefully examine what benefit accrued to the corporation is that corporate officers, even in the most upright enterprises, can always be said, in some meaningful sense, to act for their own interests, particularly when those officers own all or a very large piece of the business and control it. The adverse interest exception swallows the rule if all that is required to invoke it is a secondary, or indirect benefit of keeping the enterprise alive to preserve their jobs or increase the paper value of their ownership shares.

Sentinel did, according to the complaint, benefit from the alleged fraud. Its apparent success attracted clients and capital, reduced debt, increased income from investments and increased trading gains allocated to Sentinel's own account. The Trustee argues that the fraud hurt Sentinel by stealing from Sentinel. But management did not steal from Sentinel, it stole from Sentinel's clients for the benefit of Sentinel. The auditors do not argue there was no looting here, they assert that Sentinel was the looter. It is true that, ultimately, harm came to Sentinel because its investment decisions were wrong or, for those who think of the market as a casino, because it bet on the black rather than the red. So the benefit was of limited duration. But that is enough. *See Beck v. Deloitte & Touche,* 144 F.3d 732, 736 (11th Cir. 1998).

The ultimate fate of Sentinel does not decide the question of benefit. Even the case most heavily relied on by the Trustee implies (and, perhaps, holds) that an adverse interest exception applies only when the wrongdoing can "[i]n no way . . . be described as beneficial" to the company. The auditors are correct to argue that the adverse interest exception "is not automatically triggered whenever misconduct contributes to a future financial harm. If it were, it

would effectively eliminate the *in pari delicto* doctrine altogether, since unmasked frauds resulting in lawsuits rarely, if ever, benefit a company in the long run."[6]  The later demise of Sentinel does not mean there was no benefit to Sentinel, here for quite some time, when its officers acted wrongly.  *See Baena v. KPMG, LLP.*, 453 F.3d 1, 7 (1st Cir. 2006); *Nisselson v. Lernout*, 469 F.3d at 156 n.4 ("subsequent implosion is of no moment").[7]

Sentinel's trustee, aware of the state of the law, argues strenuously for the proposition that the equities of applying *in pari delicto* to this case are skewed and the doctrine is a poor fit here, if not elsewhere.

The equity at issue is the compensation of the victims of wrongdoing; and the wrongdoing is an important element of the Trustee's argument.  A bankruptcy trustee usually operates in one of two modes.  When a bankrupt business can be rescued, the trustee looks to shed operating costs and to short creditors to the extent necessary to allow the enterprise to survive in large part (as some airlines have) or, in part, as happens when profitable divisions and subsidiaries are bundled together (or a single profitable division is left standing) without their (or its) debt ridden brothers (as in the Equity Funding matter).  When a bankrupt business is dead on arrival, the polarities reverse.  As the Third Circuit long ago explained:

---

[6] There are not, and will never be, comparative statistics on the percentage of cases in which funds are used in improper ways to make investments that turn out to be successful. Those who achieve such success do not publicize their achievements.  It is reasonable to suppose that, once in a while, the bank teller who embezzles money for a trip to the races will win the trifecta, secretly replace the stolen money, and buy something nice with the rest of the winnings.

[7] The harm to Sentinel alleged here is not, I note, alleged to depend on the concept of deepening insolvency which, to the extent it makes sense at all as a measure of damages, is inapplicable when liabilities are incurred for fair value, such as a pledge of assets in exchange for a loan or a sale of an interest in the corporation for new equity. *E.g.*, *In re CitX Corp., Inc.,* 448 F.3d 672 (3d Cir. 2006).

> "[I]t must be kept in mind that there is a sharp difference between straight bankruptcy proceedings and those for reorganization. In bankruptcy the object is to liquidate the assets of the bankrupt, to pay off his creditors as quickly and inexpensively as possible and to free the bankrupt from the burden of accumulated debt so that he may begin his business life anew. But the purpose of reorganization is not liquidation at all. If reorganization is successful the debtor corporation will continue to function, to pay its creditors, and carry on its business. The purpose of reorganization is to save a sick business, not to bury it and divide up its belongings."

*Susquehanna Chemical Corp. v. Producers Bank & Trust Co.,* 174 F.2d 783, 786-87 (3d Cir. 1949).

The trustee of the unsalvageable company will only do one thing – try to collect as many assets as possible to pay as many of the liabilities as possible. The trustees' policies are supported by the bankruptcy courts.

A trustee's incentive to maximize recovery for the creditors is legitimate and presents no difficulty in practice when the right to an asset is not contingent. Some examples include enforcing the payment of rent from a tenant in the debtor's building, pursuing receivables or cash in bank accounts, or delivery of goods already paid for. Collecting money from lawyers, auditors or lenders for their malpractice that contributed to the demise of a bankrupt business is sometimes problematic. A trustee's incentive to seek such remedies may be precisely the same as the debtor's would have been, but the trustee's path to deciding whether to do so is very different. Assuming a still solvent Sentinel were able to avoid the *in pari delicto* defense, it would have to consider the cost of suing, the level of litigation risk and the possibility that, by suing, they would find it more difficult and more expensive to secure lawyers, auditors or bank loans. They would have to decide, in short, whether the cost of suing was worth the probable

reward.[8] Sentinel's trustee, on the other hand, pays nothing out of its pocket. The estate pays the legal fees, costs, or both. It is true that failure to prevail on its claim would diminish the assets available to creditors of the estate, but the trustee cannot be blamed for trying and might well be blamed for not trying.

The Trustee urges that it has additional worthy incentives that the private party might not have and that these incentives are enhanced by the absence of personal stakes in the outcome. That is, these suits deter wrongdoing, and this suit is not about a mere claim to assets but an attempt to right a wrong. And some courts have suggested that deterring auditors from future misconduct is part of the value of malpractice lawsuits. Given the events of the past decade, I am quite unsure if some big judgments here or there deter anything. Moreover, deterrence of future wrongdoing is not part of the duties of the trustee. The trustee sues for money and may well be satisfied by an amount that is less than that which would deter a future auditor so long as the amount satisfies the creditors. Whatever weight deterrence by civil actions should be given, it is not enough to justify declining to allow a defense established by now settled law.

None of the cases deciding the validity of *in pari delicto* recognizes an exception based on the general concepts of equity interposed by the trustee here.

Sentinel's trustee's last contention is that the auditors are not entitled to dismissal of the suit because the allegations in the complaint do not establish *in pari delicto* in so complete a

---

[8] The Trustee argues that one of the reasons it should not be vulnerable to the *in pari delicto* concept is that Sentinel's customers and creditors have not sued McGladrey so there will be no risk of double recovery and no risk that non-innocent customers would be rewarded. Leaving aside the question of whether such suits might yet be brought, that such suits are not filed is a reflection of how ordinary plaintiffs evaluate this claim. The failure to file private lawsuits is a fact that can be interpreted to support both sides on this motion and thus should not determine the outcome.

manner that the claim can go no further. In short, the complaint does say that the wrongdoing allowed Sentinel to acquire more money and control of assets for its own accounts and, by inference, gave it more time to work its way out of its difficulties. Nevertheless, there still remains the question of whether these benefits are, in the specific circumstances here, meaningful benefits to Sentinel as opposed to illusory ones meant to conceal benefits solely intended for those who controlled Sentinel. I accept this argument even though I would rate its potential success to be less than certain. I do so because the auditors' argument hinges on phrasing in the complaint that could be slightly changed to weaken the inference drawn by the auditors. In addition, it is clear, that the complaint does not state whether there was a benefit at all to Sentinel. The conclusion that Sentinel benefitted is an inference. While the auditors are entitled to rely on inference, it is my view that the inference is not so strong that it justifies dismissal on an undeveloped record.

II.

The auditors claim that Count I, founded on accounting malpractice or negligence, fails because the trustee has not plead causation of a loss. This contention is based on one aspect of the Sentinel Trustee's allegations that the three men who ran Sentinel and owned a good deal of it performed various improper acts and, for that reason, knew of these acts. Because they knew of them, they could not have relied on anything the auditors told them. Whatever it was the auditors missed or concealed from them could not have caused a loss.

The Trustee, though, says the auditors caused the loss because they failed to tell regulators, as required by law, about improper conduct, which according to the complaint "would have resulted in either the regulators shutting down Sentinel, the withdrawal of money by Sentinel's customers, or Sentinel otherwise adjusting its business practices and rectifying its

deficiencies." The Trustee suggests in its brief that Sentinel's loans "would have been unwound."

There are two problems that inhere in Plaintiff's loss causation theory. First, the Trustee does not allege how any of the actions that would occur as a result of the auditors' reporting to regulators might actually prevent the loss or reduce the loss. It is possible that, had the auditors done what the Trustee demands, the loss would have been as large and, depending on economic conditions, even larger. The second, and far more important problem, is that there is nothing to support the contention that the auditors owed a duty to Sentinel to report to the regulators. It is Sentinel's rights that the trustee is authorized to enforce here. Nothing in the excerpts of the engagement letter that appear in the complaint creates an obligation *on the part of Sentinel's auditors* to report Sentinel's fraud to regulators.

The Trustee says that "[c]ourts routinely uphold causation theories based on auditors' failure to report violations to regulators or management . . . ." But the Trustee cites appellate authorities that do not address the issue in the context of a trustee's attempt to fix liability solely on the duty of an auditor to report to regulators. In conventional cases, loss causation is addressed where auditors are excused from liability because the trustee (as here) could not say the company had not known of its own actions. *See, e.g., Fehribach v. Ernst & Young,* 493 F.3d 905 (7th Cir. 2007).

Count 1 of the complaint for negligence and malpractice is dismissed with leave to replead to allege Sentinel's right to establish its claim on a violation of a duty owed to entities other than Sentinel or the auditors' contractual duty to Sentinel to report its findings to regulators.

III.

The auditors move to strike an allegation of damages in the amount of $550 million dollars. The practice of claiming astronomical damages in recent years is spurred by two circumstances. Financial and natural disasters create astronomical damages and, even where they don't, a very large demand is "intimidating, because of its size." *Maxwell v. KPMG LLP*, 520 F.3d 713 (7th Cir. 2008) (Posner, J.). Moreover, a commercial entity may find it more expensive to obtain loans, insurance, or credit from vendors who fear that an outsized threat of damages makes the entity too dangerous to deal with on conventional terms.[9]

In this case, the damage claim is not as egregious as the one in Judge Posner's case, but it is, in light of the allegations, without adequate support. Sentinel itself did not lose (and was apparently never worth) the half-billion dollars claimed. The Trustee supports the damage as a measure of the losses suffered by creditors, and the Trustee can sue on behalf of all the debtor's creditors. The extent to which he may do so in the specific setting here – customer investment losses – is at issue, but I do not decide the question now. The motion to strike can be resolved on simpler grounds.

The allegations in the complaint do not support the proposition that the auditors are liable, or could even be liable, for the full loss to creditors. The business plan which brought

---

[9] Some jurisdictions bar specific damage claims. In Illinois, "[i]t has long been the law . . . that where a contract has a sum annexed by way of penalty or damages to secure its performance, equity may decree a specific performance; but where a contract provides for one of two things in the alternative, as where a party may perform the contractual acts or pay a designated sum of money in lieu of such performance, equity will not declare a specific performance of the contractual acts." *Coney v. Commercial Nat. Realty Co.*, 410 N.E.2d 1181, 1182 (Ill. App. Ct. 1980).

Sentinel to ruin began in 2003. It was thinly capitalized and highly leveraged. The auditors did not work on the account until 2006. Complaints are judged on plausibility. *See Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1974 (2007). This damage claim is not plausible; it is stricken with leave given to replead.

IV.

In the likely event that loss causation is replead, I direct the parties to submit a plan for discovery in this case. The two threshold issues of *in pari delicto* and loss causation seem to me to be particularly important and, accordingly, the course of discovery should be directed first to the material relevant to those issues. If Sentinel's trustee avoids a first stage defeat on those grounds, the parties can then embark on what is likely to be a more expensive and complex course of discovery. The parties should also take into account the degree to which evidence found or produced in the bankruptcy proceeding can shorten the period of discovery and reduce its expense. The parties are directed to offer a plan (or competing plans) for discovery within four weeks of the date of this opinion.

The motion to dismiss Count I on the grounds of inadequate allegation of loss causation is granted. The motion to strike the damage claim is granted. Plaintiff is granted leave to replead both Count I and the damage claim. In other respects, the motion to dismiss is denied.

ENTER:

_____
James B. Zagel
United States District Judge

DATE: September 26, 2008